No. 25-4172

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

*IN RE* META PLATFORMS, INC.,

*Petitioner.*

META PLATFORMS, INC.

*Petitioner-Defendant,*

v.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

JANE DOE I, JOHN DOE I, JOHN DOE II, JANE DOE II,

JANE DOE III, JOHN DOE III, JOHN DOE IV,

*Real-Parties-in-Interest-Plaintiffs.*

## PETITIONER'S MOTION FOR LEAVE TO FILE A CORRECTED PETITION FOR A WRIT OF MANDAMUS AND ADDENDUM (VOL. 1)

Andrew B. Clubok
Nicolas Luongo
LATHAM & WATKINS LLP
1270 Avenue of the Americas
New York, NY 10020

Melanie M. Blunschi
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Gary Feinerman
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
gary.feinerman@lw.com

Lauren R. Goldman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

*Counsel for Petitioner Meta Platforms, Inc.*

August 13, 2025

Pursuant to Rule 27(a) of the Federal Rules of Appellate Procedure and Circuit Rule 27-1, Petitioner Meta Platforms, Inc. ("Meta") moves to file corrected versions of its Petition for Writ of Mandamus and Volume 1 of the accompanying Addendum. The undersigned recently learned that a citation to Dkt. 1006-5 ¶¶ 3-4 on page 5, line 9 of the Petition was mistakenly cited as "*Id.* ¶¶ 3-4"—and that Dkt. 1006-5 was inadvertently omitted from Volume 1 of the Addendum as a result. The proposed corrected Petition is attached as Exhibit 1. The proposed corrected Volume 1 of the Addendum is attached as Exhibit 2. The changes are non-substantive, and instead merely correct a typographical error in the Petition and ensure that Volume 1 of the Addendum contains the relevant cited material.

Accordingly, Meta respectfully requests that this motion to file corrected versions of the Petition and Volume 1 of the Addendum be granted, and that the attached corrected versions be submitted for filing and be deemed timely filed.

Dated:   August 13, 2025

Respectfully submitted,

*/s/ Gary Feinerman*

Andrew B. Clubok
Nicolas Luongo
LATHAM & WATKINS LLP
1270 Avenue of the Americas
New York, NY 10020

Melanie M. Blunschi
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Gary Feinerman
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
gary.feinerman@lw.com

Lauren R. Goldman
Darcy C. Harris
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

Elizabeth K. McCloskey
Abigail A. Barrera
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111

*Counsel for Petitioner Meta Platforms, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 25-4172

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Honorable William H. Orrick
United States District Court for the
Northern District of California
Courtroom 2
450 Golden Gate Ave
San Francisco, CA 94102

**Description of Document(s)** *(required for all documents)*:

PETITIONER'S MOTION FOR LEAVE TO FILE A CORRECTED PETITION FOR A WRIT OF MANDAMUS AND ADDENDUM (VOL. 1)

**Signature** | s/Gary Feinerman | **Date** | 8/13/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 15** | *Rev. 12/01/2018*

# Exhibit 1

No. 25-4172

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*IN RE* META PLATFORMS, INC.,

*Petitioner.*

META PLATFORMS, INC.

*Petitioner-Defendant,*

v.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

JANE DOE I, JOHN DOE I, JOHN DOE II, JANE DOE II,

JANE DOE III, JOHN DOE III, JOHN DOE IV,

*Real-Parties-in-Interest-Plaintiffs.*

## CORRECTED PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

Andrew B. Clubok
Nicolas Luongo
LATHAM & WATKINS LLP
1270 Avenue of the Americas
New York, NY 10020

Melanie M. Blunschi
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Gary Feinerman
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
gary.feinerman@lw.com

Lauren R. Goldman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

*Counsel for Petitioner Meta Platforms, Inc.*

August 13, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner Meta Platforms, Inc. certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*/s/ Gary Feinerman*
Gary Feinerman
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
gary.feinerman@lw.com

*Counsel for Petitioner Meta Platforms, Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS................................................................ ii

PRELIMINARY STATEMENT ........................................................1

RELIEF SOUGHT ........................................................3

ISSUE PRESENTED ........................................................3

FACTUAL AND PROCEDURAL BACKGROUND ...............................................3

REASONS FOR GRANTING THE WRIT.......................................................11

I.     THIS COURT SHOULD GRANT MANDAMUS TO RESOLVE AN ENTRENCHED SPLIT IN THE LOWER COURTS...................................13

     A.     District Courts Are Deeply Divided On How To Apply The Apex Doctrine ........................................................ 13

     B.     Mandamus Is Needed To Resolve The Split.......................................16

II.     THE DECISION BELOW IS CLEARLY ERRONEOUS AS A MATTER OF LAW AND SHOULD BE CORRECTED...........................18

     A.     Possessing Final Decisionmaking Authority Cannot Itself Overcome The Apex Doctrine ........................................................ 19

     B.     This Case Exemplifies The Flawed, Tautological Reasoning That Has Taken Hold In Some District Courts ..................................21

III.     THERE ARE NO OTHER ADEQUATE MEANS OF RELIEF .................24

CONCLUSION ........................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Anderson v. Cnty. of Contra Costa*,
  2017 WL 930315 (N.D. Cal. Mar. 9, 2017) ......................................................16

*Barnes v. Sea Hawaii Rafting, LLC*,
  889 F.3d 517 (9th Cir. 2018) .......................................................................12, 18

*Bauman v. U.S. Dist. Ct.*,
  557 F.2d 650 (9th Cir. 1977) .......................................................................11, 21

*Beeman v. Protective Life Corp.*,
  2020 WL 13656058 (N.D. Ala. May 28, 2020) ............................................9, 19

*Celerity, Inc. v. Ultra Clean Holding, Inc.*,
  2007 WL 205067 (N.D. Cal. Jan. 25, 2007)........................................6, 19, 20, 23

*City of Las Vegas v. Foley*,
  747 F.2d 1294 (9th Cir. 1984) .............................................................................17

*Credit Suisse v. U.S. Dist. Ct.*,
  130 F.3d 1342 (9th Cir. 1997) .............................................................................12

*Doble v. Mega Life & Health Ins.*,
  2010 WL 1998904 (N.D. Cal. May 18, 2010)......................................................14

*Drake v. Steak N Shake Ops., Inc.*,
  2018 WL 3625769 (E.D. Mo. July 30, 2018)......................................................20

*Finisar Corp. v. Nistica, Inc.*,
  2015 WL 3988132 (N.D. Cal. June 30, 2015)...................................................1, 6

*Frasco v. Flo Health Inc.*,
  No. 21-cv-00757 (N.D. Cal. Feb. 8, 2023), Dkt. 269 ........................................16

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
  22 F.4th 1125 (9th Cir. 2022) .............................................................................16

*In re Kirkland*,
  75 F.4th 1030 (9th Cir. 2023) ...............................................................13, 17, 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 WL 10967617 (N.D. Cal. Aug. 1, 2011) ...........................................2, 9, 19

*In re U.S. Dep't of Educ.*,
25 F.4th 692 (9th Cir. 2022) ....................................................3, 18, 25

*In re Williams-Sonoma, Inc.*,
947 F.3d 535 (9th Cir. 2020) ........................................................24, 25

*Kadrey v. Meta Platforms, Inc.*,
2024 WL 4293910 (N.D. Cal. Sept. 24, 2024)....................................15

*LA Terminals, Inc. v. United Nat'l Ins.*,
2022 WL 1637206 (C.D. Cal. Jan. 28, 2022)......................................14

*LocusPoint Networks, LLC v. D.T.V. LLC*,
2015 WL 5043261 (N.D. Cal. Aug. 26, 2015) ....................................20

*Metabyte, Inc. v. Meta Platforms, Inc.*,
2025 WL 799040 (N.D. Cal. Mar. 13, 2025) ......................................15

*Naylor Farms, Inc. v. Anadarko OGC Co.*,
2011 WL 2535067 (D. Colo. June 27, 2011) ......................................21

*Newmark Realty Cap., Inc. v. BGC Partners, Inc.*,
2018 U.S. Dist. LEXIS 17786 (N.D. Cal. Feb. 1, 2018) ............... 14, 19

*Patagonia, Inc. v. Anheuser Busch, LLC*,
2020 WL 12048987 (C.D. Cal. Nov. 23, 2020) ..................................13

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ............................................13, 16, 17

*River City Testing v. Cohen*,
2021 WL 4805443 (C.D. Cal. July 8, 2021)...................................14, 22

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.*,
187 F.3d 1096 (9th Cir. 1999) ..........................................................18

*Schneider v. Chipotle Mexican Grill, Inc.*,
2017 WL 4127992 (N.D. Cal. Sept. 19, 2017)....................................15

*SG Cowen Sec. Corp. v. U.S. Dist. Ct.*,
   189 F.3d 909 (9th Cir. 1999) ................................................................16, 17, 25

*Total Recall Techs. v. Lucky*,
   No. 15-cv-02281 (N.D. Cal. Sept. 22, 2020), Dkt. 292 .....................................15

*United States v. Fei Ye*,
   436 F.3d 1117 (9th Cir. 2006) ......................................................................17, 25

*United States v. Harper*,
   729 F.2d 1216 (9th Cir. 1984) ..............................................................................12

*ZeniMax Media, Inc. v. Oculus VR, LLC*,
   2015 WL 13949662 (N.D. Tex. Dec. 7, 2015)...................................................15

## STATUTES

28 U.S.C.
   § 1291.....................................................................................................................16
   § 1292(a)(1) ...........................................................................................................17
   § 1292(b) ...............................................................................................................16
   § 1651.....................................................................................................................11

## RULES

Fed. R. Civ. P.
   30(b)(6) .........................................................................................................6, 10, 24
   54(b) ......................................................................................................................17
   72(a) ........................................................................................................................9

## TREATISES

16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure
   § 3935.3 (2d ed. 2009) .........................................................................................17

## PRELIMINARY STATEMENT

This petition for a writ of mandamus implicates a critically important question of first impression in this Court: how to properly apply the "apex doctrine" in deciding whether to permit depositions of high-level business executives. District courts in this Circuit are deeply divided on the issue, which will evade appellate review unless this Court intervenes on mandamus.

The governing standard itself is familiar. To guard against "abuse," the apex doctrine bars depositions of high-level business executives, unless (1) they possess "unique firsthand, non-repetitive knowledge" of relevant facts and (2) "less intrusive discovery methods" have been exhausted without success. *Finisar Corp. v. Nistica, Inc.*, 2015 WL 3988132, *1 (N.D. Cal. June 30, 2015). But how to apply the doctrine properly is unsettled, as district courts disagree about whether an executive's status as a final decisionmaker on pertinent company policies or actions itself justifies an apex deposition.

In this case, the District Court (DeMarchi, M.J., and Orrick, D.J.) held that the chairman and CEO of Meta Platforms Inc., Mark Zuckerberg, must sit for a deposition "by virtue of his role" as "a decision maker regarding certain privacy-related matters at issue." Dkt. 967 at 3; *see also* Dkts. 1025, 1049, 1082.[1]

---

[1] References to "Dkt." refer to docket numbers in the District Court. *In Re Meta Pixel Healthcare Litigation*, No. 22-cv-03580 (N.D. Cal.).

Several more district courts have relied on similar logic to reach the same conclusion, including as to Mr. Zuckerberg himself. *See infra* at 13-15. But other district courts in this Circuit—some in cases also involving Mr. Zuckerberg—have explicitly and correctly rejected this reasoning as tautological, since *any* apex executive, by definition, is a final decisionmaker. *See id.*

Under the reasoning adopted by the District Court here, the very status that triggers the apex doctrine in the first place—being a high-level executive who exercises final decisionmaking authority—itself overcomes the doctrine's protections. That reasoning "eviscerate[s] the apex doctrine" and leaves executives like Mr. Zuckerberg exposed to abuse and harassment in nearly every case brought against their companies. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 10967617, at *2 (N.D. Cal. Aug. 1, 2011). That is an intolerable result. Large enterprises face scores of lawsuits at any given juncture, and their leaders have uniquely crucial and demanding job duties, as well as limited time. The apex doctrine shields them from the burdens of litigation in all but the most compelling circumstances. It is up to this Court to restore the doctrine's vital protections.

Absent mandamus, the proper scope of the apex doctrine will not be addressed at the appellate level. Because discovery-related matters are unreviewable on direct appeal after final judgment—or even on interlocutory appeal—this Court routinely grants mandamus to consider such issues, especially those that have divided district

2

courts. In fact, the Court recently granted mandamus to enforce analogous protections against unwarranted depositions of high-level government officials. *See In re U.S. Dep't of Educ.*, 25 F.4th 692, 703 (9th Cir. 2022). The Court should now do the same for high-level business executives. Meta has no other adequate means of relief, and Mr. Zuckerberg's deposition is plainly unwarranted under the circumstances of this case.

## RELIEF SOUGHT

Petitioner Meta Platforms, Inc. respectfully requests that this Court issue a writ of mandamus directing the District Court to vacate the Magistrate Judge's March 14, 2025 and May 15, 2025 orders (Dkts. 967, 1025) compelling Mr. Zuckerberg to sit for a deposition, along with the District Judge's June 3, 2025 and June 24, 2025 orders (Dkts. 1049, 1082) denying relief from those decisions.

## ISSUE PRESENTED

Whether the apex doctrine permits the deposition of a high-level corporate executive on the theory that, as a final decisionmaker, the executive is the only person who can testify to the decisionmaking process on allegedly relevant company policies or actions.

## FACTUAL AND PROCEDURAL BACKGROUND

1. This lawsuit concerns allegations involving the Meta Pixel, which is one version of an internet analytics tool used by numerous companies. Pixel-based tools are a ubiquitous technology that helps website developers across industries measure

3

certain actions taken by users on their websites, such as viewing pages or purchasing products, and then use that information to grow their businesses and improve online user experiences.  The Meta Pixel is publicly available, and website developers can freely customize and install it to help them improve the online services they offer. Dkt. 335 ¶¶ 49-55.

Plaintiffs allege that certain healthcare providers misused the Meta Pixel—in violation of Meta's terms and policies—to send sensitive health-related information to Meta.  *Id.* ¶ 8.  Based on that allegation, Plaintiffs accuse Meta of obtaining this information without their consent and bring claims for breach of contract, privacy torts, and violations of California privacy statutes.  *Id.* ¶¶ 368-547.  Most of these claims require proof that "Meta intentionally intercepted" Plaintiffs' health-related information.  *Id.* ¶¶ 417, 429, 433, 440, 447-448, 458, 484.  Mr. Zuckerberg is not a defendant, and his personal state of mind is not an element of any of Plaintiffs' claims against Meta.

Nevertheless, Plaintiffs have sought to depose Mr. Zuckerberg from the start—before deposing a single other witness.  Dkt. 994-4 ¶ 4.  On November 15, 2024, Plaintiffs served their initial list of "witnesses they wish[ed] to depose," which "included [Mr.] Zuckerberg, but did not include Meta executives" closer to the relevant facts.  *Id.*  For example, Plaintiffs did not seek to depose Meta Chief Privacy and Compliance Officer for Product Michel Protti—even though he oversees a team

4

that prepares quarterly reports on "well over a thousand privacy decisions made by other Meta personnel" and, like Mr. Zuckerberg, must certify Meta's compliance with an FTC consent order related to the company's data-sharing practices. Dkt. 1006-6 ¶ 7. Nor did Plaintiffs' initial list include Meta Vice President and Deputy Chief Privacy Officer of Policy Rob Sherman—even though he has "substantial firsthand knowledge regarding Meta's privacy decisions relevant to this litigation, including its efforts to prevent receipt of potentially sensitive data" and "proposals to change [its] behavioral advertising control from an opt-out to an opt-in." Dkt. 1006-5 ¶¶ 3-4. Plaintiffs' initial list also did not include Meta Vice President of Product Management Fred Leach—even though he is personally "responsible for all of Meta's Business Tools (including the Pixel)," Dkt. 994-4 ¶ 17—or numerous other Meta personnel with relevant knowledge.[2]

In contrast to Mr. Protti, Mr. Sherman, Mr. Leach, and other Meta personnel, Mr. Zuckerberg is not involved in "the day-to-day operations" of Meta's large privacy apparatus, given his roles as CEO and chairman. Dkt. 1006-6 ¶ 5. Perhaps for that reason, none of Plaintiffs' "313 requests for production" or their "dozens of requests for admission and interrogatories" made "any inquiries regarding

---

[2] To name just a few, Plaintiffs did not seek testimony from Mary Ku, Andrew Bocking, Sammi Krug, Ning Li, Greg Marra, McKenzie Thomas, Meera Krishna, David Sasaki, Sam Mincer, Amee Kamdar, or Chinmay Karande. Dkt. 994-4 ¶ 17; Dkt. 993-3 at 1; *see also* Dkt. 1070-2.

Mr. Zuckerberg's involvement" in relevant events. Dkt. 1006-4 ¶ 7. Nor did their "Rule 30(b)(6) deposition notices," which "identif[ied] 43 topics and more than 130 sub-topics" purportedly relevant to Plaintiffs' claims. Dkt. 994-4 ¶ 5.

Meta opposed Plaintiffs' request to depose Mr. Zuckerberg, relying on the "apex doctrine." Dkt. 921-2 at 4-7. Because "deposition notices directed at an official at the highest level or 'apex' of corporate management" pose "a tremendous potential for abuse," the doctrine bars depositions of such officials unless there is a compelling need for their testimony. *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007). Deposing an apex executive is "improper" when *either* (1) "a high-level decision maker 'removed from the daily subjects of the litigation' has no unique personal knowledge of the facts at issue" *or* (2) "the information sought in the deposition can be obtained through less intrusive discovery methods," such as "depositions of lower-level employees with more direct knowledge of the facts at issue." *Id.*

As Meta explained before the Magistrate Judge, Plaintiffs' request failed twice over. Dkt. 921-2 at 4-7. On the first prong, Mr. Zuckerberg lacked "unique firsthand, non-repetitive knowledge" of relevant facts. *Finisar*, 2015 WL 3988132, at *1. And on the second, "less intrusive discovery methods" were readily available but had not been "exhausted" without success. *Id.*

2. On April 10, 2025, the Magistrate Judge denied Meta's request for relief. Dkt. 967 at 4. The Magistrate Judge acknowledged the "potential for abuse or harassment with respect to Mr. Zuckerberg's deposition," given "the manner in which discovery has been conducted in this case." *Id.* Yet the Magistrate Judge ordered the deposition to proceed on the ground that "Mr. Zuckerberg is likely to have at least some unique first-hand knowledge of facts relevant" to Plaintiffs' claims "by virtue of his role" as "a decision maker regarding certain privacy-related matters at issue." *Id.* at 3. In particular, the Magistrate Judge observed that the FTC consent order requires that Mr. Zuckerberg "be *informed* of consequential privacy decisions" and that "he *certify* on a quarterly basis" that Meta has complied with its directives. *Id.* The Magistrate Judge also pointed to "a proposal [that] was presented to Mr. Zuckerberg in 2021 to move certain third-party data to 'a consent-only model' (i.e. opt-in rather than opt-out)." *Id.* Information about his own decisionmaking process on these and other matters, the Magistrate Judge stated, cannot be "obtained from other witnesses and/or through other less intrusive means." *Id.* at 4. So in the Magistrate Judge's view, the apex doctrine did not bar Mr. Zuckerberg's deposition, which she ordered to last a maximum of "three hours" and be "directed to facts known to him by virtue of his role pursuant to the FTC Consent Order and as a decision maker regarding privacy-related matters relevant to this case." *Id.*

Meta sought reconsideration based on "new facts" that emerged after the Magistrate Judge ruled: two "senior Meta executives"—Mr. Sherman and Mr. Leach—were "set to be deposed" and would "be able to provide more detailed testimony than Mr. Zuckerberg about relevant privacy-related issues." Dkt. 1006-3 at 4. Mr. Sherman was scheduled to testify as a fact witness, while Mr. Leach was slated to "testify as both a fact witness and as Meta's 30(b)(6) witness on topics pertaining to privacy controls and user consent," *id.* at 2, as he is personally "responsible for all of Meta's Business Tools (including the Pixel)." Dkt. 994-4 ¶ 17.

On May 15, 2025, the Magistrate Judge denied relief, while again recognizing that "Mr. Zuckerberg's deposition presents an opportunity for abuse or harassment." Dkt. 1025 at 5. The Magistrate Judge reasoned that while Mr. Sherman and Mr. Leach "may be knowledgeable about many relevant privacy-related topics," neither "purports to be the final decision maker regarding the specific matters plaintiffs identify"—i.e., the 2021 opt-in proposal. *Id.* at 3. Accordingly, the Magistrate Judge continued, "it is difficult to understand how another executive or employee could testify about how Mr. Zuckerberg arrived at the decisions attributed to him, which factors he considered, or why he decided as he did, without engaging in speculation." *Id.* at 3-4. The notion that such information "should instead be obtained from other witnesses," the Magistrate Judge concluded, "is simply not persuasive." *Id.* at 4.

3. Meta then asked the District Court for relief from the Magistrate Judge's orders. Dkt. 1035-3; *see* Fed. R. Civ. P. 72(a). Meta argued that, by relying on Mr. Zuckerberg's status as a final decisionmaker, the logic of those orders means that "chief executives always have unique, first-hand knowledge about their own thought processes, such that they must testify 'in virtually every lawsuit'" against their companies. Dkt. 1035-3 at 3 (quoting *Beeman v. Protective Life Corp.*, 2020 WL 13656058, at *5 (N.D. Ala. May 28, 2020)). That reasoning, Meta emphasized, "eviscerate[s] the apex doctrine." *Id.* (quoting *TFT-LCD.*, 2011 WL 10967617, at *2). On June 3, 2025, the District Court issued a brief order denying relief, which "agree[d] with and adopt[ed]" the Magistrate Judge's "analysis and reasoning in its entirety." Dkt. 1049 at 1.

The next day, Plaintiffs canceled Mr. Sherman's deposition. Dkt. 1070-1 ¶ 5. They made that decision in the immediate wake of receiving new documents confirming that Mr. Sherman, along with Mr. Zuckerberg and eighteen other Meta personnel, received internal recommendations and analysis on the "opt-in" proposal. *Id.* ¶¶ 3-4; *see* Dkt. 1070-2. In lieu of Mr. Sherman—or anyone else included in Meta's discussion of the "opt-in" proposal, such as Mr. Protti—Plaintiffs demanded to depose a former Director of Product Management who left Meta in 2023, did not specialize in privacy issues, and was not among the numerous Meta personnel

9

involved in the "opt-in" proposal on which the Magistrate Judge relied. Dkt. 1070-1 ¶ 7.

Then, on June 16, 2025, Plaintiffs took Mr. Leach's deposition. Even though Mr. Leach is responsible for the Meta Pixel and related business tools, and even though he spent roughly 30 hours preparing for the Rule 30(b)(6) deposition—including by speaking with Mr. Sherman and other Meta personnel about privacy policies, user consent, and other issues related to this case—Plaintiffs did not ask Mr. Leach a single question about the "opt-in" proposal. *Id.* ¶¶ 9-10.

Two days later, Meta asked the District Court for leave to seek reconsideration in light of these new developments. Dkt. 1070. Meta argued that, by "canceling Mr. Sherman's deposition and choosing not to ask Mr. Leach any pertinent questions about the 'opt-in' proposal," Plaintiffs "have studiously avoided learning new facts about that proposal—or anything else that might undermine their purported need for Mr. Zuckerberg's testimony." *Id.* at 2-3. Plaintiffs' tactics also effectively "admit[ted] that, all along, [Plaintiffs] were overstating their purported need for testimony from Mr. Zuckerberg." *Id.* at 4. So, as Meta argued, Plaintiffs' head-in-the-sand approach confirmed that demanding "Mr. Zuckerberg's testimony is—and always has been—a tactic to increase the burdens on Meta, not to help prove [P]laintiffs' claims on the merits." *Id.*

On June 24, 2025, the District Court issued a three-sentence order denying Meta's request, reasoning that if Plaintiffs are "'studiously avoiding' securing information critical to their case so that they can proceed with [Mr. Zuckerberg's deposition], that is a risk they will bear." Dkt. 1082 at 1. All told, Plaintiffs have deposed just one fact witness (Privacy Program Manager Jenny Lin) who held a role within Meta's Privacy group during the relevant period. Dkt. 1070-1 ¶ 9. They did not ask Ms. Lin a single question about "the Consent Order, the opt-in proposal, or Mr. Zuckerberg's potential awareness of or involvement in decision-making regarding privacy matters." Dkt. 1006-4 ¶ 5.

## REASONS FOR GRANTING THE WRIT

This case calls for mandamus relief. In determining whether to issue a writ of mandamus pursuant to the All Writs Act, *see* 28 U.S.C. § 1651, this Court looks to five general "guidelines." *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654-55 (9th Cir. 1977). Three of those guidelines focus on the merits of the challenged order—whether it "is clearly erroneous as a matter of law," constitutes "an oft repeated error, or manifests a persistent disregard of the federal rules," or "raises new and important problems, or issues of first impression." *Id.* The other two guidelines assess whether the party seeking mandamus relief "has no other adequate means" to obtain relief or will otherwise "be damaged or prejudiced in any way not correctable on appeal." *Id.* at 654.

11

Although informative, these five guidelines "are not exhaustive, and need not all be met in order to grant mandamus relief." *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 535 (9th Cir. 2018) (citations and quotation marks omitted). Indeed, "rarely will a case arise where all these guidelines point in the same direction or where each guideline is even relevant or applicable." *Credit Suisse v. U.S. Dist. Ct.*, 130 F.3d 1342, 1345 (9th Cir. 1997); *accord United States v. Harper*, 729 F.2d 1216, 1222 (9th Cir. 1984). And when a case presents an "issue of first impression," mandamus may issue when the challenged order evinces merely "ordinary (as opposed to clear) error." *Barnes*, 889 F.3d at 537.

Here, these considerations cut sharply in favor of mandamus. District courts in this Circuit are deeply divided on whether a high-level executive's status as a final decisionmaker overcomes the apex doctrine's protections, and there is no practical way for this Court to resolve the split absent mandamus relief. The rule adopted by the District Court here is also plainly incorrect. Because apex executives are, by definition, final decisionmakers, justifying their depositions based on their decisionmaking power would destroy the apex doctrine's vital protections. Unless this Court intervenes, Mr. Zuckerberg's unwarranted deposition will proceed and the irremediable damage will be done.

12

## I. THIS COURT SHOULD GRANT MANDAMUS TO RESOLVE AN ENTRENCHED SPLIT IN THE LOWER COURTS

Whether an apex deposition may be justified based on a high-level executive's status as a final decisionmaker has created "substantial uncertainty and confusion in the district courts" that calls for this Court's intervention on mandamus. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1157 (9th Cir. 2010). The issue is a "'particularly important question[] of first impression' regarding discovery" that will otherwise "elude appellate review." *In re Kirkland,* 75 F.4th 1030, 1041 (9th Cir. 2023) (quoting *Perry*, 591 F.3d at 1157).

### A. District Courts Are Deeply Divided On How To Apply The Apex Doctrine

District courts in this Circuit are deeply divided as to whether a high-level executive's status as a final decisionmaker on relevant company policies or actions itself justifies an apex deposition. The District Court's decision in this case deepens this entrenched split.

1. On one side of the split, several courts—including the District Court here—have ordered apex depositions on the theory that "only" final decisionmakers themselves "can testify about what [they were] thinking, knew or understood" when making relevant decisions. *Patagonia, Inc. v. Anheuser Busch, LLC*, 2020 WL 12048987, at *3 (C.D. Cal. Nov. 23, 2020). According to these courts, that satisfies both prongs of the apex doctrine. For the first prong, the argument goes, a final

13

decisionmaker necessarily "possesses unique, first-hand, non-repetitive knowledge" because he "alone knows what he personally focuse[d] on" while making a decision, "the weight he g[ave] to particular kinds of information," and "how he use[d] … reports" provided by other company personnel. *LA Terminals, Inc. v. United Nat'l Ins.*, 2022 WL 1637206, at *6 (C.D. Cal. Jan. 28, 2022). For the second prong, these courts hold that "less intrusive means" of discovery are unavailable because supposedly no one else can "testify about how [an apex executive] arrived at the decisions attributed to him, which factors he considered, or why he decided as he did, without engaging in speculation." Dkt. 1025 at 3-4; *see* Dkt. 1049 at 1 (adopting Magistrate Judge's "analysis and reasoning in its entirety").

On the other side of the split, many district courts have reached the opposite conclusion. Those courts hold that merely asserting that a final decisionmaker is "the *only* person who can testify about why" they made a certain decision is insufficient to justify an apex deposition. *Doble v. Mega Life & Health Ins.*, 2010 WL 1998904, at *3 (N.D. Cal. May 18, 2010). After all, "the same could be said for any 'apex' deponent." *Newmark Realty Cap., Inc. v. BGC Partners, Inc.*, 2018 U.S. Dist. LEXIS 17786, at *4-5 (N.D. Cal. Feb. 1, 2018). Courts in this camp also reject the notion that other witnesses cannot "testify about the official decisions" made by the "final decision maker" at a company, including as to the apex executive's personal "state of mind." *River City Testing v. Cohen*, 2021 WL 4805443, at *3

14

(C.D. Cal. July 8, 2021); *see also Schneider v. Chipotle Mexican Grill, Inc.*, 2017 WL 4127992, at *3 (N.D. Cal. Sept. 19, 2017).

2.  This split of authority has come to the fore in cases involving efforts to depose Mr. Zuckerberg himself.  In this case, the District Court deemed the apex doctrine overcome "by virtue of [Mr. Zuckerberg's] role" as "a decision maker regarding certain privacy-related matters at issue."  Dkt. 967 at 3; *see supra* at 7-8. Two other district courts—including one in this Circuit—have reached the same conclusion for similar reasons.  *See Kadrey v. Meta Platforms, Inc.*, 2024 WL 4293910, at *1 (N.D. Cal. Sept. 24, 2024) (holding that Mr. Zuckerberg's status as "the principal decision maker concerning Meta's decision to open source the language model" was enough to "justif[y] an apex deposition"); *ZeniMax Media, Inc. v. Oculus VR, LLC*, 2015 WL 13949662, at *1 (N.D. Tex. Dec. 7, 2015) (holding that "no one else" but Mr. Zuckerberg "is in a better position to testify about [his] personal decision-making" about a business acquisition).

By contrast, other district courts have rejected deposition demands premised on an asserted need for "investigation of Mr. Zuckerberg's state of mind" regarding "his decision[s]," describing those demands as "speculative," "unsubstantiated," and "unpersuasive."  *Metabyte, Inc. v. Meta Platforms, Inc.*, 2025 WL 799040, at *1 (N.D. Cal. Mar. 13, 2025); *see also* Order on Discovery Dispute Regarding Deposition, *Total Recall Techs. v. Lucky*, No. 15-cv-02281 (N.D. Cal. Sept. 22,

15

2020), Dkt. 292 (rejecting attempt to depose Mr. Zuckerberg). In fact, another district court summarily rejected an attempt to depose Mr. Zuckerberg in a case involving allegations about the Meta Pixel that are materially similar to those in this case. *See* Order, *Frasco v. Flo Health Inc.*, No. 21-cv-00757 (N.D. Cal. Feb. 8, 2023), Dkt. 269. The split on this critically important issue could not be clearer.[3]

## B. Mandamus Is Needed To Resolve The Split

Given the entrenched split in the district courts, this Court's guidance on how to apply the apex doctrine is urgently needed. Absent mandamus, this "novel and important question" will "repeatedly evade review because of the collateral nature" of "discovery ruling[s]." *Perry*, 591 F.3d at 1159.

Parties hoping to challenge adverse decisions applying the apex doctrine lack the ordinary avenues for appellate review. "They may not directly appeal" because such "discovery orders are not final, appealable orders under 28 U.S.C. § 1291." *SG Cowen Sec. Corp. v. U.S. Dist. Ct.*, 189 F.3d 909, 913 (9th Cir. 1999). Interlocutory appeals under 28 U.S.C. § 1292(b) are also off the table, as discovery orders like these do not decide "controlling" merits issues and review of such orders do not "materially advance the ultimate termination of the litigation." *ICTSI Oregon,*

---

[3] District courts are divided even on the threshold question of which party bears the burden of proving (or disproving) the need for an apex deposition. *See Anderson v. Cnty. of Contra Costa*, 2017 WL 930315, at *3 (N.D. Cal. Mar. 9, 2017) (collecting cases); Dkt. 967 at 1 (improperly putting the burden on Meta). This additional confusion further confirms the need for this Court's intervention.

*Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1130 (9th Cir. 2022). "Neither does Federal Rule of Procedure 54(b) apply," since it "applies [only] to situations in which final judgment is entered as to some but not all claims or parties." *SG Cowen*, 189 F.3d at 913. And an appeal is similarly "not allowed under 28 U.S.C. § 1292(a)(1)" because discovery orders "do[] not grant or deny an injunction." *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984).

For these reasons, this Court routinely issues mandamus relief on discovery matters, particularly when—as here—the matter presents "a novel issue" that "has divided district courts" and "is likely to have significant continued relevance." *In re Kirkland*, 75 F.4th at 1036; *accord Perry*, 591 F.3d at 1156-57 (citing 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3935.3 (2d ed. 2009)). For example, this Court has relied on mandamus to rein in "the scope of [a bankruptcy] court's subpoena power," *Kirkland*, 75 F.4th at 1036, enforce rules "govern[ing] the taking of depositions in criminal cases," *United States v. Fei Ye*, 436 F.3d 1117, 1123 (9th Cir. 2006), and "define the scope" of "important privilege[s]," such as "the attorney-client privilege" and "the First Amendment privilege against compelled disclosure of internal campaign communications," *Perry*, 591 F.3d at 1157.

Of particular relevance here, this Court has issued mandamus relief to address directly analogous restrictions on deposing high-level *government* officials, given the significant dangers of "distracting cabinet secretaries from their essential duties

with an inundation of compulsory, unnecessary depositions." *U.S. Dep't of Educ.*, 25 F.4th at 703. This Court should exercise its mandamus authority to provide much-needed guidance on the apex doctrine's related protections for high-level business executives. The disarray in the lower courts is unsustainable, and clarity on this important subject is needed.

## II. THE DECISION BELOW IS CLEARLY ERRONEOUS AS A MATTER OF LAW AND SHOULD BE CORRECTED

Because proper application of the apex doctrine "raises an important issue of first impression" in this Court and "has divided district courts in this circuit," Meta "need show only ordinary (as opposed to clear) error" to obtain mandamus relief. *Barnes*, 889 F.3d at 537 (quoting *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1100 (9th Cir. 1999)). But "the difference between clear error and ordinary error" ultimately does not matter here, as "mandamus relief is warranted under either standard." *Kirkland*, 75 F.4th at 1042. The District Court's order compelling Mr. Zuckerberg's deposition based on his status as a final decisionmaker is manifestly incorrect, as are the many decisions relying on the same flawed reasoning. This Court should intervene in this case to restore the apex doctrine's vital protections across this Circuit.

18

## A. Possessing Final Decisionmaking Authority Cannot Itself Overcome The Apex Doctrine

That a high-level business executive possesses final decisionmaking authority on relevant company policies or actions cannot itself justify an apex deposition. By definition, "*any* 'apex' deponent" qualifies as a final decisionmaker. *Newmark Realty*, 2018 U.S. Dist. LEXIS 17786, at *4-5 (emphasis added); *see also Celerity*, 2007 WL 205067, at *3 (equating apex executive with "high-level decision maker"). Permitting the deposition of an apex executive simply "because of his position" as an apex executive "would eviscerate the apex doctrine." *TFT-LCD*, 2011 WL 10967617, at *2. It makes no sense for the very status that triggers the apex doctrine in the first place to overcome the doctrine's crucial safeguards against abuse and harassment. This Court should reject such tautological reasoning.

It is also trivially easy to allege that an apex executive had the final say on a company policy or action relevant to a lawsuit against the company. All a plaintiff must do is point to something that arguably bears on their claims and assert that it crossed the executive's desk. This "kind of 'the-buck-stops-here' argument goes too far," as it would make apex executives "fair game to be deposed in virtually every lawsuit" against their companies. *Beeman*, 2020 WL 13656058, at *5.

Such reasoning is particularly misguided considering that many lawsuits against large companies do not require proof of an apex executive's personal state of mind. Rather, they generally turn on "corporate knowledge," about which

19

plaintiffs can readily "obtain discovery … without deposing" the CEO. *Drake v. Steak N Shake Ops., Inc.*, 2018 WL 3625769, at *3 (E.D. Mo. July 30, 2018). Such evidence might include a combination of documentary evidence, such as emails, memoranda, and other internal company documents; public statements by corporate representatives; testimony from other personnel; and of course the relevant company decision itself. Indeed, "circumstantial evidence" is a "principal … means of proving" corporate intent. *LocusPoint Networks, LLC v. D.T.V. LLC*, 2015 WL 5043261, at *16 (N.D. Cal. Aug. 26, 2015).

At any given time, large enterprises must defend themselves against scores of lawsuits across the country and even overseas, many of which are meritless. CEOs and other high-level executives have demanding and time-consuming duties, even before factoring in the burdens of litigation. They also cannot be in multiple places at once. These realities create the "tremendous potential for abuse" against which the apex doctrine is designed to guard. *Celerity*, 2007 WL 205067, at *3. Rigorous standards governing depositions of apex executives are thus crucial to ensuring that litigation burdens are commensurate with a case's actual needs, rather than exploited to gain perceived leverage.

The apex doctrine cannot be satisfied by incanting magic words like "final decisionmaker." Yet multiple district courts have defanged the apex doctrine by

20

doing exactly that. *See supra* at 13-15. This "oft-repeated error" cries out for correction from this Court. *Bauman*, 557 F.2d at 655.

### B. This Case Exemplifies The Flawed, Tautological Reasoning That Has Taken Hold In Some District Courts

This case is a textbook example of the tautological reasoning adopted by multiple district courts that improperly waters down the apex doctrine's stringent standards. By adopting the Magistrate Judge's "analysis and reasoning in its entirety," the District Court deemed the apex doctrine satisfied based on the mere fact that Mr. Zuckerberg, as Meta's CEO and chairman, is the final decisionmaker on privacy matters. Dkt. 1049 at 1. That circular analysis cannot stand. The evidence in this case demonstrates that neither prong of the apex doctrine is satisfied. This Court should end Plaintiffs' abusive campaign to depose Mr. Zuckerberg.

1. On the first prong, the District Court concluded that "Mr. Zuckerberg is likely to have" both "unique" and "first-hand" knowledge of relevant facts "by virtue of his role" as "a decision maker regarding certain privacy-related matters at issue." Dkt. 967 at 3. That is inaccurate. The record shows that any relevant knowledge Mr. Zuckerberg possesses is "coextensive" with information known to others. *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 2535067, at *3 (D. Colo. June 27, 2011).

For example, the Magistrate Judge relied on the FTC consent order requiring that Mr. Zuckerberg "be *informed* of consequential privacy decisions" and that "he

*certify* on a quarterly basis" that Meta has complied with its directives. Dkt. 967 at 3. But merely being informed of privacy-related decisions made by other people necessarily means that Mr. Zuckerberg's information is neither unique nor first-hand. And Mr. Protti must *also* certify Meta's compliance with the FTC consent order, yet Plaintiffs never sought to depose him. Dkt. 1006-6 ¶ 7.

In addition, the Magistrate Judge cited testimony about a proposal "presented to Mr. Zuckerberg in 2021 to move certain third-party data to 'a consent-only model' (i.e. opt-in rather than opt-out)." Dkt. 967 at 3. But the same testimony emphasized that decisions on such proposals were driven by "consensus" among Meta executives—not made solely by Mr. Zuckerberg. Dkt. 999-3 at 219:20-220:4, 221:24-222:7. And Mr. Zuckerberg relies on internal company reports, including for privacy-related matters, Dkt. 1006-6 ¶ 6, which are necessarily "second-hand information provided by other individuals," *River City*, 2021 WL 4805443, at *3. For the opt-in proposal in particular, Mr. Protti, Mr. Sherman, and at least seventeen other Meta personnel (aside from Mr. Zuckerberg) received the relevant internal analysis and recommendations. Dkts. 1070-1, 1070-2.

Given these facts, the Magistrate Judge acknowledged that other Meta personnel "may be knowledgeable" about the "privacy-related topics" in dispute. Dkt. 1025 at 3. The Magistrate Judge's sole basis for nonetheless deeming the first

22

prong met was that none of those personnel "purports to be the final decision maker." *Id.* That ipse dixit is not enough. This Court should not accept it.

2. The story is much the same for the second prong. The Magistrate Judge saw no less intrusive means of discovery because, in her view, information about "how Mr. Zuckerberg arrived at the decisions attributed to him"—i.e., the 2021 opt-in proposal—could not "be obtained from other witnesses." *Id.* at 3-4. But, again, numerous other Meta executives were involved in the proposal. And the Magistrate Judge incorrectly held that other employees are incapable of testifying to an apex executive's decisionmaking process, as evidenced by the internal recommendations he received, the views he expressed, and so on. Regardless, none of Plaintiffs' claims requires proof of Mr. Zuckerberg's state of mind—only Meta's corporate intent is at issue. Dkt. 335 ¶ 417 (alleging "Meta intentionally intercepted" certain data).

The reality is that Plaintiffs have not seriously tried to gather evidence from other sources about Mr. Zuckerberg's conduct or intent. They have not even "take[n] half-hearted depositions of lower-level employees" to try to "set up an opportunity to depose [him]." *Celerity*, 2007 WL 205067, at *5; *see supra* at 4-6 & n.2. On the contrary, the day after obtaining the District Court's June 3, 2025 order compelling Mr. Zuckerberg's deposition, Plaintiffs *canceled* Mr. Sherman's deposition, despite his extensive knowledge about Meta's privacy practices and involvement in the

opt-in proposal. And then, on June 16, Plaintiffs took Mr. Leach's Rule 30(b)(6) deposition without asking a *single* question about the opt-in proposal, much less the decision-making process behind it. Moreover, none of Plaintiffs' requests for production, requests for admission, or interrogatories made "any inquiries regarding [Mr. Zuckerberg's] involvement" in relevant events. Dkt. 1006-4 ¶ 7.

These head-in-the-sand tactics demonstrate that Plaintiffs are intentionally evading any means of obtaining the testimony they purportedly need that would be less intrusive than deposing Mr. Zuckerberg. That gives Plaintiffs' game away: Their effort to depose Mr. Zuckerberg is a ploy to increase the burdens of this litigation and obtain perceived leverage, not a necessary measure for proving their claims. Even the Magistrate Judge acknowledged the "potential for abuse or harassment with respect to Mr. Zuckerberg's deposition," given "the manner in which discovery has been conducted in this case." Dkt. 967 at 4. That should have been dispositive. Contrary to the District Court's submission, the apex doctrine prohibits Plaintiffs from choosing to take the "risk" of "'studiously avoiding' securing information" they have misleadingly represented is "critical to their case," just so "they can proceed with the deposition" of Mr. Zuckerberg. Dkt. 1082 at 1.

## III.   THERE ARE NO OTHER ADEQUATE MEANS OF RELIEF

Finally, mandamus is appropriate because Meta has "no other adequate means for relief" from "the district court's discovery order." *In re Williams-Sonoma, Inc.*,

947 F.3d 535, 540 (9th Cir. 2020). And the harm threatened here—Mr. Zuckerberg being compelled to undergo an unwarranted deposition—"is not correctable" after the fact. *U.S. Dep't of Educ.*, 25 F.4th at 705.

As explained, the ordinary avenues for appellate review are unavailable for interlocutory discovery orders. *See supra* at 16-18. Nor is waiting to seek relief until after final judgment a feasible option. "[B]efore a direct appeal could be taken and heard" following a resolution on the merits, Mr. Zuckerberg would have to sit for his court-ordered deposition. *Williams-Sonoma*, 947 F.3d at 540. The "damage" to Mr. Zuckerberg's and Meta's interests "would be complete," and Meta's challenge to the District Court's decision on the apex doctrine "would be mooted." *Id.*; *accord SG Cowen*, 189 F.3d at 914. The harm Meta seeks to avoid, after all, "is the intrusion of the deposition itself." *U.S. Dep't of Educ.*, 25 F.4th at 705. Unless this Court intervenes now, that harm will occur and cannot be redressed.

Nor is it realistic or fair to require that Mr. Zuckerberg "refuse to comply with the district court's discovery order and appeal the resulting sanction." *Fei Ye*, 436 F.3d at 1122. This Court has "explicitly rejected" that line of argument "where 'discovery is directed at third-parties who could not be expected' to incur a contempt citation." *Id.*; *accord SG Cowen*, 189 F.3d at 913. Mr. Zuckerberg is not a party to this case, and he cannot be expected to incur a contempt citation just to obtain appellate review of the District Court's erroneous orders.

The whole point of the apex doctrine is to *avoid* unwarranted burdens on high-level executives. Demanding that such executives expose themselves to contempt sanctions any time they face an unwarranted deposition violates the doctrine's core purpose and makes no sense. It would exponentially increase the risks of distraction, while inviting widespread abuse and harassment. Mandamus is appropriate and should issue forthwith.

## CONCLUSION

This Court should issue a writ of mandamus directing the District Court to vacate its orders compelling Mr. Zuckerberg's deposition in this case.

Dated: August 13, 2025           Respectfully submitted,

 

*/s/ Gary Feinerman*

Andrew B. Clubok                Gary Feinerman

Nicolas Luongo                 LATHAM & WATKINS LLP

LATHAM & WATKINS LLP      330 N. Wabash Avenue, Suite 2800

1270 Avenue of the Americas    Chicago, IL 60611

New York, NY 10020          (312) 876-7700

                            gary.feinerman@lw.com

Melanie M. Blunschi

Nicholas Rosellini             Lauren R. Goldman

LATHAM & WATKINS LLP      Darcy C. Harris

505 Montgomery Street, Suite 2000  GIBSON, DUNN & CRUTCHER LLP

San Francisco, CA 94111      200 Park Avenue

                            New York, NY 10166

 

                            Elizabeth K. McCloskey

                            Abigail A. Barrera

                            GIBSON, DUNN & CRUTCHER LLP

                            One Embarcadero Center, Suite 2600

                            San Francisco, CA 94111

*Counsel for Petitioner Meta Platforms, Inc.*

## STATEMENT OF RELATED CASES

Petitioner is unaware of any cases pending in this Court that are related to this proceeding, as defined and required by Circuit Rules 21-3 and 28-2.6.

**Exhibit 2**

No. 25-4172

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

*IN RE* META PLATFORMS, INC.,

*Petitioner.*

META PLATFORMS, INC.

*Petitioner-Defendant,*

v.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

JANE DOE I, JOHN DOE I, JOHN DOE II, JANE DOE II,

JANE DOE III, JOHN DOE III, JOHN DOE IV,

*Real-Parties-in-Interest-Plaintiffs.*

## CORRECTED ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS VOL. 1 OF 2

Andrew B. Clubok
Nicolas Luongo
LATHAM & WATKINS LLP
1270 Avenue of the Americas
New York, NY 10020

Melanie M. Blunschi
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Gary Feinerman
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
gary.feinerman@lw.com

Lauren R. Goldman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

*Counsel for Petitioner Meta Platforms, Inc.*

August 12, 2025

# TABLE OF CONTENTS

### *In Re Meta Pixel Healthcare Litig.*, No. 22-cv-03580 (N.D. Cal.)
### Record Documents in Accordance with Fed. R. App. P 21(a)(2)(C)

**Exhibit**                                                               **Dkt. No.**

#### Orders

1     Order Denying Most Recent Motion for Leave to File a           1082
      Motion for Reconsideration, dated June 24, 2024.

2     Order Denying Defendants' Motion for Relief, dated June        1049
      3, 2025.

3     Order Granting Motion for Reconsideration and Denying          1025
      Request for Relief from Prior Order, dated June 3, 2025.

4     Order re March 14, 2025 Discovery Dispute re Zuckerberg        967
      Deposition, dated April 10, 2025.

#### Other Documents

5     Declaration of Elizabeth K. McCloskey in Support of            1070-1
      Defendant Meta Platforms, Inc.'s Motion for Leave to File
      a Motion for Reconsideration of the Court's June 2025
      Order Denying Defendants' Motion for Relief, dated June
      18, 2025.

6     Declaration of Michael Protti in Support of Defendant          1006-6
      Meta Platforms, Inc.'s Motion for Reconsideration of the
      Court's April 10, 2025 Order, dated April 30, 2025.

7     Declaration of Kory Hines in Support of Defendant Meta         1006-4
      Platforms, Inc.'s Motion for Reconsideration of the Court's
      April 10, 2025 Order, dated April 30, 2025.

8     Declaration of Elizabeth McCloskey in Support of               994-4
      Defendant Meta Platforms, Inc.'s Motion for
      Reconsideration of the Court's April 10, 2025 Order, dated
      April 25, 2025.

9     First Amended Consolidated Class Action Complaint              335
      [REDACTED], dated April 10, 2025.

10    *Exhibit 10, which was filed under seal, may be found in*
      *Volume 2 of the Addendum*

ii

11      Declaration of Robert Sherman in Support of Defendant     1006-5
Meta Platforms, Inc.'s Motion for Reconsideration of the
Court's April 10, 2025 Discovery Order

# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE META PIXEL HEALTHCARE
LITIGATION

Case No.  22-cv-03580-WHO

**ORDER DENYING MOST RECENT
MOTION FOR LEAVE TO FILE A
MOTION FOR RECONSIDERATION**

Re: Dkt. No. 1070

Meta's most recent motion for leave to file a motion for reconsideration is DENIED.
There is no justification to revisit this issue yet again.  If plaintiffs are, as defendant surmises,
"studiously avoid[ing]" securing information critical to their case so that they can proceed with the
deposition Judge DeMarchi found was appropriate, that is a risk they will bear.

**IT IS SO ORDERED.**

Dated: June 24, 2025



William H. Orrick
United States District Judge

# Exhibit 2

1

2

3

4                  UNITED STATES DISTRICT COURT

5                 NORTHERN DISTRICT OF CALIFORNIA

6

7    IN RE META PIXEL HEALTHCARE          Case No.  22-cv-03580-WHO
     LITIGATION
8
                                          **ORDER DENYING DEFENDANT'S**
9                                         **MOTION FOR RELIEF**

10                                        Re: Dkt. No. 1035

11

12

13

14          Defendant Meta Platforms, Inc. moves for relief from Magistrate Judge Virginia K.

15   DeMarchi's order and order on reconsideration allowing the limited "apex" deposition of Meta's

16   Chairman and CEO Mark Zuckerberg. Dkt. No. 1035. Meta's motion for relief is DENIED.

17          I referred discovery matters to Judge DeMarchi on January 25, 2023. Since that time, the

18   parties have brought scores of disputes to her to resolve. She is intimately familiar with the issues

19   in this case, the discovery that has been allowed and prohibited, and the stated and actual needs of

20   the parties so that the merits of this sprawling case can be litigated. She has done an excellent job

21   in parsing through the parties' positions to meet the requirements of the case.

22          On the pending issue, Judge DeMarchi carefully and thoughtfully weighed the competing

23   interests of Meta and Mr. Zuckerberg against the showing made by plaintiffs of the need for the

24   deposition. Judge DeMarchi acknowledged Meta's concerns regarding the deposition, addressed

25   each of Meta's arguments that the deposition should not be allowed, and ultimately ruled that the

26   deposition should proceed but be limited with respect to time and topics. She addressed all the

27   issues that Meta identified as a reason to prohibit the deposition. I agree with and adopt her

28   analysis and reasoning in its entirety. Her determination was neither clear error nor contrary to

United States District Court
Northern District of California

1    law.  Fed. R. Civ. P. 72(a).  Mr. Zuckerberg's deposition should proceed promptly.

2        **IT IS SO ORDERED.**

3    Dated: June 3, 2025

4

5    _____

6                                                        William H. Orrick
                                                         United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# Exhibit 3

1
2
3
4                           UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7    IN RE META PIXEL HEALTHCARE              Case No. 22-cv-03580-WHO (VKD)
     LITIGAITON
8
     This Document Relates To:               **ORDER GRANTING MOTION FOR**
9                                            **RECONSIDERATION AND DENYING**
     All Actions.                            **REQUEST FOR RELIEF FROM PRIOR**
10                                           **ORDER**
11                                           Re: Dkt. No. 1005
12
13          With leave of the Court, defendant Meta Platforms, Inc. ("Meta") moves for

14   reconsideration of the Court's April 10, 2025 order permitting plaintiffs to take a limited

15   deposition of Mark Zuckerberg (Dkt. No. 966), and upon reconsideration, asks the Court to order

16   that the deposition may not proceed at this time.  Dkt. No. 1005 at 1-3.  Plaintiffs oppose Meta's

17   motion for reconsideration.  Dkt. No. 1019.  The Court finds the motion suitable for decision

18   without oral argument.  Civil L.R. 7-1(b).

19          Having considered the parties' submissions, the Court grants Meta's motion for

20   reconsideration, but, on reconsideration, denies its request for relief from the Court's April 10,

21   2025 order.

22   **I.     BACKGROUND**

23          In its April 10, 2025 order, the Court concluded that plaintiffs should be permitted to take a

24   limited deposition of Mr. Zuckerberg.  The Court summarized its reasoning as follows:

25                 Mr. Zuckerberg is likely to have at least some unique first-hand
                   knowledge of facts relevant to a claim or defense by virtue of his
26                 role pursuant to the FTC Consent Order and as a decision maker
                   regarding certain privacy-related matters at issue in this case.  The
27                 circumstances presented here differ from those in *Affinity Labs*, in
                   which the plaintiff demanded the deposition of Apple's CEO
28

United States District Court
Northern District of California

regarding broad public statements with little relevance to the underlying litigation. *See Affinity Labs v. Apple, Inc.*, No. 09-cv-4436 CW (JL), 2011 WL 1753982, at *16-*17 (N.D. Cal. May 9, 2011) (denying deposition request). They also differ materially from those in *Frasco*, in which the plaintiffs' sole justification for deposing Mr. Zuckerberg was that he was "involved in" government investigations, "was apprised of" Meta's collection of sensitive health data, and had knowledge that could be imputed to Meta for purposes of the "intent" element of the plaintiffs' wiretapping claims. *Frasco v. Flo Health Inc.*, No. 21-cv-00757-JD, Dkt. No. 264, Dkt. No. 269 (N.D. Cal. Feb. 8, 2023) (denying deposition request, subject to plaintiffs advising court if circumstances change at a later date). Finally, nothing in the record suggests that plaintiffs here seek Mr. Zuckerberg's deposition based on his high-level, general management responsibilities, as in *Doble v. Mega Life and Health Ins.*, No. 09-cv-1611-CRB (JL), 2010 WL 1998904, at *3 (N.D. Cal. May 18, 2010) (denying deposition request). However, to the extent, plaintiffs seek information about how Meta implemented the pixel, what data it obtained, how it used the data, and how it implemented privacy protections, they may not use Mr. Zuckerberg's deposition to obtain information about these matters, as such information can be obtained from other witnesses and/or through other less intrusive means. Rather, plaintiffs' deposition of Mr. Zuckerberg should be directed to facts known to him by virtue of his role pursuant to the FTC Consent Order and as a decision maker regarding privacy-related matters relevant to this case.

Dkt. No. 966 at 3-4. Meta seeks reconsideration of the Court's April 10, 2025 on two grounds: (1) new facts show that plaintiffs have not exhausted less intrusive means to obtain the discovery they seek from Mr. Zuckerberg, and (2) the Court's order did not address Meta's legal arguments regarding plaintiffs' failure to exhaust other means. Dkt. No. 1005 at 1-3.

## II.     DISCUSSION

Under Civil Local Rule 7-9(b), a party seeking reconsideration of an interlocutory order must show one of the following: (1) "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought"; (2) "[t]he emergence of new material facts or a change of law occurring after the time of such order"; or (3) "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Civil L.R. 7-9(b).

Meta invokes the second and third grounds in Civil Local Rule 7-9(b) in seeking

2

1    reconsideration here.  First, Meta argues that after the Court issued its order regarding Mr.

2    Zuckerberg's deposition, Meta designated a senior executive, Fred Leach, to testify on behalf of

3    the company regarding Rule 30(b)(6) topics that include "user consent" and "user privacy

4    control."  Dkt. No. 1005 at 4.  In addition, Meta has made another senior executive, Robert

5    Sherman, available for an individual deposition.  *Id.*  Meta explains that these executives "will be

6    able to provide more detailed testimony than Mr. Zuckerberg about privacy-related issues," and

7    that this is new material information the Court should consider.  *Id.*  Second, Meta argues that

8    plaintiffs did not show, and could not possibly have shown, that they have exhausted "without

9    success" other sources of discovery of the information they seek to obtain from Mr. Zuckerberg,

10   observing that other Meta employees, including Michael Protti and Nathan Davis, have

11   responsibilities and information that overlap with Mr. Zuckerberg's with respect to the FTC

12   Consent Order and Meta's privacy practices.  *Id.* at 5, 8-10.

13          While the Court is not entirely persuaded that reconsideration is warranted for any reason

14   under Civil Local Rule 7-9(b), the Court will nevertheless grant the motion and will consider the

15   additional information and argument both parties present, together with their original discovery

16   dispute submission, in reviewing the April 10, 2025 order.

17          In its April 10, 2025 order, the Court found that Mr. Zuckerberg likely has "at least some

18   unique first-hand knowledge of facts relevant to a claim or defense by virtue of his role pursuant

19   to the FTC Consent Order and as a decision maker regarding certain privacy-related matters at

20   issue in this case."  To the extent Meta challenges the Court's finding that Mr. Zuckerberg's

21   knowledge is "unique" or "first-hand," the Court is not persuaded its assessment was incorrect.

22   Mr. Mudd's excerpted deposition testimony, which is cited in the original discovery dispute

23   submission and again on reconsideration, supports this conclusion.  Moreover, Mr. Zuckerberg has

24   not submitted a declaration denying that he has such knowledge, and while Meta's declarants may

25   be knowledgeable about many relevant privacy-related topics, none purports to be the final

26   decision maker regarding the specific matters plaintiffs identify.

27          If Mr. Zuckerberg indeed has unique information, as the Court has found, it is difficult to

28   understand how another executive or employee could testify about how Mr. Zuckerberg arrived at

United States District Court
Northern District of California

the decisions attributed to him, what factors he considered, or why he decided as he did, without

engaging in speculation.  Indeed, Meta made just such an objection when plaintiffs questioned Mr.

Mudd in deposition about whether Mr. Mudd had "any insight into any thoughts that [Mr.

Zuckerberg] had about the business strategy" around potential changes to Meta's privacy

practices.  Dkt. No. 1019-2 (Mudd dep. at 219:15-18); *id.* (Mudd dep. at 212:16-213:17); *see also*

*Laatz v. Zazzle, Inc.*, No. 5:22-cv-04844-BLF, 2024 WL 4487355, at *2 (N.D. Cal. Sept. 5, 2024)

(permitting deposition where apex witness may have unique first-hand knowledge of facts material

to disputed issues in the case, including whether he "knew of the contractual terms or acted

recklessly in not educating [himself] on such terms," and observing that no other witness could

speak to what apex witness knew of the contract terms); *In re Uber Techs., Inc., Passenger Sexual*

*Assault Litig.,* No. 23-md-03084-CRB (LJC), 2025 WL 896412, at *3 (N.D. Cal. Mar. 24, 2025)

(permitting apex witness depositions regarding matters uniquely within witness's knowledge).

Regarding the question of whether plaintiffs have exhausted, without success, other less

intrusive means of obtaining the discovery they seek from Mr. Zuckerberg, the Court considered

this issue and discussed it in the April 10, 2025 order.  As reflected in the excerpt from that order

quoted above, the Court distinguished between information *unique* to Mr. Zuckerberg and

information that was not unique and that could be obtained from other sources, stating:

> [T]o the extent, plaintiffs seek information about *how Meta*
> *implemented the pixel, what data it obtained, how it used the data,*
> *and how it implemented privacy protections*, they may not use Mr.
> Zuckerberg's deposition to obtain information about these matters,
> *as such information can be obtained from other witnesses and/or*
> *through other less intrusive means.*  Rather, plaintiffs' deposition of
> Mr. Zuckerberg should be directed to *facts known to him by virtue of*
> *his role pursuant to the FTC Consent Order and as a decision*
> *maker regarding privacy-related matters relevant to this case.*

Dkt. No. 966 at 4 (emphasis added).  As explained above, Meta's suggestion that information

uniquely known to Mr. Zuckerberg should instead be obtained from other witnesses is simply not

persuasive.  Even so, the parties' briefing on reconsideration reflects that plaintiffs *have* made

several attempts to obtain discovery through other means regarding Meta's privacy practices,

including whether and how Meta obtains consent.  Meta has objected to many of these efforts, and

United States District Court
Northern District of California

1    only recently identified Mr. Sherman and Mr. Leach, neither of whom is a document custodian, as

2    witnesses capable of testifying about its privacy practices. Thus, the Court is not persuaded that

3    plaintiffs failed to seek document discovery or deposition testimony of others before moving to

4    compel Mr. Zuckerberg's deposition.

5           However, to the extent Meta suggests that information uniquely known to Mr. Zuckerberg

6    could be obtained *from him* by less intrusive means, Meta is correct that the Court did not address

7    this point in its April 10, 2025 order. It will do so now. Plaintiffs have already sought and

8    obtained discovery of documents from Mr. Zuckerberg's custodial files. Dkt. No. 1019 at 2

9    (citing Dkt. No. 315). Now, at the very end of the fact discovery period, plaintiffs seek Mr.

10   Zuckerberg's deposition testimony, in view of those documents as well as the testimony of the

11   other witnesses who have identified him as the decision maker on certain matters. It is not clear to

12   the Court what other less intrusive means Meta believes plaintiffs should have employed earlier in

13   the discovery period to obtain this information from Mr. Zuckerberg, and the Court finds that

14   plaintiffs have made a sufficient showing on this point.

15          Finally, Meta appears to question whether plaintiffs truly believe Mr. Zuckerberg can

16   provide relevant testimony or whether they are instead using the deposition as a vehicle to harass a

17   prominent CEO, as evidenced by plaintiffs' asserted failure to focus their prior discovery efforts

18   on the information they now claim is critical to their case. *See* Dkt. No. 1005 at 1, 4, 5. As the

19   Court observed in its April 10, 2025 order, Mr. Zuckerberg's deposition presents an opportunity

20   for abuse or harassment. Dkt. No. 966 at 4. That is one of the reasons the Court imposed

21   limitations on both the subject matter and duration of his deposition. *See id.; see also Apple Inc.*

22   *v. Samsung Elecs. Co., Ltd*., 282 F.R.D. 259, 265 (N.D. Cal. 2012) (permitting limited depositions

23   of CEO and other executives). However, Meta's discovery-focus argument is not particularly

24   persuasive, given how prominently issues of consent—including, how it is obtained or manifested

25   and Meta's compliance with the FTC Consent Order—feature in plaintiffs' operative complaint.

26   *See, e.g.,* Dkt. No. 334-3 ¶¶ 168-169, 175, 294, 319, 339-346; *see also* Dkt. No. 1004.

27

28

United States District Court
Northern District of California

5

**III.    CONCLUSION**

For the reasons explained above and in the Court's April 10, 2025 order, plaintiffs may take Mr. Zuckerberg's deposition, consistent with the limitations set forth in the April 10, 2025 order.

**IT IS SO ORDERED.**

Dated: May 14, 2025

Virginia K. DeMarchi
United States Magistrate Judge

**Exhibit 4**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 22-cv-03580-WHO (VKD) |
| This Document Relates To: | **SEALED** |
| All Actions. | **ORDER RE MARCH 14, 2025 DISCOVERY DISPUTE RE ZUCKERBERG DEPOSITION** |
| | Re: Dkt. No. 909 |

The parties ask the Court to resolve their dispute regarding whether plaintiffs should be permitted to take the deposition of Mark Zuckerberg, Meta's CEO. Dkt. No. 909.[1] The Court finds this dispute suitable for resolution without oral argument.[2] Civil L.R. 7-1(b).

Rule 30 of the Federal Rules of Civil Procedure permits "[a] party . . . [to] depose any person, including a party, without leave of court . . . ." Fed. R. Civ. P. 30(a)(1). However, under Rule 26(c)(1), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including forbidding a deposition, or limiting its scope. Fed. R. Civ. P. 26(c)(1). The party seeking a protective order bears the burden of showing good cause for the order by "demonstrating harm or prejudice that will result from the discovery." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004).

A party's request for the deposition of a high-level executive of an adverse party—a so-called "apex" deposition—may create a risk of abuse or harassment. *Apple Inc. v. Samsung Elecs.*

---

[1] At the Court's direction, Meta subsequently filed a copy of the FTC Consent Order and lodged the Mudd deposition transcript, to which both parties refer.

[2] The Court will issue a separate order on the associated sealing motion (Dkt. No. 908). Information publicly disclosed in this order reflects information for which the Court has determined sealing is not warranted

1  *Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012).  A court may, in its discretion, disallow or limit

2  such a deposition if the discovery "can be obtained from some other source that is more

3  convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i).  In determining

4  whether to permit or limit an apex deposition, a court should consider (1) whether the deponent

5  has unique first-hand knowledge of the facts at issue in the case, and (2) whether the party seeking

6  the deposition has exhausted other less intrusive means to obtain the discovery.  *Apple*, 282 F.R.D.

7  at 263.

8         According to plaintiffs, Mr. Zuckerberg has unique first-hand knowledge regarding several

9  matters relevant to a claim or defense.  Specifically, plaintiffs say that discovery obtained to date

10  indicates that Mr. Zuckerberg was the "final decisionmaker on all consequential privacy

11  decisions," including those involving data collection, consent, and user privacy.  *See* Dkt. No. 909

12  at 2, 3.  By virtue of this role, plaintiffs argue, Mr. Zuckerberg's decisions and the reasons for

13  those decisions bear on questions of Meta's intent, among other things.  Plaintiffs claim that they

14  have exhausted other discovery methods to obtain this information, including taking the deposition

15  of Mr. Mudd, Meta's Vice President of Business Product Marketing.  *Id.* at 3, 4.

16         Meta objects to plaintiffs' taking Mr. Zuckerberg's deposition on several grounds.  First,

17  Meta contends that Mr. Zuckerberg has no unique first-hand knowledge of any relevant facts, as

18  he did not design or implement the relevant business tools or the Meta filter.  *Id.* at 4.  Second, it

19  argues that to the extent Mr. Zuckerberg was informed, together with many others, of allegations

20  concerning Meta's receipt of user health data, his information is, by definition, not unique.  *Id.* at

21  4, 5.  Third, Meta disputes that Mr. Zuckerberg was required by the FTC or otherwise to act as the

22  final decisionmaker regarding any privacy matters, contending that he merely received reports and

23  certified compliance with the FTC Consent Order by others charged with that responsibility.  *Id.* at

24  5.  As to other decisions, Meta argues that there is no indication from Mr. Mudd's testimony or

25  otherwise that Mr. Zuckerberg made any decisions pertinent to the pixel or this action.  *Id.*

26  Finally, Meta argues that plaintiffs have not attempted, let alone exhausted, other less intrusive

27  means to obtain the discovery they seek from other sources.  *Id.* at 6.

28         The Court has reviewed the pertinent portions of the FTC Consent Order.  Dkt. No. 965.

United States District Court
Northern District of California

2

1   While nothing in that Order requires Mr. Zuckerberg to act as the "final decisionmaker" on

2   consequential privacy decisions (as plaintiffs claim), the Order does require that he be *informed* of

3   consequential privacy decisions and other privacy-related information *and* that he *certify* on a

4   quarterly basis that Meta has (1) "established, implemented, and maintained a Privacy Program

5   that complies in all material respects with" the mandatory privacy program requirements in the

6   Order; and (2) "is not aware of any material noncompliance" with those requirements "that has not

7   been corrected or disclosed to the [FTC]." *Id.* at sec. XI, A.  While Meta is correct that Mr.

8   Zuckerberg is permitted to rely on information, reports, and certifications provided to him by

9   others, he also "shall rely" on "his . . . personal knowledge." *Id.*  The Court has also reviewed the

10  pertinent portions of Mr. Mudd's deposition transcript.  Mr. Mudd described his understanding of

11  Mr. Zuckerberg's general approach to decision making.  Mudd dep. at 219:2-220:4.  In addition,

12  Mr. Mudd testified that a proposal was presented to Mr. Zuckerberg in 2021 to move certain third-

13  party data to "a consent-only model" (i.e. opt-in rather than opt-out), and that Mr. Zuckerberg

14  made a decision or gave directions regarding that proposal.  Mudd dep. at 229:20-230:24, 233:24-

15  238:6, 241:19-242:18, 247:15-252:11.  The proposal in question appears to be relevant to

16  plaintiffs' claims and/or Meta's defenses.

17          Having considered the parties' discovery dispute submission, as well as the FTC Consent

18  Order and Mr. Mudd's testimony, the Court finds that plaintiffs have shown Mr. Zuckerberg is

19  likely to have at least some unique first-hand knowledge of facts relevant to a claim or defense by

20  virtue of his role pursuant to the FTC Consent Order and as a decision maker regarding certain

21  privacy-related matters at issue in this case.  The circumstances presented here differ from those in

22  *Affinity Labs*, in which the plaintiff demanded the deposition of Apple's CEO regarding broad

23  public statements with little relevance to the underlying litigation.  *See Affinity Labs v. Apple, Inc.*,

24  No. 09-cv-4436 CW (JL), 2011 WL 1753982, at *16-*17 (N.D. Cal. May 9, 2011) (denying

25  deposition request).  They also differ materially from those in *Frasco*, in which the plaintiffs' sole

26  justification for deposing Mr. Zuckerberg was that he was "involved in" government

27  investigations, "was apprised of" Meta's collection of sensitive health data, and had knowledge

28  that could be imputed to Meta for purposes of the "intent" element of the plaintiffs' wiretapping

United States District Court
Northern District of California

3

1  claims. *Frasco v. Flo Health Inc.*, No. 21-cv-00757-JD, Dkt. No. 264, Dkt. No. 269 (N.D. Cal.

2  Feb. 8, 2023) (denying deposition request, subject to plaintiffs advising court if circumstances

3  change at a later date).  Finally, nothing in the record suggests that plaintiffs here seek Mr.

4  Zuckerberg's deposition based on his high-level, general management responsibilities, as in *Doble*

5  *v. Mega Life and Health Ins.*, No. 09-cv-1611-CRB (JL), 2010 WL 1998904, at *3 (N.D. Cal. May

6  18, 2010) (denying deposition request).  However, to the extent, plaintiffs seek information about

7  how Meta implemented the pixel, what data it obtained, how it used the data, and how it

8  implemented privacy protections, they may not use Mr. Zuckerberg's deposition to obtain

9  information about these matters, as such information can be obtained from other witnesses and/or

10 through other less intrusive means.  Rather, plaintiffs' deposition of Mr. Zuckerberg should be

11 directed to facts known to him by virtue of his role pursuant to the FTC Consent Order and as a

12 decision maker regarding privacy-related matters relevant to this case.

13      As Meta observes, a deposition notice directed to an official at the highest level of

14 corporate management creates a "tremendous potential for abuse or harassment."  *Celerity, Inc. v.*

15 *Ultra Clean Holding, Inc.*, No. 05-cv-4374-MMC (JL), 2007 WL 205067, at *3 (N.D. Cal. Jan.

16 25, 2007).  Considering the manner in which discovery has been conducted in this case, the Court

17 agrees that such potential exists with respect to Mr. Zuckerberg's deposition.  Accordingly, the

18 deposition will be subject to the following limitations:  The parties must agree on a date and

19 location for the deposition, which must occur no later than May 30, 2025 unless the parties

20 stipulate otherwise.  The deposition will be limited to no more than three hours, and it will count

21 against plaintiffs' allotment of 12 individual depositions.

22      **IT IS SO ORDERED.**

23 Dated: April 10, 2025

24

25

26                                    Virginia K. DeMarchi
                                      United States Magistrate Judge

27

28

United States District Court
Northern District of California

4

# Exhibit 5

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    (415) 393-8200

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>This Document Relates To:<br><br>All Actions | Case No. 3:22-cv-03580-WHO (VKD)<br><br>**DECLARATION OF ELIZABETH K. MCCLOSKEY IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S MOTION FOR LEAVE TO FILE A MOTION FOR RECONSIDERATION OF THE COURT'S JUNE 3, 2025 ORDER DENYING DEFENDANT'S MOTION FOR RELIEF**<br><br>Hon. William H. Orrick |

Gibson, Dunn &
Crutcher LLP

1    I, Elizabeth K. McCloskey, declare as follows:

2    1.    I am an attorney admitted to practice law in the State of California, including in the

3    United States District Court for the Northern District of California.  I am a partner at the law firm

4    Gibson, Dunn & Crutcher LLP and counsel for Meta Platforms, Inc. ("Meta") in the above-captioned

5    action.

6    2.    I make this declaration in support of Meta's Motion for Leave to File a Motion for

7    Reconsideration of the Court's June 3, 2025 Order Denying Defendant's Motion for Relief, filed on

8    June 18, 2025.  Unless otherwise stated, I have personal knowledge of the facts stated herein and, if

9    called as a witness, I could and would testify competently to them.

10    3.    Attached as **Exhibit A** is a true and correct copy of a document produced by Meta at

11    Bates number PIXEL_HEALTH001377574.  Exhibit A is an email thread showing that 20 Meta

12    employees received a pre-read for a meeting regarding Meta's data usage strategy, including a proposal

13    to potentially move to opt in consent for individually identifiable third-party data.

14    4.    On May 30, 2025, Meta produced Exhibit A, which shows that Mr. Sherman, along with

15    Mr. Zuckerberg and 18 other Meta employees, received internal recommendations and analysis

16    regarding the "opt-in" proposal.

17    5.    On June 4, 2025, plaintiffs informed Meta that they were canceling the June 10, 2025

18    deposition of Rob Sherman, Meta's Vice President and Deputy Chief Privacy Officer of Policy.

19    Plaintiffs demanded to depose Meta's former Director of Product Management, whose employment at

20    Meta ended in 2023, instead of Mr. Sherman.  This former employee's testimony would not be relevant

21    in any way to the privacy decisions in which plaintiffs are purportedly interested.

22    6.    On June 16, 2025, plaintiffs took the Rule 30(b)(1) and 30(b)(6) deposition of

23    Fred Leach, Meta's Vice President of Product Development.  Plaintiffs ended the deposition early,

24    even though Meta's counsel offered to give plaintiffs more deposition time.

25    7.    Mr. Leach was designated for Rule 30(b)(6) topics related to user privacy controls and

26    user consent, including "[a]ny purported agreement You allege any Plaintiff or class member gave to

27    Meta to permit Meta's collection, processing, or use of Pixel-Generated Health Information or the

28    association of Pixel-Generated Health Information with Facebook accounts or other user profiles" and

1    "purported consent or agreement You allege any Plaintiff, class member, or Healthcare Provider gave

2    to have their communications with their Healthcare Providers to be processed" by Meta.  Dkt. 946-1

3    ¶¶ 27, 29.  Plaintiffs did not ask Mr. Leach a single question about the opt-in proposal.

4           8.      As he testified, Mr. Leach spent roughly 30 hours preparing for his Rule 30(b)(6)

5    deposition.  As part of this preparation, Mr. Leach spoke with numerous Meta employees, including

6    Mr. Sherman, about the "opt-in" proposal, Meta's initiatives to prevent the receipt of sensitive health

7    data via the Business Tools, and users' consent for how their data is stored by Meta.

8           9.      Although plaintiffs deposed 15 witnesses in total, plaintiffs have only deposed one fact

9    witness from Meta's Privacy organization, Jenny Lin, a Privacy Program Manager.  Ms. Lin has never

10   held executive-level decision-making authority on Meta's privacy policies or practices.

11          I declare under penalty of perjury that the foregoing is true and correct and that I executed this

12   declaration on June 18, 2025, in San Francisco, California.

13                                                         */s/ Elizabeth K. McCloskey*
                                                          Elizabeth K. McCloskey
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 6**

Docusign Envelope ID: 3B8F178A-D2C9-42CB-834E-0D28B247A691

1
**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)

2
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)

3
dharris@gibsondunn.com
200 Park Avenue

4
New York, NY 10166
Telephone:    (212) 351-4000

5

6
ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com

7
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com

8
One Embarcadero Center, Suite 2600
San Francisco, CA 94111

9
Telephone:    (415) 393-8200

10
*Attorneys for Defendant Meta Platforms, Inc.*

11

12
**UNITED STATES DISTRICT COURT**

13
**NORTHERN DISTRICT OF CALIFORNIA**

14
**SAN FRANCISCO DIVISION**

15

16
IN RE META PIXEL HEALTHCARE
LITIGATION

17

18
This Document Relates To:

19
All Actions

20

21

Case No. 3:22-cv-03580-WHO (VKD)

**DECLARATION OF MICHEL PROTTI IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S MOTION FOR RECONSIDERATION OF THE COURT'S APRIL 10, 2025 DISCOVERY ORDER**

Hon. Virginia K. DeMarchi

22

23

24

25

26

27

28

## DOCUMENT FILED UNDER SEAL

Gibson, Dunn &
Crutcher LLP

Docusign Envelope ID: 3B8F178A-D2C9-42CB-834E-0D28B247A691

I, Michel Protti, declare as follows:

1.      I make this declaration in support of Meta's Motion for Reconsideration of the Court's April 10, 2025 Discovery Order, filed on April 30, 2025.  Unless otherwise stated, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently to them.

2.      I am the Chief Privacy and Compliance Officer, Product at Meta Platforms, Inc. ("Meta").  I have been continuously employed by Meta since 2013.  In particular, I have held my role as Chief Privacy Officer (Product) since June 2019.  Over the course of my employment at Meta, I have acquired substantial personal knowledge of Meta's privacy policies, practices, and decisions, including privacy matters relevant to this litigation.

3.      Since May 2020, I have held the role of Meta's Designated Compliance Officer ("DCO") pursuant to the April 23, 2020 FTC Consent Order ("Consent Order").  I work closely with Mr. Zuckerberg in my role as DCO.

4.      Pursuant to the Consent Order, Meta maintains a comprehensive Privacy Program to protect the privacy and confidentiality of user data that Meta receives, uses, or shares.  The Privacy Program provides numerous detailed procedures to facilitate that goal.

5.      In my role as DCO, I direct a team of Meta personnel tasked with establishing, implementing, and maintaining the Privacy Program.  My team includes, or has included during the relevant discovery period, Nathan Davis (Vice President of Product Management) and Michael Levinson (Vice President of Product Management), among others.  To my knowledge, these individuals work, or have worked, more directly on the day-to-day operations of the Privacy Program, than either I or Mr. Zuckerberg have.

6.      My specific duties under the Consent Order include, without limitation, delivering quarterly reports to Mr. Zuckerberg that include summaries of privacy review statements identifying

-1-

DECLARATION OF MICHEL PROTTI
CASE NO. 3:22-CV-03580-WHO (VKD)

Docusign Envelope ID: 3B8F178A-D2C9-42CB-834E-0D28B247A691

material risks to the privacy or confidentiality of user data, and include a detailed discussion of those risks, as well as detailed appendices including all privacy review statements and listing all privacy decisions generated during the preceding fiscal quarter. These materials are voluminous and often reference well over a thousand privacy decisions made by other Meta personnel on a wide range of issues across international jurisdictions. I necessarily rely on a team to help me prepare these reports, and it is my understanding, based on my conversations with Mr. Zuckerberg and others, that Mr. Zuckerberg in turn relies on me to provide the reports to him.

7. The Consent Order also requires me to certify each quarter, on Meta's behalf, that Meta has established, implemented, and maintained a Privacy Program that materially complies with Part VII of the Consent Order and that Meta is not aware of any material noncompliance with Part VII that has not been corrected or disclosed to the FTC. These are the same certifications that Mr. Zuckerberg also signs.

8. The Consent Order recognizes that, in addition to any personal knowledge we may have, Mr. Zuckerberg and I shall rely on compliance "sub-certifications" provided by my team of Privacy Program personnel, as well as the quarterly reports. It is my understanding, based on my conversations with Mr. Zuckerberg and others, that Mr. Zuckerberg has generally relied on other Meta executives, including me, to prepare and provide the information he needs to carry out his duties under the Consent Order.

9. My duties are not limited to my work overseeing the Privacy Program. I also frequently advise Meta executives, including Mr. Zuckerberg, on privacy issues concerning Meta products.

I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on April 30, 2025, in Menlo Park, California.



Michel Protti

-2-

DECLARATION OF MICHEL PROTTI
CASE NO. 3:22-CV-3580-WHO

**Exhibit 7**

1   **GIBSON, DUNN & CRUTCHER LLP**
    LAUREN R. GOLDMAN (*pro hac vice*)
2   lgoldman@gibsondunn.com
    DARCY C. HARRIS (*pro hac vice*)
3   dharris@gibsondunn.com
    200 Park Avenue
4   New York, NY 10166
    Telephone:    (212) 351-4000
5

6   ELIZABETH K. MCCLOSKEY, SBN 268184
    emccloskey@gibsondunn.com
    ABIGAIL A. BARRERA, SBN 301746
7   abarrera@gibsondunn.com
    One Embarcadero Center, Suite 2600
8   San Francisco, CA 94111
    Telephone:    (415) 393-8200
9

10   *Attorneys for Defendant Meta Platforms, Inc.*

11

                **UNITED STATES DISTRICT COURT**
12
           **NORTHERN DISTRICT OF CALIFORNIA**
13
                **SAN FRANCISCO DIVISION**
14

15

16   IN RE META PIXEL HEALTHCARE       Case No. 3:22-cv-03580-WHO (VKD)
    LITIGATION
17   _____       **DECLARATION OF KORY HINES IN**
                                      **SUPPORT OF DEFENDANT META**
18                                    **PLATFORMS, INC.'S MOTION FOR**
    This Document Relates To:           **RECONSIDERATION OF THE COURT'S**
19                                    **APRIL 10, 2025 DISCOVERY ORDER**
    All Actions
20                                    Hon. Virginia K. DeMarchi

21

22

23

24

25

26                      DOCUMENT FILED UNDER SEAL

27

28

                            DECLARATION OF KORY HINES
                       CASE NO. 3:22-CV-03580-WHO (VKD)

I, Kory Hines, declare as follows:

1. I am an attorney admitted to practice law in the State of New York. I am an associate at the law firm Gibson, Dunn & Crutcher LLP and counsel for Meta Platforms, Inc. ("Meta") in the above-captioned action.

2. I make this declaration in support of Meta's Motion for Reconsideration of the Court's April 10, 2025 Discovery Order, filed on April 30, 2025. Unless otherwise stated, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently to them.

3. Plaintiffs have sought minimal discovery concerning a "proposal [that] was presented to Mr. Zuckerberg in 2021 to move certain third-party data to 'a consent-only model.'" Dkt. 967 at 3. Plaintiffs have served no discovery requests that specifically focus on, or expressly reference, that proposal. The documents Meta has produced concerning that proposal hit on the parties' agreed-upon search terms and were found to be responsive to general requests for production that are not specifically limited to or focused on that proposal.

4. On March 14, 2025, plaintiffs filed a joint discovery dispute letter seeking Mr. Zuckerberg's deposition. Dkt. 908-4. At that time, plaintiffs had never asked Meta or its witnesses about facts Mr. Zuckerberg would have known as a result of his duties under the April 23, 2020 FTC Consent Order ("Consent Order"), nor had they suggested that they wished to depose any Meta executives tasked with executing the duties described in that Consent Order.

5. On April 22, 2025, plaintiffs took a fact deposition of Meta employee Jenny Lin, who worked as a Privacy Program Manager from October 2016 to November 2023 and is a current Meta employee. During that deposition, plaintiffs did not ask Ms. Lin about the Consent Order, the opt-in proposal, or Mr. Zuckerberg's potential awareness of or involvement in decision-making regarding privacy matters.

6. As of this filing, plaintiffs have taken seven of their 12 allotted fact depositions, and roughly four of their 20 allotted hours of Rule 30(b)(6) testimony. Dkt. 850. Plaintiffs have only asked one deponent (Graham Mudd) a couple of questions about Mr. Zuckerberg's general knowledge or potential decision-making regarding the privacy decisions at issue in this case. Plaintiffs have not

1   asked to depose anyone who has a formal role in facilitating or overseeing Meta's compliance with the

2   Consent Order other than Mr. Zuckerberg, nor have they asked Meta or any deponent to identify those

3   individuals.

4        7.     Plaintiffs have served 313 requests for production, and dozens of requests for admission

5   and interrogatories, none of which included any inquiries regarding Mr. Zuckerberg's involvement

6   pursuant to the Consent Order in the issues in this case.

7        8.     Meta has designated Fred Leach to provide Rule 30(b)(6) testimony on privacy controls

8   and user consent issues. That deposition has not yet occurred.

9        I declare under penalty of perjury that the foregoing is true and correct and that I executed this

10   declaration on April 30, 2025, in Fire Island Pines, New York.

11                                      */s/ Kory Hines*

12                                        Kory Hines

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 8

1    **GIBSON, DUNN & CRUTCHER LLP**
    LAUREN R. GOLDMAN (*pro hac vice*)
2    lgoldman@gibsondunn.com
    DARCY C. HARRIS (*pro hac vice*)
3    dharris@gibsondunn.com
    200 Park Avenue
4    New York, NY 10166
    Telephone:    (212) 351-4000
5

6    ELIZABETH K. MCCLOSKEY, SBN 268184
    emccloskey@gibsondunn.com
7    ABIGAIL A. BARRERA, SBN 301746
    abarrera@gibsondunn.com
8    One Embarcadero Center, Suite 2600
    San Francisco, CA 94111
    Telephone:    (415) 393-8200
9

10    *Attorneys for Defendant Meta Platforms, Inc.*

11

12         **UNITED STATES DISTRICT COURT**

13        **NORTHERN DISTRICT OF CALIFORNIA**

14          **SAN FRANCISCO DIVISION**

15

16   IN RE META PIXEL HEALTHCARE     Case No. 3:22-cv-03580-WHO (VKD)
   LITIGATION
17                              **DECLARATION OF ELIZABETH K.**
                                 **MCCLOSKEY IN SUPPORT OF**
18                              **DEFENDANT META PLATFORMS, INC.'S**
   This Document Relates To:            **MOTION FOR LEAVE TO SEEK**
19                              **RECONSIDERATION, OR TO HOLD THE**
   All Actions                        **COURT'S APRIL 10, 2025 DISCOVERY**
20                              **ORDER IN ABEYANCE**

21                              Hon. Virginia K. DeMarchi

22

23

24

25

26

27              DOCUMENT FILED UNDER SEAL

28

I, Elizabeth K. McCloskey, declare as follows:

1.     I am an attorney admitted to practice law in the State of California, including in the United States District Court for the Northern District of California.  I am a partner at the law firm Gibson, Dunn & Crutcher LLP and counsel for Meta Platforms, Inc. ("Meta") in the above-captioned action.

2.     I make this declaration in support of Meta's Motion for Leave to File a Motion for Reconsideration, or to Hold the Court's April 10, 2025 Discovery Order in Abeyance, filed on April 25, 2025.  Unless otherwise stated, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently to them.

3.     Attached as **Exhibit A** is a true and correct copy of a document produced by Meta at Bates number PIXEL_HEALTH000910482.  Exhibit A is an email thread that shows that Michel Protti received an invitation to an April 13, 2021 meeting regarding a proposal to potentially "use opt in consent for individually identifiable 3rd party data."

4.     On November 15, 2024, plaintiffs sent Meta a letter listing the fact witnesses they wish to depose in this matter.  That list included Meta CEO Mark Zuckerberg, but did not include Meta executives Erin Egan (Chief Privacy Officer, Policy), Michel Protti (Chief Privacy and Compliance Officer, Product), Rob Sherman (Vice President of Policy and Deputy Chief Privacy Officer), or Fred Leach (Vice President of Product Development).  As of November 15, 2024, plaintiffs had not taken any depositions in this litigation.

5.     On January 20 and 24, 2025, plaintiffs served Rule 30(b)(6) deposition notices identifying 43 topics and more than 130 sub-topics, none of which mentions Mr. Zuckerberg, any state or federal investigations, the Privacy Committee, the FTC Consent Order, the quarterly privacy reports or certifications, Meta's privacy review escalation process, or the "Clear History" feature.  Dkts. 927-1, 944-3.  The parties began the meet-and-confer process regarding those notices shortly thereafter.

6.     By February 14, 2025, plaintiffs had also requested Ms. Egan's fact deposition but had not requested depositions of Mr. Sherman or Mr. Leach.  Dkt. 845 at 2.

7.     On February 26, 2025, plaintiffs took a fact deposition of former Meta executive Graham Mudd (Vice President of Product Marketing, Ads and Business Products).

8. During the week of March 10, 2025, I learned for the first time that Ms. Egan would be unavailable for a deposition for the remainder of the fact discovery period because her son is currently undergoing treatment for cancer. We immediately investigated to identify a suitable replacement witness whose personal knowledge of issues relevant to this litigation would closely approximate Ms. Egan's knowledge.

9. On March 14, 2025, plaintiffs filed a joint discovery dispute letter seeking Mr. Zuckerberg's deposition. Dkt. 908-4. At that time, the parties' negotiations regarding the scope of the Rule 30(b)(6) deposition topics that plaintiffs had served were in their early stages, and plaintiffs had taken only three fact depositions. After substantially narrowing the disputed topics, the parties filed a joint discovery dispute letter on March 24, 2025 seeking resolution of their remaining disputes concerning plaintiffs' Rule 30(b)(6) topics. Dkt. 927. Before moving to compel Mr. Zuckerberg's deposition, plaintiffs had never identified the supposed relevance of the April 23, 2020 FTC Consent Order.

10. On March 18, 2025, I advised plaintiffs of Ms. Egan's unavailability and that Meta was working to identify a replacement witness for Ms. Egan.

11. On April 7, 2025, Meta began disclosing its Rule 30(b)(6) designees to plaintiffs on a rolling basis.

12. On April 9, 2025, after confirming that Mr. Sherman has worked at Meta for the entire discovery period, reported directly to Ms. Egan, and has substantially similar knowledge of relevant matters, Meta offered to allow plaintiffs to take a fact deposition of Mr. Sherman as a replacement for Ms. Egan. Specifically, Meta confirmed that Mr. Sherman has personal knowledge of, among other things, the "opt-in proposal" referenced in Mr. Mudd's deposition testimony, Meta's efforts to prevent receipt of potentially sensitive data via the Business Tools (such as filters and notifications) and changes in Meta policies concerning advertisement targeting. Plaintiffs never requested Mr. Sherman's deposition as a fact witness.

13. On April 10, 2025, the Court issued an order granting plaintiffs' request to depose Mr. Zuckerberg. Dkt. 967.

14.     On April 11, 2025, the Court issued an order resolving the parties' disputes concerning certain of plaintiffs' Rule 30(b)(6) topics. Dkt. 969.

15.     On April 14, 2025, plaintiffs sent Meta an updated list of the fact witnesses they wish to depose. Later that same day, plaintiffs also conditionally accepted Meta's offer to allow the deposition of Mr. Sherman in lieu of Ms. Egan, provided that Meta agree to produce Mr. Sherman's custodial documents in advance of his deposition. Also later that same day (April 14), Meta accepted plaintiffs' condition, and plaintiffs withdrew their deposition notice for Ms. Egan on April 16, 2025.

16.     On April 15, 2025, Jason (Jay) Barnes (plaintiffs' lead counsel) noted on a phone call with me that he understood Mr. Zuckerberg was occupied with the ongoing FTC trial and might not be available for a deposition in this litigation until after that trial has concluded.

17.     On April 23, 2025, Meta designated Mr. Leach for Rule 30(b)(6) Topic Nos. 1(a), 13, 18, 18(b), 18(c), 18(d), 18(e), 18(f), 19, 24, 27–32, 33(a), 33(b), 33(c) and 42–43. Those topics cover, among other things, issues concerning user consent and user privacy control. Mr. Leach will also be deposed as a fact witness. As of this filing, plaintiffs have not yet taken Mr. Leach's deposition in any capacity. It is my understanding that Mr. Leach is responsible for all of Meta's Business Tools (including the Pixel), and oversees all data that Meta receives via the Business Tools. I also understand that Mr. Leach has substantial personal knowledge regarding the issues that formed the basis of the Court's April 10, 2025 order and has worked at Meta for the entire relevant discovery period.

18.     Plaintiffs have not deposed, or asked to depose, Nathan Davis (Vice President of Product Management) or Michael Levinson (Vice President of Product Management) in this litigation. It is my understanding that Mr. Davis reports directly to Mr. Protti and is involved in a variety of privacy-related discussions impacting Meta's products. I also understand that Mr. Levinson oversaw Privacy Review for a substantial portion of the relevant discovery period. Dkt. 267.

I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on April 25, 2025, in San Francisco, California.

*/s/ Elizabeth K. McCloskey*

-3-

1                                                     Elizabeth K. McCloskey

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ELIZABETH K. MCCLOSKEY
CASE NO. 3:22-CV-3580-WHO

**Exhibit 9**

Jason "Jay" Barnes, *Admitted Pro Hac Vice*
Email: jaybarnes@simmonsfirm.com
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue, 7th Floor
New York, New York 10016
Telephone: (212) 784-6400

Jeffrey A. Koncius, CSB #189803
Email: koncius@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444

Beth E. Terrell, CSB #178181
Email: bterrell@terrellmarshall.com
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603

Geoffrey Graber, CSB #211547
Email: ggraber@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600

Andre M. Mura, CSB #298541
Email: amm@classlawgroup.com
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700

*Attorneys for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION, | Case No. 3:22-cv-3580-WHO-VKD |
| | **CLASS ACTION** |
| This Document Relates To: | **[REDACTED – PUBLICLY FILED VERSION]** |
| All Actions | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| | Honorable William H. Orrick |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................. 1

II.     PARTIES ............................................................................................... 5

III.    JURISDICTION AND VENUE ......................................................... 16

IV.     FACTUAL ALLEGATIONS ............................................................. 16

        A.   Meta's Collection Tools redirect patients' data from healthcare
             provider and covered entity websites and applications to use for ad
             targeting. ........................................................................................ 16

        B.   Meta uses identifiers to match the health information it collects with
             Facebook users. ............................................................................. 20

        C.   Meta also encourages healthcare Partners to upload patient lists for ad
             targeting. ........................................................................................ 21

        D.   Meta acquires a broad spectrum of identifiable health information from
             healthcare providers' use of Meta Collection Tools. ...................... 23

        E.   Plaintiffs' Allegations Include Meta's Other Collection Tools and Both
             Websites and Applications .............................................................. 35

        F.   Meta falsely promises Facebook users that it requires its healthcare
             Partners to have the right to share their data. ................................. 39

        G.   Meta's health marketing division targets its "Partner" healthcare
             providers and covered entities and their patients to "disrupt health" and
             "market to patients." ..................................................................... 48

        H.   Meta's health marketing division already has systems it could adopt to
             comply with an injunction. ............................................................ 56

        I.   Meta's conduct violates federal and state privacy laws. .................. 58

             1.   The HIPAA Privacy Rule protects patient healthcare
                  information. ............................................................................ 58

             2.   Patient status is among the health information protected by
                  HIPAA. ................................................................................... 60

             3.   There is no HIPAA exception for marketing on the Internet. ...... 62

             4.   The FTC Act protects health information. ................................. 65

             5.   State law also protects health information. ............................... 66

             6.   Patients have protectable property interests in their individually
                  identifiable health information. ............................................... 68

             7.   The information Meta acquires without Plaintiffs' and Class
                  members' consent has actual, measurable monetary value .......... 70

        J.   Meta has acknowledged that targeted health advertising is not
             appropriate, but provides Pixel-based "work-arounds" for its healthcare
             providers and covered entities ......................................................... 74

K.     Meta can identify healthcare provider webpages where the Meta
       Collection Tools are redirecting patients' health information to Meta
       without patients' consent. ................................................................ 82

L.     Meta has been required to thoroughly police itself since at least 2011
       by consent decrees governing the company's conduct. ......................... 86

M.     Meta uses health information it acquires without authorization for
       commercial gain. ................................................................................ 91

V.    CLASS ACTION ALLEGATIONS ................................................................ 93

VI.   TOLLING .......................................................................................................... 95

VII.  CLAIMS FOR RELIEF .................................................................................... 96

      FIRST CLAIM FOR RELIEF (Breach of Contract) ...................................... 96

      SECOND CLAIM FOR RELIEF (Breach of the Duty of Good Faith and Fair
             Dealing) .......................................................................................... 103

      THIRD CLAIM FOR RELIEF (Violation of Electronic Communications
             Privacy Act, 18 U.S.C. § 2510 *et seq*) ....................................... 106

      FOURTH CLAIM FOR RELIEF (Violation of California Invasion of Privacy
             Act, Cal. Penal Code §§ 631 and 632) ......................................... 115

      FIFTH CLAIM FOR RELIEF (Intrusion Upon Seclusion—Common Law) ......... 116

      SIXTH CLAIM FOR RELIEF (California Constitutional Invasion of Privacy) ........... 120

      SEVENTH CLAIM FOR RELIEF (Trespass to Chattel) ................................ 123

      EIGHTH CLAIM FOR RELIEF (Violation of California Consumer Legal
             Remedies Act, Cal. Civil Code§ 1780(a)) ................................... 126

      NINTH CLAIM FOR RELIEF (Violation of the California Comprehensive
             Computer Data Access and Fraud Act, Cal. Penal Code § 502) ......... 128

      TENTH CLAIM FOR RELIEF (Unjust Enrichment – California Law) ............ 134

VIII. PRAYER FOR RELIEF .................................................................................. 135

IX.   DEMAND FOR JURY TRIAL ...................................................................... 136

## I.      NATURE OF THE ACTION

1.      Plaintiffs bring this action on behalf of themselves and millions of other Americans whose medical privacy has been violated by Meta's tracking and collection tools, including the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, the Meta Graph API, server-to-server transmissions, and any other similar collection tools (collectively, "Meta Collection Tools").[1] The Meta Collection Tools allow Meta to intercept individually identifiable health information from Meta healthcare "Partner" websites and monetize the collected information for its own financial gain.

2.      Meta operates the world's largest social media company. Meta's revenue is derived almost entirely from selling targeted advertising.

3.      Meta's "Health" division is dedicated to marketing to and servicing Meta's healthcare "Partners." Meta defines its "Partners" to include "businesses" that use Meta's products, including the Meta Pixel or Meta Audience Network tools "to advertise, market, or support their products and services."

4.      Meta has worked with hundreds of Meta healthcare Partners to deploy the Meta Collection Tools to learn about visitors to their websites and use that information for targeted advertising based on patients' online behavior. Meta's healthcare Partners also use Meta's other ad targeting tools, including tools that involve uploading patient lists to Meta.

5.      Plaintiffs are Facebook users who allege that Meta acquires their confidential health information from their healthcare providers and covered entities in violation of federal and state laws and despite Meta's promises that it: (1) only collects and uses their data if Meta's Partners have obtained the "right" or "lawful right" to share their data with Meta; and (2) "employ[s]

---

[1] Plaintiffs' Consolidated Class Action Complaint included the Meta Collection Tools by alleging that Meta used "tracking tools, including the Meta Pixel" to intercept class members' health information from websites and applications. *See*, *e.g.*, Consolidated Class Action Complaint, Dkt. 185 at ¶¶ 1, 84. For clarity, in this amended complaint, Plaintiffs list the specific tools used by Meta. "Meta Collection Tools" are defined as, "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar collection tools."

1  dedicated teams around the world, work[s] with … partners … and develop[s] advanced technical

2  systems to detect potential misuse of [Meta's] products," which would include the Meta Pixel.

3      6.    When a patient uses their healthcare provider or covered entities' website or

4  application where Meta Collection Tools are present, the Meta Collection Tools transmit the

5  content of their communications to Meta, including, but not limited to: (1) signing-up for a patient

6  portal; (2) signing-in or -out of a patient portal; (3) taking actions inside a patient portal;

7  (4) making, scheduling, or participating in appointments; (5) exchanging communications relating

8  to doctors, treatments, payment information, health insurance information, prescription drugs,

9  prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions;

10 (6) conduct a search on the Meta health partner website; and (7) other information that qualifies as

11 "personal health information" under federal and state laws.

12     7.    In many circumstances, Meta also obtains information from its healthcare Partners

13 that identify a Facebook user's status as a patient and other health information that is protected by

14 federal and state law. This occurs through tools that Meta encourages its healthcare Partners to use

15 to upload customer lists to Meta for use in its advertising systems. In the case of Meta's healthcare

16 Partners, a customer list is a patient list.

17     8.    The information transmitted from a healthcare Partner's website or application to Meta

18 always includes information sufficient to uniquely identify a patient under federal law (such as IP

19 address information and device identifiers that Meta associates with a patient's Meta account), and

20 may also include a patient's demographic information, email address, phone number, computer ID

21 address, or contact information entered as emergency contacts or for advanced care planning, along

22 with information like appointment type and date, a selected physician, button and menu selections,

23 the content of buttons clicked and typed into text boxes, and information about the substance,

24 purport, and meaning of patient requests for information from their providers and other "covered

25 entities" under federal and state health privacy laws.

26     9.    The transmission is instantaneous—Meta often receives the information before the

27 healthcare provider or covered entity does.

28     10.    The transmission is invisible.

1  11. The transmission is made without any affirmative action taken by the patient.

2  12. The transmission occurs without any notice to the patient that it is occurring.

3  13. Meta collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing its healthcare Partners and others to target advertisements both on and off Facebook. For example, Meta can target ads to a person who has used a patient portal and exchanged communications about a specific condition, such as cancer.

  14. Meta says its healthcare Partners are required to have the right to share patients' data before transmitting it to Meta. But Meta knows the Meta Collection Tools are being used on healthcare provider and covered entity websites and applications and is contemporaneously transmitting patients' individually identifiable health information to Meta without patients' consent. Meta's "Health" division targets its services directly to healthcare providers and pharmaceutical companies. Meta is aware of every advertiser that it engages with through its Health division. Meta is also able to identify healthcare providers, pharmaceutical companies, and other covered entities that are using Meta Collection Tools without consent through its web-crawler and the deployment of common industry tools (called "verticals") that categorize the content and types of businesses on which tech tools appear.

  15. It is against the law for Meta to disclose or obtain individually identifiable health information without giving appropriate notice to the patient and obtaining their consent.

  16. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") protects sensitive patient health information, including patient status, from being obtained or disclosed without the patient's knowledge and consent—and directly applies to companies that obtain individually identifiable health information without authorization. *See* 42 U.S.C. § 1320d-6.

  17. In addition to the protections afforded patients by federal law, Meta's Terms of Service, as explained below, include a California choice-of-law provision for all of its users. California has enacted several laws prohibiting the disclosure of patient information without consent, including the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq.*, and the California Consumer Privacy Protection Act, Cal. Civ. Code § 1798.100, *et seq.*

18.   The United States Department of Health and Human Services ("HHS") recently confirmed that HIPAA and its regulations prohibit the transmittal of individually identifiable health information by tracking technology like the Meta Pixel without the patient's authorization and other protections like a business associate agreement with the recipient of patient data.

19.   Meta's Terms of Service, Data Policy, and Cookies Policy do not inform Facebook users that Meta may acquire their health information when they interact with healthcare providers or covered entity websites and applications, or obtain consent to do so.

20.   Meta healthcare Partners include hundreds of healthcare providers and other "covered entities" under federal and state health privacy laws. As used herein, "covered entity" refers to any person or business entity for which Plaintiffs and Class members have a reasonable expectation of privacy that the "covered entity" will not share patient health information with third parties such as Meta for any non-healthcare related purpose, including marketing. This expectation is based on, among other things: ancient and modern common law and ethical rules relating to the privacy of health-related communications; and federal and state laws that expressly apply standards of privacy to health information related to these covered entities. Under HIPAA, a "covered entity" includes healthcare providers (which includes doctors, clinics, psychologists, dentists, chiropractors, nursing homes, hospitals, and pharmacies), health plans, and healthcare clearinghouses. 45 C.F.R. § 160.103. In addition, confidentiality rules also apply to "business associates" that "create[], receive[], maintain[], or transmit[] protected health information for a function or activity regulated by" HIPAA "on behalf of" a covered entity. 45 C.F.R. § 160.103. Under the California Confidentiality of Medical Information Act, rules of confidentiality apply to "medical information" created, maintained, preserved, stored, abandoned, destroyed, or disposed of by "[e]very provider of healthcare, healthcare service plan, pharmaceutical company, or contractor." Cal. Civ. Code § 56.101.

21.   To avoid including a lengthy list of such entities or having to refer to "covered entities or business associates/contractors" throughout the Complaint, Plaintiffs refer to these entities collectively as "covered entities" throughout. Thus, as used below, "covered entities" refers to healthcare providers, health insurers, healthcare clearinghouses, patient portal providers,

1  pharmacies, pharmaceutical companies, and any other entity, business associate, or contractor for

2  which health or medical information is protected by HIPAA or the CMIA.

3      22. Meta's interception, dissemination, and use of individually identifiable health

4  information not only violates federal and state law but also harms patients by intruding upon their

5  privacy; erodes the confidential nature of the provider-patient relationship; and takes patients'

6  property and property rights without compensation and ignores their right to control the

7  dissemination of their health information to third parties. In addition, Meta has been unjustly

8  enriched by its misconduct, obtaining unearned revenues derived from its unauthorized taking of

9  patient information.

10      23. Plaintiffs exchanged numerous communications with their healthcare providers and

11  covered entities. Plaintiffs' communications included logging-in and -out of patient portals,

12  exchanging communications about doctor sand conditions, and using click-to-call functionality

13  from their providers' websites. Without Plaintiffs' knowledge and consent, Meta intercepted the

14  content of those communications. Plaintiffs bring this lawsuit on behalf of themselves and other

15  Facebook users in the United States who were also subject to Meta's unlawful practices.

16  **II.     PARTIES**

17      24. Plaintiff John Doe I is a Maryland resident, Facebook user, and a patient of MedStar

18  Health, Inc. ("Medstar") who used MedStar's web properties, including the myMedStar patient

19  portal, currently located at https://www.medstarhealth.org/mymedstar-patient-portal, to view

20  medical records, medications, and lab results; pay bills; and communicate with his healthcare

21  provider, including using the "click to call" functionality. John Doe I used the MedStar web

22  properties while the Meta Collection Tools were present on the properties. The full scope of Meta's

23  interceptions of John Doe I's communications with MedStar can only be determined through

24  formal discovery. However, Meta intercepted at least the following communications between

25  MedStar and John Doe I, which include communications about John Doe I's doctor, ███████

26  ███████, and communications about the patient portal, ██████████████████████

27  ███████. The following long-URLs or substantially similar URLs were sent to Meta via Meta's

28  Collection Tools:

1

2

3

4   • https://www.medstarhealth.org/mymedstar-patient-portal.

5   25.  Plaintiff Jane Doe I is a Wisconsin resident, Facebook user, and a patient of Rush

6   University System for Health ("Rush") who used Rush's website, including the MyChart patient

7   portal, currently located at https://mychart.rush.edu, to view medical records and lab results,

8   schedule appointments, search for doctors, and communicate with her healthcare provider. Jane

9   Doe I used the Rush web-properties while Meta Collection Tools were present on the properties.

10  The full scope of Meta's interceptions of Jane Doe I's communications with Rush can only be

11  determined through formal discovery. However, Meta intercepted at least the following

12  communications between Rush and Jane Doe I, which include communications about specific

13  treatments such as ████████████████; Jane Doe I's providers ████████████

14  ████████████████████████; and Jane Doe I's communications

15  concerning ████████████████████████████████████

16  ████████████. The following long-URLs or substantially similar URLs were sent to

17  Meta via Meta's Collection Tools:

18

19

20

21

22

23

24

25

26

27

28

- https://mychart.rush.edu/mychart/Authentication/Login?.

26.  Plaintiff John Doe II is a North Carolina resident, Facebook user, and a patient of WakeMed Health & Hospitals ("WakeMed") who used WakeMed's website, including the MyChart patient portal, currently located at https://mychart.wakemed.org, to view medical records, lab results, and communicate with his healthcare provider, including using the "click to call" functionality. John Doe II used the WakeMed web properties while Meta Collection Tools

were present on the properties. The full scope of Meta's interceptions of John Doe II's communications with WakeMed can only be determined through formal discovery. However, Meta intercepted at least the following communications between WakeMed and John Doe II, which include communications about John Doe II's providers ██████████████████████ ████████████████████. The following long-URLs or substantially similar URLs were sent to Meta via Meta's Collection Tools:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

- https://mychart.wakemed.org/MyChart-PRD/Authentication/Login.

27.   Plaintiff Jane Doe II is an Ohio resident, Facebook user, and a patient of the Ohio State University Wexner Medical Center ("OSU") who used OSU's web properties, including the MyChart patient portal, currently located at https://wexnermedical.osu.edu/features/mychart, to view medical records, lab results, and communicate with her healthcare provider, including using the "click to call" functionality. Jane Doe II used the OSU web properties while Meta Collection Tools were present on the properties. The full scope of Meta's interceptions of Jane Doe II's communications with OSU can only be determined through formal discovery. However, Meta intercepted at least the following communications between OSU and Jane Doe II, which include communications about ███████████████████████. The following long-URLs or substantially similar URLs were sent to Meta via Meta's Collection Tools:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

- https://mychart.osu.edu/osumc/Authentication/Login?.

28.   Plaintiff Jane Doe III is a Missouri resident, Facebook user, and a patient of North Kansas City Hospital ("North Kansas City") who used North Kansas City's web properties, including the MyHealth patient portal, currently located at https://myhealthnkch.iqhealth.com, to

1  view medical records and lab results, and communicate with her healthcare provider, including

2  using the "click to call" functionality. Jane Doe III used North Kansas City's web properties while

3  Meta Collection Tools were present on the properties. The full scope of Meta's interceptions of

4  Jane Doe III's communications with North Kansas City can only be determined through formal

5  discovery. However, Meta intercepted at least the following communications between North

6  Kansas City and Jane Doe III, which include communications about Jane Doe III's ████████

7  ████████ physicians ████████████████████████. The following long-URLs or

8  substantially similar URLs were sent to Meta via Meta's Collection Tools:

9
10
11       ████████████████████████████████████████
12
13

14       • https://northkansascityhospital.consumeridp.us-

15         1.healtheintent.com/saml2/sso/login?.

16       29. Plaintiff John Doe III is an Oregon resident, a Facebook user, and a patient of

17  Providence Portland Medical Center ("Providence") who used Providence's web properties,

18  including the MyChart patient portal, currently located at

19  https://mychartor.providence.org/mychart/, to message providers, schedule appointments, and

20  view test results. John Doe III used Providence's web properties while Meta Collection Tools were

21  present on the properties. John Doe III exchanged communications about doctors, conditions, and

22  treatments with Providence that were intercepted by Meta's Collection Tools. These

23  communications included, but are not limited to, precisely when and how often John Doe III

24  exchanged communications to log-in to the patient portal, thereby identifying his status as a patient

25  and, with Meta's other Collection Tools, his medical interests and concerns. Because Meta's

26  conduct was surreptitious, additional details regarding these communications will be the subject

27  of discovery requests to Meta. However, Meta intercepted at least the following communications

28  between Providence and John Doe III, which include communications that John Doe III was

1    logging into his patient portal, which he did over a dozen times. The following long-URL or a

2    substantially similar URL was sent to Meta via Meta's Collection Tools:

3          •   https://mychartor.providence.org/mychart/Authentication/Login?.

4        30. Plaintiff John Doe IV is a Maryland resident, a Facebook user, and a patient of

5    MedStar Health, who used Medstar's web properties, including the patient portal currently located

6    at https://www.medstarhealth.org/mymedstar-patient-portal, to schedule appointments and look at

7    medical records. John Doe IV used MedStar's web properties while the Meta Pixel was present on

8    the properties. The full scope of Meta's interceptions of John Doe IV's communications with

9    MedStar can only be determined through formal discovery. However, Meta intercepted at least the

10   following communications between MedStar and John Doe IV, which include communications

11   about John Doe IV's provider ████████████, ████████████████ providers, and services

12   related to ████████████████████. The following long-URLs or substantially

13   similar URLs were sent to Meta via Meta's Collection Tools:

1    ███████████████████████████████████████

2        • https://www.medstarhealth.org/mymedstar-patient-portal.

3        31.  Plaintiff Jane Doe IV is a Maryland resident, a Facebook user, and ██████████ who

4    used the ████ pharmaceutical web-property at ████████████ to communicate with her

5    prescription drug provider regarding her condition and how the ██████ drug worked to treat her

6    ████████. Jane Doe IV used ████████ web-properties while Meta Collection Tools were

7    present on the properties. The full scope of Meta's interceptions of Jane Doe IV's communications

8    with her prescription drug provider can only be determined through formal discovery. However,

9    Meta intercepted at least the following communications from Jane Doe IV, which include

10   communications about side effects of ████████. The following long-URLs or substantially similar

11   URLs were sent to Meta via Meta's Collection Tools:

12
13   ████████████████████████████████████
14

15       32.  Plaintiff Jane Doe V is a Maryland resident, Facebook user, and a patient of MedStar

16   Health, including the Good Samaritan, Franklin Square, and Union Memorial locations, who used

17   MedStar's   website,   including   the   MyMedStar   patient   portal,   currently   located   at

18   https://www.medstarhealth.org/mymedstar-patient-portal, to view records, message providers,

19   request appointments, order records, and refill prescriptions. Jane Doe V used MedStar's web-

20   properties while the Meta Pixel was present on the properties. The full scope of Meta's

21   interceptions of Jane Doe V's communications with MedStar can only be determined through

22   formal discovery. However, Meta intercepted at least the following communications between

23   MedStar and Jane Doe V, which include communications about Jane Doe V's providers ████

24   ████████████████; services for ████████████████████████

25   ██████████████████; obtaining financial assistance; and requesting

26   appointments. The following long-URLs or substantially similar URLs were sent to Meta via

27   Meta's Collection Tools:

28   ████████████████████████████████████

- https://www.medstarhealth.org/mymedstar-patient-portal.

33.  Plaintiff Jane Doe VI is a California resident, Facebook user, and a patient of Kaiser Permanente ("Kaiser"), who used Kaiser's website, including the patient portal, currently located

1  at  https://healthy.kaiserpermanente.org  to schedule appointments, message doctors, order

2  prescriptions, view test results, and view appointment notes. Jane Doe VI used the Kaiser web-

3  properties while Meta Collection Tools were present on the properties. The full scope of Meta's

4  interceptions of Jane Doe VI's communications with Kaiser can only be determined through

5  formal discovery. However, Meta intercepted at least the following communications between

6  Kaiser and Jane Doe VI, which include communications about ███████████████████

7  and Jane Doe VI's provider ████████████. The following long-URLs or substantially similar

8  URLs were sent to Meta via Meta's Collection Tools:

9
10
11   ████████████████████████████████████████████
12
13

14       • https://healthy.kaiserpermanente.org/consumer-sign-on.

15       34.  Plaintiff Jane Doe VII is a California resident, Facebook user, and a patient of Kaiser,

16  who used the Kaiser website, including the patient portal, currently located at

17  https://healthy.kaiserpermanente.org to schedule appointments, look at test results, pay bills, and

18  seek advice on health symptoms. Jane Doe VII used the Kaiser web-properties while Meta

19  Collection Tools were present on the properties. The full scope of Meta's interceptions of Jane

20  Doe VII's communications with Kaiser can only be determined through formal discovery.

21  However, Meta intercepted at least the following communications between Kaiser and Jane Doe

22  IV, which include communications about ████████████████████████

23  ████████, and Jane Doe VII's provider ████████████████. The following long-URLs or

24  substantially similar URLs were sent to Meta via Meta's Collection Tools:

25
26   ████████████████████████████████████████████
27
28

1

2

3

4

5

6

7      • https://healthy.kaiserpermanente.org/consumer-sign-on.

8      35. Plaintiff Jane Doe VIII is a California resident, Facebook user, and a patient of

9   SharpHealthCare ("Sharp"), who used Sharp's web-properties, including the patient portal,

10  currently located at https://www.sharp.com/patient/followmyhealth/ to search for doctors,

11  conditions, and insurance information, pay bills, and view lab results. Jane Doe VIII used the Sharp

12  web-properties while Meta Collection Tools were present on the properties. The full scope of

13  Meta's interceptions of Jane Doe VIII's communications with Sharp can only be determined

14  through formal discovery. However, Meta intercepted at least the following communications

15  between Sharp and Jane Doe VIII, which include communications about ████████████

16  providers and ████████████ conditions. The following long-URLs or substantially similar

17  URLs were sent to Meta via Meta's Collection Tools:

18

19

20

21

22      36. Plaintiff Jane Doe IX is a California resident, Facebook user, and a patient of Kaiser,

23  who used Kaiser's website and application, including the patient portal, currently located at

24  https://healthy.kaiserpermanente.org, to schedule appointments, exchange messages with her

25  healthcare provider, and refill prescriptions. She used the Kaiser patient portal more than two

26  dozen times while Meta Collection Tools were present on the portal login page. Jane Doe IX

27  exchanged communications about doctors, conditions, and/or treatments with Kaiser that were

28  intercepted by Meta's Collection Tools. These communications included, but are not limited to,

precisely when and how often Jane Doe IX exchanged communications to log-in to the patient portal, thereby identifying her status as a patient and, with Meta's other Collection Tools, her medical interests and concerns. Because Meta's conduct was surreptitious, additional details regarding these communications will be the subject of discovery requests to Meta.

37.   Plaintiff Jane Doe X is a California resident, Facebook user, and a patient of Adventist Health ("Adventist") who used Adventist's website and application, including the patient portal, currently located at https://www.adventisthealth.org/, to schedule appointments and view laboratory results. She used the Adventist patient portal more than four dozen times while Meta Collection Tools were present on the portal login page. Jane Doe X exchanged communications about doctors, conditions, and/or treatments with Adventist that were intercepted by Meta's Collection Tools. These communications included, but are not limited to, precisely when and how often she exchanged communications to log-in to the patient portal, thereby identifying her status as a patient. Because Meta's conduct was surreptitious, additional details regarding these communications will be the subject of discovery requests to Meta.

38.   Plaintiff Jane Doe XI is a California resident, Facebook user, and a patient of Sutter Health ("Sutter") who used Sutter's website and application, including the patient portal, currently located at https://www.sutterhealth.org/, to schedule appointments, order prescriptions, and view test results. She used the Sutter patient portal more than a dozen times while Meta Collection Tools were present on the portal login page. Jane Doe XI exchanged communications about doctors, conditions, and/or treatments with Sutter that were intercepted by Meta's Collection Tools. These communications included, but are not limited to, precisely when and how often she exchanged communications to log-in to the patient portal, thereby identifying her status as a patient. Because Meta's conduct was surreptitious, additional details regarding these communications will be the subject of discovery requests to Meta.

39.   Defendant Meta Platforms, Inc. is a publicly traded Delaware corporation, headquartered in Menlo Park, California, that does business throughout the United States and the world, deriving substantial revenue from interstate commerce.

III.     JURISDICTION AND VENUE

40.   This Court has personal jurisdiction over Meta because Meta has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District. Meta is also headquartered in this District.

41.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, *et seq.* (the Electronic Communications Privacy Act). This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different State than Meta.

42.   This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

43.   Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District and because Meta's Terms of Service governing its relationship with its users and Partners adopts California law and chooses the Northern District of California as the venue for disputes.

IV.     FACTUAL ALLEGATIONS

A.     Meta's Collection Tools redirect patients' data from healthcare provider and covered entity websites and applications to use for ad targeting.

44.   Meta maintains profiles of its Facebook users that include the users' real names, locations, email addresses, friends, "likes," and communications.

45.   Meta associates this information with personal identifiers, including IP addresses, cookies, and device identifiers.

46.   Meta also tracks non-users across the web through its widespread Internet marketing products and source code, including the Meta Pixel.

47.   Meta's revenue is derived almost entirely from selling targeted advertising, which includes, but is not limited to, targeted advertising to Meta properties and to all Internet users on non-Meta sites and apps.

48.  Meta's Business division provides advertising services and tools to web developers, including the Meta Collection Tools. Meta's Business division and its advertising services and tools are focused on trade and commerce.

49.  The Meta Pixel is a free and publicly available "piece of code" that third-party web developers can install on their website to "measure, optimize and build audiences for … ad campaigns."[2]

50.  Meta describes the Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts."[3]

51.  Meta pushes advertisers to install the Meta Pixel. Meta tells advertisers the Pixel "can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart."[4]

52.  Meta tells advertisers that the Meta Pixel will improve their Facebook advertising, including by allowing them to:

    a.   "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion.";

    b.   "Optimize the delivery of your ads" and "[e]nsure your ads reach the people most likely to take action."; and

    c.   "Create Custom Audiences from website visitors" and create "[d]ynamic ads [to] help you automatically show website visitors the products they viewed on your website—or related ones."[5]

---

[2] Meta, Meta Pixel (2023), https://www.facebook.com/business/tools/meta-pixel.
[3] Meta for Developers, Meta Pixel (2023), https://developers.facebook.com/docs/meta-pixel/.
[4] Meta, Meta Pixel (2023), https://www.facebook.com/business/tools/meta-pixel.
[5] *Id.*

53.   Meta explains that the Pixel "log[s] when someone takes an action on your website" such as "adding an item to their shopping cart or making a purchase," and the user's subsequent action:[6]



Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

54.   The Meta Pixel is customizable. Web developers can choose the actions the Pixel will track and measure.

55.   Meta advises web developers to place the Pixel early in the source code for any given webpage or website to ensure that visitors will be tracked before they leave the webpage or website:[7]

**Installing The Pixel**

To install the pixel, we highly recommend that you add its base code between the opening and closing `<head>` tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages.

Placing the code within your `<head>` tags reduces the chances of browsers or third-party code blocking the pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page.

---

[6] Meta Business Help Center, About Meta Pixel (2023), https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[7] Meta For Developers, Get Started (2023), https://developers.facebook.com/docs/meta-pixel/get-started.

56. Meta also provides advertisers with step-by-step instructions for setting up and installing the Meta Pixel on their website, so that companies can add the Meta Pixel to their website without a developer.[8]

57. If a healthcare provider or covered entity installs the Meta Pixel code as Meta recommends, patients' actions on the provider or entity's website are contemporaneously redirected to Meta. When a patient clicks a button to register for, or logs into or out of, a "secure" patient portal, Meta's source code commands the patient's computing device to send the content of the patient's communication to Meta while the patient is communicating with her healthcare provider. In other words, by design, Meta receives the content of a patient's portal log in communication immediately when the patient clicks the log-in button—even before the healthcare provider or covered entity receives it.

58. Thus, the Meta "pixel allows Facebook to be a silent third-party watching whatever you're doing."[9]

59. For example, when a patient clicks a button to schedule a doctor's appointment on a healthcare provider or covered entity's public scheduling page where the Meta Pixel is present, the Pixel sends Meta sensitive information about the patient, including the text of the button the patient clicked, the doctor's name with whom the patient scheduled an appointment with, and search terms the patient used to find the doctor, such as "home abortion."[10]

60. The Pixel literally consists of a 1x1 pixel that is set on a user's computing device and screen by Meta's source code.

61. By design, the Pixel is invisible.

---

[8] Meta, Meta Pixel (2023), https://www.facebook.com/business/tools/meta-pixel.

[9] Jefferson Graham, *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

[10] Anson Chan, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022 6:00 am), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

62. Meta acquires the content of the communication while the patient is exchanging the communication with their healthcare provider or other covered entity.

**B.** **Meta uses identifiers to match the health information it collects with Facebook users.**

63. Meta uses cookies to identify patients, including cookies named c_user, datr, fr, and _fbp.

64. The c_user cookie identifies Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Meta uses the c_user cookie to record user activities and communications.

65. An unskilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking with their mouse, (3) selecting 'View page source,' (4) executing a control-f function for "UserID," and (5) copying the number value that appears after "UserID" in the page source code of the Facebook user's page.

66. Following these directions, it is easy to discover that the Facebook UserID assigned to Mark Zuckerberg is 4. By typing www.facebook.com/4 into a browser and hitting enter, the browser will be re-directed to Mr. Zuckerberg's page at www.facebook.com/zuck.

67. The Meta datr cookie identifies the web browser the patient is using. It is an identifier that is unique to the patient's specific web browser and is therefore another way that Meta can identify Facebook users.

68. Meta keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Meta by using the Facebook Download Your Information tool.

69. The Meta fr cookie is an encrypted combination of the c_user and datr cookies.[11]

70. The c_user, datar, and fr cookies are traditional third-party cookies. That is, they are cookies associated with a party other than the entity with which a person is communicating at the

---

[11] *See* Gunes Acar, *et al.*, Facebook Tracking Through Social Plug-ins: Technical Report Prepared for the Belgian Privacy Commission (Mar. 27, 2015), https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

1   time. In the example of a healthcare provider, they are third-party cookies because Meta is a third-

2   party to the communication between a patient and their healthcare provider.

3       71.   The Meta _fbp cookie is a Facebook identifier that is set by Facebook source code and

4   associated with the healthcare provider using the Meta Pixel.

5       72.   Upon information and belief, the letters fbp are an acronym for Facebook Pixel.

6       73.   The _fbp (or Facebook Pixel) cookie is also a third-party cookie in that it is also a

7   cookie associated with Meta that is used by Meta to associate information about a person and their

8   communications with non-Meta entities while the person is on a non-Meta website or application.

9       74.   Meta disguises the _fbp cookie as a first-party cookie even though it is Meta's cookie

10  on non-Meta websites.

11      75.   By disguising the _fbp cookie as a first-party cookie for a healthcare provider rather

12  than a third-party cookie associated with Facebook, Meta ensures that the _fbp cookie is placed on

13  the computing device of patients who seek to access the patient portal.

14      76.   Most and perhaps all healthcare providers with a patient portal require patients to have

15  enabled first-party cookies to gain access to their patient records through the portal.

16      77.   The purpose of these portal-associated first-party cookies is security.

17      78.   The _fbp cookie is then used as a unique identifier for that patient by Meta.

18      79.   If a patient takes an action to delete or clear third-party cookies from their device, the

19  _fbp cookie is not impacted – even though it is a Meta cookie – again, because Meta has disguised

20  it as a first-party cookie.

21      80.   Meta also uses IP address and user-agent information to match the health information

22  it collects from Meta healthcare Partners with Facebook users.

23      **C.   Meta also encourages healthcare Partners to upload patient lists for ad**

24          **targeting.**

25      81.   Meta offers an ad targeting option called "Custom Audiences." When a patient takes

26  an action on a Meta healthcare Partner's website embedded with the Pixel, the Pixel will be

27  triggered to send Meta "Event" data that Meta matches to its users. A web developer can then

28  create a "Custom Audience" based on Events to target ads to those patients. The Pixel can then be

used to measure the effectiveness of an advertising campaign. Dkt. 76-1 (Wooldridge Declaration). ¶ 4.

> 4.   Specifically, when someone takes an action a developer chooses to track on their website (like subscribing to email updates), the Meta Pixel is triggered and sends Meta certain data, called an "Event." Meta attempts to match the Events it receives to Meta users (Meta cannot match non-Meta users). The developer can then create "Custom Audiences" based on Events and can target ads on Facebook, Instagram, and publishers within Meta's Audience Network to Meta users who have taken certain actions on their own website. Meta can also provide the developer with de-identified, aggregated reporting that helps the developer better understand the impact of its ads by measuring what happens when people see them. The identity of matched Meta users is never revealed to the developer or to any advertiser.

82. Meta also allows Meta healthcare Partners to create a Custom Audience by uploading a patient list to Meta. As Meta describes it:[12]

> A Custom Audience made from a customer list is a type of audience you can create to connect with people who have already shown an interest in your business or product. It's made of information - called "identifiers" - you've collected about your customers (such as email, phone number and address) and provided to Meta. Prior to use, Meta hashes this information.
>
> Then, we use a process called matching to match the hashed information with Meta technologies profiles so that you can advertise to your customers on Facebook, Instagram and Meta Audience Network. The more information you can provide, the better the match rate (which means our ability to make the matches). Meta doesn't learn any new identifying information about your customers.

83. Meta provides detailed instructions for healthcare Partners to send their patients' individually identifiable information to Meta through the customer list upload. For example:[13]

---

[12] Meta Business Help Center, *About Customer List Custom Audiences* (2023), https://www.facebook.com/business/help/341425252616329?id=2469097953376494.
[13] Meta Business Help Center, *Create a Customer List Custom Audience* (2023), https://www.facebook.com/business/help/170456843145568?id=2469097953376494.

> **Prepare your customer list in advance.** To make a Custom Audience from a customer list, you provide us with information about your existing customers and we match this information with Meta profiles. The information on a customer list is known as an "identifier" (such as email, phone number, address) and we use it to help you find the audiences you want your ads to reach.
>
> Your customer list can either be a CSV or TXT file that includes these identifiers. To get the best match rates, use as many identifiers as possible while following our formatting guidelines. You can hover over the identifiers to display the formatting rules and the correct column header. For example, **first name** would appear as **fn** as a column header in your list.
>
> Alternatively, we have a file template you can download to help our system map to your identifiers more easily. (You can upload from Mailchimp as well.)

The Meta healthcare Partner can then use the Custom Audiences derived from its patient list with the Pixel and Pixel Events for Meta marketing campaigns and to measure the success of those campaigns.

**D.     Meta acquires a broad spectrum of identifiable health information from healthcare providers' use of Meta Collection Tools.**

84.    The information Meta acquires from its healthcare Partners' use of the Meta Collection Tools includes, but is not limited to, the following:

a.    When a patient clicks to register for a provider's patient portal;

b.    Information that a patient types into registration forms;

c.    When a patient clicks to log in to the patient portal;

d.    When a patient clicks to log out of the patient portal;

e.    When a patient sets up or schedules an appointment;

f.    Information that a patient types into an appointment form;

g.    When a patient clicks a button to call the provider from a mobile device directly from the provider's website;

h.    The communications a patient exchanges through her healthcare provider's website, including communications about providers and specialists, conditions, and treatments, along with the timing of those communications, including whether they are made while a patient is still logged in to a patient portal or around the same time that the patient has scheduled an

appointment, called the medical provider, or logged in or out of the patient portal; and

   i.   The same or substantially similar communications that patients exchange with health insurance companies, pharmacies, and prescription drug companies.

85.   Meta's conduct constitutes an egregious breach of social norms.

86.   Public polling shows that, "[n]inety-seven percent of Americans believe that doctors, hospitals, labs and health technology systems should not be allowed to share or sell their sensitive health information without consent." 14

87.   In response to the Court's question during a hearing in this matter about how a Facebook user can "prevent disclosure of that information to Meta," Meta stated a patient would need "to pick up the phone" to call "their doctor" or "[t]heir hospital" and that "[t]here are many, many people out there who don't have computers and don't use these portals as their sole means of communication with their doctors." Nov. 9, 2022 Hearing Transcript at 5:15-17 (question from Court); 9:10-22 (Meta response). But if a patient clicked on the telephone number on a healthcare provider's webpage with a Meta Pixel to make that call via a smart phone, that patient's individually identifiable health information, including patient status, would still be redirected to Meta.

88.   Plaintiff John Doe I is a patient of MedStar Health in Baltimore, Maryland. When he used the "myMedStar" patient portal to review his lab results, make medical appointments, and communicate with his healthcare providers, the Meta Pixel on MedStar's website redirected his identity and the fact that he clicked to log in to the patient portal to Meta. The Meta Pixel redirected the following information about John Doe I to Meta:

   a.   He was communicating with MedStar via its www.MedStarHealth.org website;

---

14 *Poll: Huge majorities wants control over health info,* Healthcare Finance (Nov. 10, 2020), https://www.healthcarefinancenews.com/news/poll-huge-majorities-want-control-over-health-info.

b.   He engaged in an 'ev' or event called a SubscribedButtonClick;

c.   The content of the button he clicked was "Login to myMedstar;"

d.   The page on which he clicked the button was Patient Portal, or "Home;"

e.   He had previously visited a MedStar page about breast health;

f.   His Internet Protocol address;

g.   Identifiers that Facebook uses to identify him and his device, including the c-user, datr, fr, and fbp cookies; and

h.   Browser attribute information sufficient to fingerprint his device.

| QueryString | |
|---|---|
| Name ▲ | Value |
| cd[buttonFeatur | {"classList":"button medstar-button-primary button-round-medium margin-10","destination":"https://medstar.iqhealth.com/home?opt_id=████████&_ga=to myMedstar","numChildButtons":0,"tag":"a","name":""} |
| cd[buttonText] | Login to myMedstar |
| cd[formFeatures] | [] |
| cd[pageFeature | {"title":"Patient Portal - Home"} |
| cd[parameters] | [] |
| coo | false |
| dl | https://www.mymedstar.org/?ReturnUrl=%2Fdefault.aspx&opt_id=████████&_ga=█ |
| ec | 2 |
| es | automatic |
| ev | SubscribedButtonClick |
| fbp | fb.1.1 ████████ 23 |
| id | ████ |
| if | false |
| lt | ████ |
| o | 30 |
| r | stable |
| rl | https://www.medstarhealth.org/mhs/our-services/womens-health/conditions/breast-health/breast-conditions/ |
| rqm | GET |
| sh | 1080 |
| sw | 1920 ███ |

89.   In other words, the Meta Collection Tools transmitted to Meta—even before MedStar received it—John Doe I's identity, his log in to the patient portal, the contents of the webpage he was visiting before he logged in, and the contents of the webpage he accessed upon logging in. John Doe I did not know that the Meta Pixel on the MedStar webpage redirected this information to Meta when he used the MedStar website and the myMedstar portal. And, of course, John Doe I certainly never consented to such sharing.

90.   In addition to intercepting Plaintiff's individually identifiable health information and patient status information, the content Meta intercepted from the MedStar property from

communications that John Doe I exchanged with MedStar included, but is not limited to, the detailed URL information described above. *See supra* ¶ 24.

91.  Meta used the intercepted contents of John Doe I's communication with MedStar so then serve him ads which included the name of his healthcare provider, the conditions for which he was being treated by Medstar, and his patient status with MedStar:



92. On July 20, 2023, the Federal Trade Commission and Department of Health and Human Services sent a joint warning to MedStar Health, directly, regarding its use of the Meta Pixel:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17




**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office for Civil Rights**

July 20, 2023

MedStar Health
10980 Grantchester Way
Columbia, MD 21044
Attn:  Oliver M. Johnson II, EVP, Chief Administrative Officer, and General Counsel

　　　Re:　　Use of Online Tracking Technologies

Dear Mr. Johnson,

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities.  These tracking technologies

18

19

20

21

22

23

24

25

26

27

28

     93.　The letter specifically warned MedStar that tracking technologies, such as the Meta Pixel, "gather individually identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and are largely unknown to users." Furthermore, the letter acknowledges that "**disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual** or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medication, medical treatments, and more." (emphasis added).

     94.　Despite even HHS and the FTC sending MedStar a warning regarding its use of the Meta Pixel, there is no evidence Meta ever warned Medstar that it was disclosing potentially sensitive health information.

95.  Plaintiff Jane Doe I is a patient of Rush University System for Health. The Meta Pixel on Rush's webpage also transmitted, without her knowledge or consent, similar identifiable health information about Jane Doe I to Meta when she clicked to log in to the Rush MyChart patient portal:

a.    She was communicating with Rush via its mychart.rush.edu webpage:

b.    She engaged in an 'ev' or event called a SubscribedButtonClick;

c.    The content of the button she clicked was "MyChart;"

d.    The page from which the button she clicked was Patient Portal, the "Patients & Visitors" page;

e.    She had previously visited a Rush page about medical records;

f.    Her Internet Protocol address;

g.    Identifiers that Facebook uses to identify her and her device, including cookies named c-user, datr, fr, and fbp (*i.e.* Facebook Pixel); and

h.    Browser attribute information sufficient to fingerprint her device.

| Name | Value |
|---|---|
| id | ███████ |
| ev | SubscribedButtonClick |
| dl | https://www.rush.edu/patients-visitors |
| rl | https://www.rush.edu/patients-visitors/medical-records |
| if | false |
| ts | ███████ |
| cd[buttonFeatures] | {"classList":"icon-mychart external","destination":"https://mychart.rush.edu/?_ga=███████ |
| cd[buttonText] | MyChart |
| cd[formFeatures] | [] |
| cd[pageFeatures] | {"title":"Patients & Visitors \| Rush System"} |
| cd[parameters] | [] |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.64 |
| r | stable |
| ec | 2 |
| o | 30 |
| fbp | fb.███████ |
| it | |
| coo | false |
| es | automatic |
| tm | 3 |
| exp | p1 |
| rqm | GET |

96.  In addition to intercepting Plaintiff's individually identifiable health information and patient status information, the content Meta intercepted from the Rush property from communications that Jane Doe I exchanged with Rush included, but is not limited to, the detailed URL information described above. *See supra* ¶ 25.

97.  On July 20, 2023, the FTC and HHS sent a joint warning to Rush University Medical Center, directly, regarding its use of the Meta Pixel:



**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office for Civil Rights**

July 20, 2023

Rush University Medical Center
1620 W Harrison St.
Chicago, IL 60612
Attn: Carl Bergetz, General Counsel

Re:     Use of Online Tracking Technologies

Dear Mr. Bergetz,

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies

98.   The letter specifically warned Rush that tracking technologies, such as the Meta Pixel, "gather individually identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and are largely unknown to users." Furthermore, the letter acknowledges that "**disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual** or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medication, medical treatments, and more." (emphasis added).

99.   Despite even HHS and the FTC sending Rush a warning regarding its use of the Meta Pixel, there is no evidence Meta ever warned Rush that it was disclosing potentially sensitive health information.

100. <u>Plaintiff John Doe II:</u> Substantially similar transmissions were sent to Meta when Plaintiff John Doe II used the WakeMed web properties, including when he logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

101. In addition to intercepting John Doe II's individually identifiable health information and patient status information, the content Meta intercepted from the WakeMed property from communications that John Doe II exchanged with WakeMed included, but is not limited to, the detailed URL information described above. *See supra* ¶ 26.

102. <u>Plaintiff Jane Doe II:</u> Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe II used the OSU web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

103. In addition to intercepting Jane Doe II's individually identifiable health information and patient status information, the content Meta intercepted from the OSU properties from communications that Jane Doe II exchanged with OSU included, but is not limited to, the detailed URL information described above. *See supra* ¶ 27.

104. <u>Plaintiff Jane Doe III:</u> Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe III used the North Kansas City web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

105. In addition to intercepting Jane Doe III's individually identifiable health information and patient status information, the content Meta intercepted from the North Kansas City properties from communications that Jane Doe III exchanged with North Kansas City included, but is not limited to, the detailed URL information described above. *See supra* ¶ 28.

106. <u>Plaintiff John Doe III:</u> Substantially similar transmissions were sent to Meta when Plaintiff John Doe III used the Providence web properties, including when he logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

107. In addition to intercepting John Doe III's individually identifiable health information and patient status information, the content Meta intercepted from the Providence properties from communications that John Doe III exchanged with Providence included, but is not limited to, the detailed URL information described above. *See supra* ¶ 29.

108. <u>Plaintiff John Doe IV:</u> Substantially similar transmissions were sent to Meta when Plaintiff John Doe IV used the MedStar web properties, including when he logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

109. In addition to intercepting John Doe IV's individually identifiable health information and patient status information, the content Meta intercepted from the MedStar properties from communications that John Doe IV exchanged with MedStar included, but is not limited to, the detailed URL information described above. *See supra* ¶ 30.

110. <u>Plaintiff Jane Doe IV:</u> Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe IV exchanged communications with her prescription drug provider Gilead regarding her ▆▆ medication ▆▆▆▆ at the ▆▆▆▆▆▆ web-property regarding her condition and how ▆▆▆ treats it.

111. In addition to intercepting Jane Doe IV's individually identifiable health information and patient status information, the content Meta intercepted from the ▆▆▆ property from communications that Jane Doe IV exchanged with ▆▆▆ included, but is not limited to, the detailed URL information described above. *See supra* ¶ 31.

112. <u>Plaintiff Jane Doe V:</u> Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe V used the MedStar web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

113. In addition to intercepting Jane Doe V's individually identifiable health information and patient status information, the content Meta intercepted from the MedStar properties from communications that Jane Doe III exchanged with MedStar included, but is not limited to, the detailed URL information described above. *See supra* ¶ 32.

114. <u>Plaintiff Jane Doe VI:</u> Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe VI used the Kaiser web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

115. In addition to intercepting Jane Doe VI's individually identifiable health information and patient status information, the content Meta intercepted from the Kaiser properties from

communications that Jane Doe VI exchanged with Kaiser included, but is not limited to, the detailed URL information described above. *See supra* ¶ 33.

116. Plaintiff Jane Doe VII: Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe VII used the Kaiser web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

117. In addition to intercepting Jane Doe VII's individually identifiable health information and patient status information, the content Meta intercepted from the Kaiser properties from communications that Jane Doe III exchanged with Kaiser included, but is not limited to, the detailed URL information described above. *See supra* ¶ 34.

118. Plaintiff Jane Doe VIII: Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe VIII used the Sharp web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

119. In addition to intercepting Jane Doe VIII's individually identifiable health information and patient status information, the content Meta intercepted from the Sharp properties from communications that Jane Doe III exchanged with Sharp included, but is not limited to, the detailed URL information described above. *See supra* ¶ 35.

120. Plaintiff Jane Doe IX: Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe IX used the Kaiser web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

121. The content that Meta intercepted from the Kaiser website includes, but is not limited to, Jane Doe IX's patient status information when she logged into the Kaiser patient portal at: https://healthy.kaiserpermanente.org/northern-california/consumer-sign-on#/signon.

122. Plaintiff Jane Doe X: Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe X used the Adventist web properties, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

123. The content that Meta intercepted from the Adventist website includes, but is not limited to, Jane Doe X's patient status information when she logged into the Adventist patient portal at:

https://accounts.myadventisthealthportal.org/saml2/sso/login?authenticationRequestId=967bb0f8-2d06-4d9c-bd58-a8d1615e8dbb

124. Plaintiff Jane Doe XI: Substantially similar transmissions were sent to Meta when Plaintiff Jane Doe XI used the Sutter website and application, including when she logged into the patient portal. Plaintiff did not have any knowledge of those transmissions or consent to them.

125. The content that Meta intercepted from the Sutter website includes, but is not limited to, Jane Doe XI's patient status information when she logged into the Sutter patient portal at: https://myhealthonline.sutterhealth.org/mho/Authentication/Login.

126. Plaintiffs all expected that their communications with their healthcare providers were confidential and private. Plaintiffs' expectations of privacy were reasonable.

127. Plaintiffs' detailed investigation is supported by an article published by The Markup in June 2022, which found that 33 of the top 100 hospitals in the country were sending health information to Meta via the Pixel, including appointment scheduling.[15]

128. Since the filing of the Consolidated Class Action Complaint, Plaintiffs have identified 1,844 healthcare properties from which Meta is collecting information through the Meta Collection Tools

129. Plaintiffs provided Meta with this list on June 21, 2023 and incorporate the list by reference into this First Amended Complaint via its attachment as Appendix A.

**E.      Plaintiffs' Allegations Include Meta's Other Collection Tools and Both Websites and Applications**

130. Plaintiffs bring this action on behalf of themselves and millions of other Americans whose medical privacy has been violated by Meta's Collection Tools, including but not limited to the Meta Pixel.

131. Plaintiffs' Consolidated Class Action Complaint included the Meta Collection Tools by alleging that Meta used "tracking tools, including the Meta Pixel" to intercept class members'

---

[15] Anson Chan, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022 6:00 am), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

1  health information from websites and applications. *See, e.g.*, Consolidated Class Action

2  Complaint, Dkt. 185 at ¶¶ 1, 6, 8, 63, 84, 102, 124, 129, 131, 175-76, 180, 242, 249, 266, 302(a).

3  For clarity, in this amended complaint, Plaintiffs list the specific tools used by Meta. "Meta

4  Collection Tools" are defined as, "the Meta Pixel, Meta SDK, Meta Conversions API, customer

5  list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar

6  collection tools."

7      132. Plaintiffs bring this action on behalf of Facebook users whose health information was

8  obtained by Meta from their healthcare provider or covered entity's website or application.

9  Plaintiffs' class allegations are not limited to websites.

10      133. For both websites and applications, Meta collects health information using the same

11  technology. For both websites and applications, Meta uses Javascript source code to command the

12  patient's browser or application to re-direct Event Data through the HTTPS protocol to Meta at a

13  Meta "endpoint," i.e., a URL at a domain controlled by Meta that exists for the purpose of

14  acquiring such information.

15      134. Meta also uses the Meta Pixel in mobile "hybrid" applications. A hybrid application

16  is created using identical source code and language to display a web-property on an application or

17  through a website on a browser application. The benefit of a hybrid application is that identical

18  source code can be used across all web-properties – i.e., a website, an Android application, and an

19  iOS application. Meta provides source code for "hybrid apps" and states that its code "convert[s]

20  Facebook Pixel events into App events."

21      135. Meta combines health information on specific persons across different devices and

22  different Meta endpoints. Meta can—and does—associate health information with individual

23  patients gathered across different devices and across different healthcare provider web properties,

24  including both websites and applications.

25      136. Meta's "Consolidated Container" for Event Data – the Meta Conversions API –

26  "enables advertisers to send web, app, and physical store events to Meta through a single endpoint

27  rather than across multiple sources. This consolidation will "simplify an advertiser's tech stack

28  and create a more comprehensive view within Meta Events Manager by using data sets." In

addition, "App Events" can be "associated with a dataset" through which Meta "connects … event data from web, app, and store event sources to the conversions API." The data Meta collects "may show event data from any of these integrations …, including website, app, and offline events." As a result, "all customer activities" can be viewed "from a single interface" in a single storage location that Meta calls a "consolidated container."

137. The Facebook SDK, specifically, "can automatically log app installs, app sessions, and in-app purchases" when deployed on a healthcare provider application.[16] The Facebook SDK can also be used to log other events that users take on an application.

138. Meta's "Graph API is the primary way to get data into and out of the Facebook platform." It is based off of Meta's concept of a social graph, which is a "representation of the information on Facebook" which is "composed of nodes, edges, and fields."[17]

139. Through server-to-server transmissions, developers "can share data directly [with Meta] from [their] server, rather than through a browser."[18]

140. <u>Meta Internal Documents Illustrate that</u> ███████████████████ ███████████████████ – Documents produced in this case describe how

███████████████████████████████████████████

---

[16] https://developers.facebook.com/docs/app-events/overview.
[17] https://developers.facebook.com/docs/graph-api/overview.
[18] https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation/

1  user data flows through ███████████████████████████

2  ████████████████. Meta's internal design documents show that ███████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████:

5  PIXEL_HEALTH000000045.

6       141. "████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████.

11      142. Another document Meta produced in this case shows ███████████

12 ████████████████████████████████████████████████████

13 ██████████████:



25 PIXEL_HEALTH000000039.

26      143. When a HIPAA or CMIA-covered entity has installed the Pixel, SDK, and

27 Conversions API on both its website and application, Meta will collect Event Data from the

website and the application, place it in a consolidated container, and use the comingled information.

**F.      Meta falsely promises Facebook users that it requires its healthcare Partners to have the right to share their data.**

144. Every Facebook user is legally deemed to have agreed to the Terms of Service, Data Policy/Privacy Policy, and Cookie Policy via a checkbox on the sign-up page. The Terms of Service, Data Policy/Privacy Policy, and Cookie Policy are binding on Meta and its users.[19]

145. The Meta contract documents contain general statements that, in exchange for the use of Meta's services, Meta will generally collect information about Facebook users.

146. Meta does not charge users any money to use its services, but Meta is not "free."

147.  In 2019, Meta removed language on its webpage that stated, "It's free and always will be."[20] This conduct demonstrates that Meta is not free. As a digital law expert explained at that time, "Facebook is not free nor has it ever been. Facebook's currency was and still is its users' personal data. It's never been free, though, because data is worth a lot of money."

148. Facebook users provide consideration under the contract by allowing Meta to collect some types of data from Facebook users.

149. Rather than charge money, Meta makes users pay for its services with their personal data, i.e., a "data license."

150. Meta has told this Court that "Facebook is free … *because we gather this data* and we use it for ads." Nov. 9, 2022 Hearing Transcript at 20:20-21.

151. The Court has already explained, based on evidence submitted by Meta in opposition to Plaintiffs' Motion for Preliminary Injunction, that "[t]o provide [its] services, Meta's terms explain, Meta 'collect[s] and use[s] your personal data." Dkt. 159 at 6 (citing Dkt. 76-3 (Terms of Service) at 4).

/ / /

---

[19] *See* Dkt. 76-3 (Terms of Service), 76-4 (Data Policy), 76-5 (Cookies Policy).

[20] https://www.businessinsider.com/facebook-changes-free-and-always-will-be-slogan-on-homepage-2019-8

152. Meta's contract states, "We collect and use your personal data in order to provide the services described above to you." It then informs users, "You can learn how we collect and use your data in our Data Policy."[21]

153. Although the Meta Data Policy makes general broad disclosures about the data it collects, the "data license" Meta charges users in place of money is not unlimited.

154.   For example, by signing up for Meta, a Facebook user has not agreed to exchange with Meta the right for Meta to obtain their bank account information or Social Security number.

155. Like any other contract, by signing up for Meta, the "data license" that Meta charges is limited by the terms of the written contract between Meta and users.

156. The Meta Privacy Policy establishes a minimum amount of information that a person must provide directly to Meta to use Meta's products.

> **What if you don't let us collect certain information?**
>
> Some information is required for our Products to work. Other information is optional, but without it, the quality of your experience might be affected.
>
> Learn more >

157. When a Facebook user clicks the "Learn more" hyperlink, Meta explains that when it says "[s]ome information is *required* for our Products to work" (emphasis added), it means that service will not be permitted unless the requirement is met:

---

[21] The hyperlink to Data Policy sends users to the Meta Privacy Policy at
https://www.facebook.com/privacy/policy/?entry_point=data_policy_redirect&entry=0.

## What happens if you don't let us collect certain information

For example, if you don't provide an email address or phone number, we won't be able to create an account for you to use our Products.

Or you can choose not to add Facebook friends, but then your Facebook Feed won't show friends' photos and status updates.

158. Meta's Terms of Service also expressly incorporates the Meta Privacy Policy by hyperlink, stating that "Our Privacy Policy explains how we collect and use your personal data to determine some of the ads you see and provide all of the other services described" in Meta's Terms of Service.

159. The Meta Privacy Policy begins with the statement, "We at Meta want you to understand what information we collect, and how we use and share it. That's why we encourage you to read our Privacy Policy. This helps you use Meta Products in the way that's right for you."

160. Next, the Meta Privacy Policy has a section titled "What information do we collect?", in which Meta tells users:

> At Meta, we use information to provide you with a more personal, secure, and meaningful experience. But where does that information come from? The information we collect comes from a variety of sources.... *And, sometimes businesses also share information with us like your activity on their websites. They may also share experiences you have offline, like signing up for a Rewards card with your email address.* This makes it easier for them to share promotions, product information, and other ads with you through our ads consistent with the choices that you make.

(Emphasis added.)

161. Meta places the information it collects into four categories:

> Here's the information we collect:
>
> Your activity and information you provide        >
>
> Friends, followers and other connections         >
>
> App, browser and device information              >
>
> Information from Partners, vendors and third parties   >

162. The word "Partners" is a defined term in Meta's contract, which Meta explains are "[b]usinesses and people" who use Meta's "Products," including Meta Collection Tools such as the Meta Pixel or Meta Audience Network tools "to advertise, market, or support their products and services." Meta's "examples" of "Partners" include: advertisers, "companies that measure how well ads are doing and provide reports," and "publishers (like a website or app) and their business partners."

163. The Meta Privacy Policy does not include any category for information collected from Facebook users' healthcare providers, health insurers, pharmacies, prescription drug companies, or other covered entities under 45 C.F.R. § 160.103 and Cal. Civil Code § 561.101, which includes patient portal providers.

164. The Meta Privacy Policy does not specify anywhere that Meta's Partners include healthcare providers, health insurers, pharmacies, prescription drug companies, and other covered entities under 45 C.F.R. § 160.103 and Cal. Civ. Code § 56.101.

165. The Meta Privacy Policy does not state anywhere that Meta actively solicits Facebook users' healthcare providers, health insurers, pharmacies, prescription drug companies, and other covered entities under 45 C.F.R. § 160.103 and Cal. Civil Code § 56.101 to become Meta Partners using Meta's business services.

166. The Meta Privacy Policy does not state anywhere that, in exchange for use of its Products, Meta will collect health information from a Facebook user's healthcare providers, health insurers, pharmacies, prescription drug companies, or other covered entities under 45 C.F.R.

§ 160.103 and Cal. Civ. Code § 56.101 about the Facebook user, including their communications, actions, and status as patients with those health entities.

167. As the Court has previously stated, "Meta's policies do not … specifically indicate that Meta may acquire *health data* from Facebook users' interactions with their *medical providers' websites*." Dkt. 159 at 15.

168. Meta has admitted that there is no "specific consent" for Meta's collection of health information as described in this action.

169. Meta told the Court that "*there is not a specific consent* because Meta doesn't want this data." Nov. 9, 2022 Hearing Transcript at 20:20-21 (emphasis added).

170. In addition to not obtaining specific consent, Meta has affirmatively promised users that it requires "Partners" to have the right to share the users' data before providing it to Meta.

171. In April 2018, Meta added a new clause to its contract with users that states: "We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."

> **Information from partners.**
> Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.
>
> Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.
>
> To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

172. Before April 2018, Meta's contract did not require Partners to have the lawful right to share user data before doing so.

| Before April 19, 2018 | After April 19, 2018 |
| --- | --- |
| **Information from websites and apps that use our Services.** We collect information when you visit or use third-party websites and apps that use our Services (like when they offer our Like button or Facebook Log In or use our measurement and advertising services). This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us. **Information from third-party partners.** We receive information about you and your activities on and off Facebook from third-party partners, such as information from a partner when we jointly offer services or from an advertiser about your experiences or interactions with them. | **Information from partners.** Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information. Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from. To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy. |

173. Meta changed this provision again in July 2022—after Plaintiffs filed this lawsuit—to remove the word "lawful" while still promising that it requires partners to have the right to share patient information with Meta:[22]

> **How do we collect or receive this information from partners?**
>
> Partners use our Business Tools, integrations and Meta Audience Network technologies to share information with us.
>
> These Partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. We require Partners to have the right to collect, use and share your information before giving it to us.

174. Despite the changes it made to this provision over time, Meta has never "required" healthcare providers or other covered entities, to have the right to "collect, use and share" patient information before redirecting it to Meta. Instead, Meta merely includes a provision in its form contract that creates an unenforced "honor system," stating that by using Meta's Business Tools the healthcare provider or covered entity "represent[s] and warrant[s] that [it has] provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage":[23]

---

[22] Meta, *Data Policy: Information from Partners, vendors and third parties* (Jan. 1, 2023), https://www.facebook.com/privacy/policy?subpage=1.subpage.4-InformationFromPartnersVendors.

[23] Dkt. 76-6 at 4.

3. Special Provisions Concerning the Use of Certain Business Tools

   a. This section applies to your use of Business Tools to enable Facebook to store and access cookies or other information on an end user's device.

   b. You (or partners acting on your behalf) may not place pixels associated with your Business Manager or ad account on websites that you do not own without our written permission.

   c. You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage that includes, at a minimum:

      i. For websites, a clear and prominent notice on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Facebook, may use cookies, web beacons, and other storage technologies to collect or receive information from your websites and elsewhere on the Internet and use that information to provide measurement services and target ads, (b) how users can opt-out of the collection and use of information for ad targeting, and (c) where a user can access a mechanism for exercising such choice (e.g., providing links to: http://www.aboutads.info/choices and http://www.youronlinechoices.eu/).

      ii. For apps, a clear and prominent link that is easily accessible inside your app settings or any privacy policy and from within any store or website where your app is distributed that links to a clear explanation (a) that third parties, including Facebook, may collect or receive information from your app and other apps and use that information to provide measurement services and target ads, and (b) how and where users can opt-out of the collection and use of information for ad targeting.

   d. In jurisdictions that require informed consent for storing and accessing cookies or other information on an end user's device (such as but not limited to the European Union), you must ensure, in a verifiable manner, that an end user provides all necessary consents before you use Facebook Business Tools to enable the storage of and access to Facebook cookies or other information on the end user's device. (For suggestions on implementing consent mechanisms, visit Facebook's Cookie Consent Guide for Sites and Apps.)

175. Meta does not verify that healthcare providers or covered entities have provided adequate notice and obtained valid consent or authorization to share their patients' data with Meta.[24]

176. Instead, Meta makes the Pixel available to any advertisers who uses Meta's automated tools to create and deploy the Pixel. This process does not include any effort by Meta to require its Partners to have lawful rights to use the Pixel. Meta does nothing to determine whether an advertiser is placing the Pixel on a website that contains health information and through which Meta will acquire health information.

177. Elsewhere in Meta's Privacy Policy, the term "require" signifies that something is not possible unless it is complied with by a user. For example:

      a.    Meta states that "Some information is required for our Products to work," explaining that "if you don't provide an email address or phone number, we won't be able to create an account for you to use our Products. Or you can

---

[24] The European Union recently ruled that Meta's attempt to obtain consent from users by including a clause in its terms and conditions allowing Meta to collect their data for personal advertising violated Europe's General Data Protection Regulation. Adam Satariano, *Meta's Ad Practices Ruled Illegal Under E.U. Law*, N.Y. Times (Jan. 4, 2023), https://www.nytimes.com/2023/01/04/technology/meta-facebook-eu-gdpr.html.

choose not to add Facebook friends, but then your Facebook Feed won't show friends' photos and status updates."[25] Dkt. 76-12 at 7, 17.

b.  Meta states that it engages in "manual review" to access and review information in some cases but promises, "We require every reviewer who's allowed access to your information to meet privacy and security standards."[26] Dkt. 76-12 at 24.

178. Meta stated to this Court that it has created a "filter to detect data sent through the Pixel" that Meta "categorizes as potentially sensitive data, including health data." Wooldridge Decl. (Dkt. 76-1) ¶ 8. Meta has also stated to members of Congress that it has the ability to "suspend[ ] or terminat[e] [a] developer from using our Business Tools" such as the Pixel.[27]

179. Meta does not use the filter or any other technological means to require web developers to have the right to share health information with Meta.

180. Meta's contract with healthcare providers for use of the Meta Pixel does not mention HIPAA.

181. In its Terms of Service, Meta promises that it goes to great lengths to ensure "the safety, security, and integrity" of its products and services:

> We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content.[28]

182. Meta does not "employ a dedicated team" or contract with an external service provider to determine whether the Pixel is installed on websites that will transmit individually identifiable health information to Meta.

---

[25] Meta, Privacy Policy: What happens if you don't let us collect certain information (Jan. 1, 2023), https://www.facebook.com/privacy/policy?annotations[0]=1.ex.43-WhatHappensIfYou.
[26] Meta, Privacy Policy: Manual review (Jan. 1, 2023), https://www.facebook.com/privacy/policy?annotations[0]=2.ex.2-ManualReviewExamplesOf.
[27] Meta letter to Senator Mark Warner at 4 (Nov. 3, 2022).
[28] Dkt. 76-3 at 4.

183. Meta does not use an advanced technical system to monitor whether Meta Collection Tools are installed on websites that will transmit individually identifiable health information to Meta.

184. To the contrary, Meta Health urges healthcare providers and other covered entities to use Meta Collection Tools to target ads to patients.

185. Because of Meta's breach of contract, Plaintiffs suffered general and direct damages.

186. As a direct and proximate result of Meta's breach of contract, Plaintiffs and Class members did not receive the full benefit of the bargain, and instead received services from Meta that were less valuable than described in their contract with Meta.

187. Plaintiffs and Class members received less than they bargained for.

188. For example, Plaintiffs provided consideration for a social media platform "that require[s] each of these partners to have lawful rights to collect, use and share your data before providing any data to us," but instead received a social media platform that does not require Partners to have the right to share health information with Meta before giving it to Meta.

**G.     Meta's health marketing division targets its "Partner" healthcare providers and covered entities and their patients to "disrupt health" and "market to patients."**

189. On November 9, 2022, Meta told the Court in oral argument in opposition to Plaintiffs' Motion for Preliminary Injunction that:

    a.    "Meta doesn't want sensitive information. It doesn't want health information. … It doesn't want any information that web developers have no right to send, and so Meta is very over-inclusive about what it tries to block out, both contractually and through its own systems, which it is constantly working hard at improving." Nov. 9, 2022 Mot. for PI Hearing Tr. at 21:11-18.

    b.    Meta represented to the Court that it tells developers "don't send us anything that you don't have the legal right to send us and don't send us health information …, even if you think you have the right. Even if you

1    think your disclosures are terrific and you have total consent, don't send us

2    that stuff. We don't want it." *Id*. at 22:1-6.

3    c.    Meta represented to the Court that it has "an over-inclusive filter system …

4    that classifies our partners, these web developers, not as HIPAA-covered,

5    okay, because we go beyond that. We say if it has anything to do with health,

6    then we operate our systems, which are described in the Wooldridge

7    declaration in the portion that are sealed, and we have multiple different

8    backstopping ways of preventing this information from coming into Meta.

9    So we're doing the best we can to prevent that information from coming in

10   and being used." *Id*. at 22:7-18.

11   190. Meta actively encourages health entities to use its marketing tools.

12   191. Meta maintains a "Health" marketing division called Meta Health, with a page at

13   https://www.facebook.com/business/industries/consumer-goods/healthcare   where Meta offers

14   advertisers the chance to "get help growing your healthcare business" and explains how

15   "Healthcare marketers are partnering with Meta."

16   192. The underlying metadata written for this page by Meta describe the page keywords to

17   include: " <meta name="keywords" content="healthcare, marketers, facebook, meta for business,

18   healthcare business, virtual healthcare, preventative healthcare" />."

19   193. Meta Health is dedicated to helping web developers and advertisers in healthcare-

20   related industries to increase their marketing spend with Meta and improve their marketing

21   campaigns using Meta Collection Tools.

22   194. Meta Health's role is to "inform" healthcare marketers "to think about how we can

23   really disrupt health and how we market to patients."[29]

24   195. Meta Health employees are assigned to specific healthcare providers and other

25   covered entities to encourage and aid their use of Meta Collection Tools for targeting patients.

26

27   _____

[29] Facebook, Disrupting Health: A Conversation with Jasson Gilmore,

28   https://www.facebook.com/business/industries/health?deeplink=829704181304626.

196. Meta provides guidance and resources for web developers and advertisers on a dedicated webpage at https://www.facebook.com/business/industries/health. Among other things, this webpage includes examples of advertising campaigns so that web developers and advertisers can "See how health brands are reaching new audiences with Facebook advertising."

197. The underlying metadata written for this page by Meta describes the page keywords to include: ""<meta name="keywords" content="facebook for health, facebook marketing for health communities, facebook ad solutions for health brands, social media marketing, facebook video ads facebook for mobile advertising, health campaign marketing, reach new patients online facebook ads, advertising on facebook" />."

198. For example, Meta highlights an advertising campaign "for adults with COPD":



199. Meta also highlights a campaign aimed at "young women" through video ads promising to "Relieve your period symptoms today":[30]



200. Meta also highlights a campaign as "a unique way to reach [cancer] patients":[31]

---

[30] Meta, *Midol* (2023), https://www.facebook.com/business/success/2-midol.

[31] Meta, *AstraZeneca: Reaching more patients with video ads in Facebook In-Stream Reserve* (2023), https://www.facebook.com/business/success/2-astrazeneca.

201. Meta has also discussed successful advertising campaigns relating to lung cancer, high cholesterol, arthritis, acne, allergies, hair loss, birth control, erectile dysfunction, migraines, and many additional prescription drugs and treatments.[32]

202. To promote its marketing tools to healthcare providers and covered entities, the Meta health webpage includes Meta Health's Erin Ott's interview with Jasson Gilmore, Senior Vice President for Global Consumer & Digital Marketing at AbbVie. In the interview, Gilmore states, "Social media is a primary place your target audience spends their time" and "if you're going to

---

[32] *See generally* Meta, *Get winning advertising solutions from businesses like yours* (2023), https://www.facebook.com/business/success/categories/health-pharmaceuticals. The "marketing case studies" on this page change on occasion.

be trying to market to potential patient populations that have unmet needs or under-serviced, these are platforms that give you immense control and measurability around the way you spend and allocate capital." The pitch also stresses that it can be a "research platform" that provides "millions and millions of data points of the consumers who are interested in our brands," which is "an invaluable asset." Through Meta, an advertiser can get "millions and millions of consumers who actually use [its] brands."[33]

  203. Ott then asks Gilmore specifically about "the patient journey" and how Meta can "play a role in that patient journey."



  204. The response is that Meta's Collection Tools (including the Pixel) can target potential and existing patients:

> We look at these channels in the conventional sort of framework of the patient journey. You have what we call the upper funnel, things like television. I think social media conventionally would be plugged into that sort of upside-down pyramid slide we've all seen a million times, right? It doesn't matter where you work, you've seen a slide like that. And then you have your lower intent, you have things like search, and then obviously we're trying to drive at an event where a consumer is talking to a provider, right? That's sort of your, kind of, conventional consumer journey slot.
>
> I don't think about social that way actually. I think that, you know, really all the way through to a patient who's already on our products.

[33] Facebook, Disrupting Health: A Conversation with Jasson Gilmore, https://www.facebook.com/business/industries/health?deeplink=829704181304626.

I look at their journey as a continuum. Now there's a dynamic in our particular brands where consumers stay on our products for a period of time, and they have a lifetime value. And I want to increase that lifetime value. I want to increase the frequency with which consumers use our products and I want to drag outward the timeline for how long they use our products.

So, in my view, from someone who is a potential consumer, who looks like, you'll hear this phrase 'Lookalike Audience,' the next person who is likely to receive one of our products looks like the last person who uses our product. And so we can use social media to help target potential new consumers, but all the way through, down to people who've been in care on our products for many years.

I use [social media] as a way to reach them. I know who those people are. I can target my media and my messaging around it. And I can actually tailor the message, right? And this gets into the buzzword 'personalization' that we hear so much about. I know who those people who are already on our products, I know who they are. And

I can tailor a message that is custom to the product that they're using, how long they've used it, even how frequently they use it, and even the region and the provider they use it with.

> ❝
>
> We can use social media to help target potential new consumers, but all the way through, down to people who've been in care on our products.
>
> **Jasson Gilmore**
> SVP Global Consumer & Digital Marketing, AbbVie

And so, from my perspective, it's an essential tool not just for driving that kind of traditional upper-funnel sort of dynamic, but really increasing the lifetime of our consumers and then that increases what your cost per acquisition threshold can be.

205. The conversation then makes a direct reference to the detailed level through which Meta's systems work, stating that Meta offers ads "personalization" where "you can know who your audience is," "you can tailor a message that's custom to the product they're using," and "you can know their region and provider."



206. In a pitch directly to healthcare providers, Meta's Ott asks Gilmore, "How are you guys thinking about … arming [healthcare providers] with the tools to advertise for themselves?" The answer: "You have to be using these tools to stay relevant with your customer in this day and age – whatever industry you happen to be in – and this is just as true for our physician partners as it is for our own business."

207. Gilmore explains how his company is helping healthcare providers use Meta's tools and ads, "I think you all do a fabulous job, frankly, of enabling that for your customers."

208. At the end of the video, Gilmore emphasizes the benefit to healthcare providers of knowing who their patients and potentials patients are:

> "
>
> It's such an optimistic thing to know who your patients are or who your potential patients are and how to reach them in a way that is very financially **manageable** and **feasible** and **profitable.**
>
> **Jasson Gilmore**
> SVP Global Consumer & Digital Marketing, AbbVie

209. Meta's Ott concludes the video with a final thought: "Hopefully everyone is really inspired now to think about how we can really disrupt health and how we market to patients."

210. Presumably, if Meta thought that any part of the interview with Gilmore incorrectly explained how Meta's marketing worked, it would not be promoted as a case study of its services.

**H.      Meta's health marketing division already has systems it could adopt to comply with an injunction.**

211. Plaintiffs request permanent injunctive relief in this action.

212. Meta's public descriptions of systems it already has in place for advertising are relevant to demonstrate that Meta is fully capable of complying with an injunction order.

213. In response to Plaintiffs' Motion for Preliminary Injunction, Meta argued that it did not want to receive health information.

214. Plaintiffs filed an expert declaration in support of their reply explaining how Meta could and should create a system to detect Pixel data that it was wrongfully acquiring from

1   healthcare providers that would involve: (1) the use of automated systems to detect health content;

2   (2) automatic blocking of Pixel data from properties sending health content; and (3) an appeal

3   process to address Meta's concerns that its filter may unintentionally block some otherwise lawful

4   data.

5        215. In response, Meta suggested such a system would be unworkable.

6        216. The video on "compliance" that Meta already has in place for ads describes a similar

7   system to the one described by Plaintiffs' expert.[34]

8        217. Meta provides healthcare advertisers with a diagram of its ad review system:



20       218. Meta claims that its "ad review system is actually designed to review all ads

21  proactively, which means before they go live" and "relies primarily on automated technology to

22  apply our advertising policies to the millions of ads that we have going live every single day."

23       219. Meta also states that it uses human reviewers in some cases, and that, the "review

24  process may include specific components of an ad, such as images, video, text, targeting

25  information, or an ad's destination, amongst other information."

26

27  _____

28  [34] See Meta, *Chapter 3: Working together on compliance* (June 13, 2022),
    https://www.facebook.com/business/inspiration/video/healthcare-chapter-3.

220. The ad review process is "typically … completed within 24 hours, but it may take longer and ads may be reviewed again, including after they are live."

221. An ad is either rejected or allowed to run based on the results of Meta's review.

222. When an ad is rejected, Meta offers advertisers options to appeal or work around the rejection. The advertiser can create an entirely new ad or revise the rejected ad to address any policy violations. And "if an advertiser believes that their ad is wrongfully rejected, another review can be requested and the status of this can be tracked in account quality."

223. Meta advises advertisers that "[u]nlike the initial review, we rely more heavily on teams of human reviewers to process re-review requests from advertisers."

224. Later in the same video, Meta tells advertisers that it may place "restrictions on their ability to advertise on Meta platforms" if they repeatedly engage in certain conduct.

225. Meta could and should adapt these systems to, as alleged in further detail below to stop: (1) acquiring health information in violation of federal and state law; (2) acquiring health information in violation of its express privacy promises; and (3) permitting advertisers to use health information to target advertising to patients.

**I.      Meta's conduct violates federal and state privacy laws.**

**1.      The HIPAA Privacy Rule protects patient healthcare information.**

226. Patient healthcare information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

227. The HIPAA Privacy Rule, located at 45 C.F.R. Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, healthcare clearinghouses, and those healthcare providers that conduct certain healthcare transactions electronically."[35]

228. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media;

---

[35] HHS.gov, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

1   maintained in electronic media; or transmitted or maintained in any other form or medium." 45

2   C.F.R. § 160.103.

3        229. IIHI is defined as "a subset of health information, including demographic information

4   collected from an individual" that is: (1) "created or received by a healthcare provider, health plan,

5   employer, or healthcare clearinghouse"; (2) "[r]elates to the past, present, or future physical or

6   mental health or condition of an individual; the provision of healthcare to an individual; or the

7   past, present, or future payment for the provision of healthcare to an individual"; and (3) either (a)

8   "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the

9   information can be used to identify the individual." 45 C.F.R. § 160.103.

10       230. Under the HIPAA de-identification rule, "health information is not individually

11  identifiable only if": (1) an expert "determines that the risk is very small that the information could

12  be used, alone or in combination with other reasonably available information, by an anticipated

13  recipient to identify an individual who is a subject of the information" and "documents the methods

14  and results of the analysis that justify such determination'"; or (2) "the following identifiers of the

15  individual or of relatives, employers, or household members of the individual are removed:

16           A.    Names;

17           H.    Medical record numbers;

18           J.    Account numbers;

19           M.    Device identifiers and serial numbers;

20           N.    Web Universal Resource Locators (URLs);

21           O.    Internet Protocol (IP) address numbers; … and

22           R.    Any other unique identifying number, characteristic, or code…; and"

23                 the covered entity must not "have actual knowledge that the information

24                 could be used alone or in combination with other information to identify

25                 an individual who is a subject of the information." 45 C.F.R. § 164.514.

26       231. The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare

27  providers—to maintain appropriate safeguards to protect the privacy of protected health

28

information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ § 160.103, 164.502.

232. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

233. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Meta when it is knowingly obtaining individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

234. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

### 2. Patient status is among the health information protected by HIPAA.

235. An individual's status as a patient of a healthcare provider is protected by HIPAA. Dkt. 159 at 12 ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."), 15 ("[T]he Pixel captures information that connects a particular user to a particular healthcare provider—i.e., patient status—which falls within the ambit of information protected under HIPAA").

236. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition,**

**healthcare provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[36]

237. HHS's guidance for marketing communications states that healthcare providers may not provide patient lists for marketing purposes without the consent of every included patient:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, **covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list**.[37]

238. HHS has previously instructed that patient status is protected by the HIPAA Privacy Rule:

    a.    "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

    b.    "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

    c.    It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

---

[36] Office for Civil Rights, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[37] Office for Civil Rights, *Marketing* at 1-2 (emphasis added) (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

d.     The only exception permitting a hospital to identify patient status without
express written authorization is to "maintain a directory of individuals in its
facility" that includes name, location, general condition, and religious
affiliation when used or disclosed to "members of the clergy" or "other
persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even
then, patients must be provided an opportunity to object to the disclosure of
the fact that they are a patient. 45 C.F.R. § 164.510(2).

**3.     There is no HIPAA exception for marketing on the Internet.**

239. HHS issued a bulletin in December 2022 "to highlight the obligations" of healthcare
providers and their business associates under the HIPAA Privacy Rule "when using online tracking
technologies" such as the "Meta Pixel," which "collect and analyze information about how internet
users are interacting with a regulated entity's website or mobile application."[38]

240. In the bulletin, HHS confirmed that HIPAA applies to healthcare providers' use of
tracking technologies like the Meta Pixel.[39] Among other things, HHS explained that healthcare
providers violate HIPAA when they use tracking technologies that disclose an individual's
identifying information (like an IP address) even if no treatment information is included and even
if the individual does not have a relationship with the healthcare provider:

> How do the HIPAA Rules apply to regulated entities' use of tracking
> technologies?
>
> Regulated entities disclose a variety of information to tracking
> technology vendors through tracking technologies placed on a
> regulated entity's website or mobile app, including individually
> identifiable health information (IIHI) that the individual provides
> when they use regulated entities' websites or mobile apps. This
> information might include an individual's medical record number,
> home or email address, or dates of appointments, as well as an

---

[38] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information* (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

[39] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of healthcare services. **This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.* it is indicative that the individual has received or will receive healthcare services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or healthcare or payment for care**.

241. HHS explained that tracking technologies on healthcare providers' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

Tracking on user-authenticated webpages

Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.

242. Tracking technology vendors like Meta are considered business associates under HIPAA if they provide services to healthcare providers and receive or maintain PHI, like Meta does:

Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* healthcare operations)

or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.

243. HIPAA applies to healthcare providers' webpages with tracking technologies even outside the patient portal:

Tracking on unauthenticated webpages

[T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal … **[and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances.** For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a healthcare provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

244. And no PHI may be disclosed to tracking technology vendors like Meta unless the healthcare provider has properly notified its website users and entered into a business associate agreement with the vendor:

Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice,

or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individual's HIPAA-compliant authorizations are required **before** the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do **not** constitute a valid HIPAA authorization.

[I]t is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.

245. HHS's bulletin did not create any new obligations. Instead, it highlighted long-standing obligations with citations to previous guidance and rules that have been in place for decades.

### 4.    The FTC Act protects health information.

246. In the context of this case, the FTC has made clear that "health information" is "anything that conveys information—or enables an information—about a consumer's health" and provides an example that location-data alone (such as repeated trips to a cancer treatment facility) "may convey highly sensitive information about a consumer's health." Jillson, Elisa, *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, Federal Trade Commission (July 25, 2023), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases. The FTC has joined HHS in notifying HIPAA-covered entities and non-HIPAA-covered entities that sharing such "health information" with Google and Facebook is an unfair business practice under federal law:

When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue

doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

*FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

### 5. State law also protects health information.

247. The Meta Terms of Service expressly provide that "the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions."

248. Upon information and belief, Plaintiffs' and Class members' information transmitted via the Meta Pixel was sent or received in California.

249. California has enacted several laws to protect patients' information. The California Confidentiality of Medical Information Act requires healthcare providers to preserve the confidentiality of patients' medical information and to obtain valid authorization before disclosing a patient's medical information to a third party. Cal. Civ. Code § 56, *et seq*. The California Consumer Privacy Protection Act requires businesses to disclose that they are obtaining medical information for marketing purposes and obtain written consent. Cal. Civ. Code § 1798.91(a)(2), (c). The California Consumer Privacy Act of 2018 requires business to notify consumers when they collect sensitive personal information, including medical information, and the purposes of the collection and use of that information. Cal. Civ. Code § 1798.100 *et seq.*

250. Meta's conduct in this action violates each of these California laws or involves Meta's knowing participation with healthcare entities in violating these California laws.

251. For example, the California Confidentiality of Medical Information Act provides that "[e]very provider of healthcare, healthcare service plan, *pharmaceutical company*, or contractor who creates, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code

1   § 56.101 (emphasis added). The CMIA then incorporates "remedies and penalties" for violations

2   of the statute, including the creation of a civil action, under Cal. Civ. Code § 56.36 (b) and (c).

3   252. Thus, the California Confidentiality of Medical Information Act applies to

4   pharmaceutical companies and information within their control, rendering Meta's actions with

5   respect to pharmaceutical companies and the interception of health communications with

6   pharmaceutical companies unlawful under California law, which Meta expressly adopts in its

7   relationship with Facebook users.

8   253. The California Consumer Privacy Protection Act applies to "medical information"

9   maintained by any entity, which would include pharmaceutical companies. It provides that "[a]

10  business may not request in writing medical information directly from an individual regardless of

11  whether the information pertains to the individual or not, and use, share, or otherwise disclose that

12  information for direct marketing purposes," without first (1) "disclosing in a clear and conspicuous

13  manner that it is obtaining the information to market or advertise products, goods, or services to

14  the individual;" and (2) "obtaining the written consent of either the individual to whom the

15  information pertains or a legally authorized representative to consent for the individual, to permit

16  his or her medical information to be used or shared to advertise products, goods, or services to the

17  individual." Cal. Civ. Code § 1798.91I.

18  254. The California Consumer Privacy Act of 2018 requires that "[i]f the business collects

19  sensitive personal information," it shall inform consumers of "the categories of sensitive personal

20  information to be collected and the purposes for which the categories of sensitive personal

21  information are collected or used, and whether that information is sold or shared" and "shall not

22  collect additional categories of sensitive information or use sensitive personal information

23  collected for additional purposes that are incompatible with the disclosed purpose for which the

24  sensitive personal information was collected without providing the consumer with notice

25  consistent with this section." Cal. Civ. Code § 1798.100. As defined under the Act, "sensitive

26  personal information" means "personal information that reveals … personal information collected

27  and analyzed concerning a consumer's health." Cal. Civ. Code § 1798.140(ae)(2)(B).

28

255. The California Consumer Privacy Act of 2018 also provides that "[a]ny consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5 …. Is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of a business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory damages, actual damages, injunctive or declaratory relief, or any other relief the court deems proper. Cal. Civ. Code § 1798.150(a). In turn, "personal information" is defined in Cal. Civ. Code § 1798.81.5 to mean "[a]n individual's first name or first initial and the individual's last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted …. Medical information [or] health insurance information." Cal. Civ. Code § 1798.81.5(d)(1)(A)(iv)-(v). "Medical information" means "any individually identifiable information, in electronic or physical form, regarding the individual's medical history or medical treatment or diagnosis by a healthcare professional." Cal. Civ. Code § 1798.81.5(d)(2). "Health insurance information" means "any unique identifier used by a health insurer to identify the individual or any information in an individual's application and claims history." Cal Civ. Code § 1798.81.5(d)(3).

### 6. Patients have protectable property interests in their individually identifiable health information.

256. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things like data and communications. Plaintiffs and Class members have a vested property right in their individually identifiable health information.

257. California courts have described property broadly:

    a.    "The word property may be properly used to signify any valuable right or interest protected by law." *Fields v. Michael*, 91 Cal. App. 2d 443, 449 (1949); *Downing v. Municipal Court*, 88 Cal. App. 2d 345, 359 (1948).

    b.    "The term property is sufficiently comprehensive to include every species of estate, real and person, and everything which one person can own and

transfer to another. It extends to every species of right and interest capable of being enjoyed as such upon which it is practicable to place a money value." *Yuba River Power Co. v. Nevada Irr. Dist.*, 207 Cal. 521, 523 (1920).

c.   "The term [property] is all-embracing, including every intangible benefit and prerogative susceptible of possession or disposition." *People v. Kozlowski*, 96 Cal. App. 4th 853, 866 (2002).

d.   Property includes a copy of a key that is made without the key owner's knowledge when the original is returned to the owner, "which is analogous to making … an unauthorized copy of computer data." *People v. Kwok*, 75 Cal. App. 4th 1236, 1251 (1998).

258. Federal and state law grant patients the right to protect the confidentiality of data that identifies them as patients of a particular healthcare provider and restrict the use of their health data, including their status as a patient, to only uses related to their care or otherwise authorized by federal or state law in the absence of patient authorization.

259. A patient's right to protect the confidentiality of their health data and restrict access to it is a valuable right.

260. In addition to property rights in their health data, patients enjoy property rights in the privacy of their health communications.

261. Patient property rights in their health data and communications are established by:

a.   HIPAA;

b.   The California Confidentiality of Medical Information Act;

c.   The California Consumer Privacy Protection Act;

d.   The California Consumer Privacy Act of 2018;

262. State health privacy laws. American courts have long recognized common law property rights in the content of a person's communications that are not to be used or disclosed to others without authorization.

263. Property rights in communications and information privacy are established by:

a.   The Electronic Communications Privacy Act, including Title I (the Wiretap Act); Title II (the Stored Communications Act); and Title III (the Pen Register Act);

b.   State laws, including the California Invasion of Privacy Act and wiretap/electronic communications privacy acts of other states that establish a right to keep communications confidential;

c.   Common law information property rights regarding the exclusive use of confidential information that have existed for centuries and continue to exist. *See Folsom v. Marsh*, 9 F.Cas. 342, 346 (C.C.D. Mass. 1841) (Story, J); *Baker v. Libbie*, 210 Mass. 599, 602 (1912); *Denis v. LeClerc*, 1 Mart. (La.) 297 (1811).

264. Even Meta's CEO Mark Zuckerberg has acknowledged that Meta users have an ownership interest in their data. In 2010, when Meta first revealed its "Download Your Information" tool, Zuckerberg stated that, "People own and have control over all info they put into Facebook and 'Download Your Information' enables people to take stuff with them."[40]

265. Although Zuckerberg's statements regarding people's ability to "control" the information "put into Facebook" and the ability to access all such data via DYI is not true, his statement about data ownership is true.

266. Meta's unauthorized acquisition of Plaintiffs' and Class members' individually identifiable health information violated their property rights to control how their data and communications are used and who may be the beneficiaries of their data and communications.

### 7.   The information Meta acquires without Plaintiffs' and Class members' consent has actual, measurable monetary value

267. Meta's services are not free.

268. Rather than pay with cash, Facebook users pay for Meta's services by agreeing to provide Meta with the right to collect certain data, the "data license."

269. Meta's "data license" rights to collect data about its users is not unlimited.

---

[40] https://techcrunch.com/2010/10/06/facebook-now-allows-you-to-download-your-information/.

270. The "data license" for Meta's services is defined by law and Meta's contract.

271. By law, Meta may not collect individually identifiable health information about users without express informed consent on a form separate from the contract of adhesion that Meta presents to users. Where individually identifiable health information is collected for marketing purposes, the legal requirements for its collection and use are even more stringent.

272. Other limitations on the "data license" paid for Meta's services are outlined by the Meta contract.

273. The "data license" includes data that Facebook users provide when signing up for Meta and when using Meta platforms on Meta properties – subject to limitations in Meta's contract.

274. The "data license" also includes data that Meta specifically discloses as part of the "data license" in the Meta contract documents, and that Meta does not specifically exclude from the "data license" as part of the contract.

275. As described above, the "data license" to become a Facebook user does not include individual health information associated with a Facebook user and their healthcare provider or other covered entities under federal and state health privacy laws.

276. Although not included in the contract, Meta collects this additional data anyway, thereby overcharging Plaintiffs and Class members for use of Meta's services.

277. The "data license" overcharge that Meta collects without authorization, and the collected data, has monetary value.

278. For example, a 2015 study found respondents placed a value of $59.80 on health information.

| Data type | Value |
|---|---|
| Passwords (login details) | $75.8 |
| Health condition | $59.8 |
| Social Security number * | $55.7 |
| Payment details (credit card) | $36.0 |
| Credit history | $29.2 |
| Names of friends & family members | $23.5 |
| Purchase histories | $20.6 |
| Physical location (GPS) | $16.1 |
| School or employer | $13.3 |
| Home address | $12.9 |
| Photos & videos | $12.2 |
| Hobbies, tastes & preferences | $12.2 |
| Marital status | $8.3 |
| Email address | $8.0 |
| Browser settings & histories | $7.1 |
| Special dates including date of birth | $5.9 |
| Phone numbers | $5.9 |
| Name | $3.9 |
| Gender | $2.9 |

\* This response was only available for US participants

279. In addition, some companies sell de-identified health information in the open market. For example, a company named Prognos Health provides a data platform where it purports to sell information from "more than 325 million de-identified patients."[41]

280. Meta obtains substantial revenues from the collection and use of private health data for targeted ads. For example, one way that Meta and other data companies report on the value of

---

[41] Prognos Health, *Prognos Health Announces Patent-Pending Technology* (Apr. 6, 2021), prognoshealth.com/about-us/news/press-release/prognos-health-announces-patent-pending-technology.

their business is through average revenue per user or "ARPU." Meta has long used ARPU in its Annual and Quarterly Reports to the United States Securities and Exchange Commission.

281. In its 2022 Form 10-K, Meta reported total advertising revenue of $15 billion in the United States and Average Revenue Per User of $58.77 for the fourth quarter of 2022.



282. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

283. Meta itself has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

284. Recent reporting indicates that Meta plans to charge customers $14 per month to opt-out of receiving targeted advertising for Facebook and Instagram. https://www.wsj.com/tech/meta-floats-charging-14-a-month-for-ad-free-instagram-or-facebook.

285. Markets, including black markets, do exist for such data.[42] It has been reported that health data can be "more expensive than stolen credit card numbers" on black markets.[43]

**J.      Meta has acknowledged that targeted health advertising is not appropriate, but provides Pixel-based "work-arounds" for its healthcare providers and covered entities**

286. Meta has publicly acknowledged that targeted advertising based on health information is not appropriate.

287. On April 10, 2018, Meta CEO Mark Zuckerberg testified in a joint hearing before the United States Senate Committees on Commerce and Judiciary. During the hearing, Zuckerberg had the following exchange with Senator Edward Markey:[44]

> Sen. Markey: In response to Sen. Blumenthal's pointed questions, you refused to answer whether Facebook should be required by law to obtain clear permission from users before selling or sharing their personal information. So I'm going to ask it one more time. Yes or no. Should Facebook get clear permission from users before selling or sharing sensitive information about your *health*, your finances, your relationships? Should you have to get their permission?
>
> Zuckerberg: Senator, *we do require permission* to use the – the system, and to – to put information in there, and for – *for all the uses of it*. I want to be clear. We don't sell information. So regardless of whether could get permission to do that, that's just not a thing …we're going to do.

288. In the same hearing, Zuckerberg was asked by Sen. Mazie Hirono what assurances Zuckerberg could give that targeting based on sensitive categories, such as race, was "going to stop?" Zuckerberg responded by stating that Meta had "removed the ability to exclude ethnic

---

[42] Joanne Kim, Data Brokers and the Sale of Americans' Mental Health Data, Duke Sanford School of Public Policy, available at https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2023/02/Kim-2023-Data-Brokers-and-the-Sale-of-Americans-Mental-Health-Data.pdf

[43] Aarti Shahani, *The Black Market For Stolen Healthcare Data*, NPR: All Tech Considered (Feb. 13, 2015 4:55 am ET), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data.

[44] C-Span, *Facebook CEO Mark Zuckerberg Hearing on Data Privacy and Protection* (April 10, 2018), https://www.c-span.org/video/?443543-1/facebook-ceo-mark-zuckerberg-testifies-data-protection&event=443543&playEvent, at 2:23:53-2:30:02.

groups and other sensitive categories from ad targeting. So that just isn't a feature that's even available anymore."

289. Yet again in the same hearing, Zuckerberg was unable or unwilling to directly answer a question during the hearing from Sen. Roger Wicker whether Meta could track someone's browsing activity even when there were logged off of Facebook.[45]

> Sen. Wicker: One other thing: There have been reports that Facebook can track a user's Internet browsing activity, even after that user has logged off of the Facebook platform. Can you confirm whether or not this is true?
>
> Zuckerberg: Senator – I – I want to make sure I get this accurate, so it would probably be better to have my team follow up afterwards.
>
> Sen. Wicker: You don't know?
>
> Zuckerberg: I know that the – people use cookies on the Internet, and that you can probably correlate activity between – between sessions. We do that for a number of reasons, including security, and including measuring ads to make sure that the ad experiences are the most effective, which, of course, people can opt out of. But I want to make sure that I'm precise in my answer.

290. In March 2020, Meta responded to an article in the Washington Post titled, "Facebook has a prescription: More pharmaceutical ads," by claiming that "Medical history is not used to inform the interest categories that we make available to advertisers, and we prohibit businesses from sending us sensitive health information. Our teams work with health related companies looking to reach their audiences on Facebook and we require them to act in accordance with the law."[46]

291. Upon information and belief, Meta staffers advised CEO Mark Zuckerberg as early as 2020 that Meta should stop using health information for advertising.

---

[45] *Id.* at 1:06:11-106:59.

[46] Nitasha Tiku, *Facebook Has a Prescription: More pharmaceutical ads: Pharmacy companies are ramping up their spending on social media, triggering some patient advocate concerns about privacy*, Washington Post (Mar. 3, 2020 1:15 am), https://www.washingtonpost.com/technology/2020/03/03/facebook-pharma-ads/.

292. On November 9, 2021, Meta announced that it was removing the ability to target users on "topics people may perceive as sensitive, such as options referencing causes, organizations, or public figures that relate to health."[47]

293. Meta's announcement was a public relations success.

    a.    Reuters published a story headlined "Facebook plans to remove thousands of sensitive ad-targeting options" and lead the story with a sentence about Facebook's "plans to remove detailed ad-targeting options that refer to 'sensitive' topics, such as ads based on interactions with content around … health."[48]

    b.    The New York Times published a similar story with a similar headline, "Meta plans to remove thousands of sensitive ad-targeting categories: Ad buyers will no longer be able to use topics such as health . . . to target people."[49]

    c.    The Associated Press, CNN, UPI, Wall Street Journal, Forbes, Politico and hundreds of other medical outlets published identical or similar articles, giving Facebook's users the misimpression that Meta would not allow targeted advertising based on health-related topics.

    d.    Appendix B that contains headlines, links, and quotations from articles published by just eight of these outlets as a result of Meta's public announcement.

294. The Wall Street Journal reported that Meta's decisions relating to health involved CEO Mark Zuckerberg: "Meta … said it would eliminate micro-targeting options for advertisers

---

[47] Meta, *Removing Certain Ad Targeting Options and Expanding Our Ad Controls* (Mar. 30, 2022), https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expanding-our-ad-controls.

[48] Elizabeth Culliford, *Facebook plans to remove thousands of sensitive ad-targeting options*, Reuters (Nov. 9, 2021), https://www.reuters.com/technology/facebook-removes-target-options-advertisers-some-topics-2021-11-09/.

[49] Mike Isaac & Tiffany Hsu, *Meta plans to remove thousands of sensitive ad-targeting categories*, N.Y. Times (Nov. 9, 2021), https://www.nytimes.com/2021/11/09/technology/meta-facebook-ad-targeting.html.

on topics related to … sensitive issues, a reversal for the company after CEO Mark Zuckerberg overruled staffers who called for tougher restrictions on such practices. Starting Jan. 19, the company will no longer allow advertisers to highly personalize their messages to users on topics including politics, race, health, and sexual orientation, the company said Tuesday."[50]

295. Despite the impression that it was prohibiting targeting based on health, in fact, Meta informed advertisers they could still use "website custom audiences and lookalike" to "help reach people who have already engaged with a business or group's website or products."[51] In the case of healthcare providers and covered entities, the "people who have already engaged" are patients.

296. According to Meta, "A lookalike audience uses an existing Custom Audience you select for its source audience. To create a lookalike audience, our system leverages information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities. When you use a lookalike audience, your ad is delivered to that audience of people who are similar to (or 'look like') your existing customers."[52]

297. Through a Lookalike Audience, a healthcare company can target other users of the same demographics, interests, and behaviors of certain patients – such as those who have expressed an interest in or exchanged communications relating to specific treatments, conditions, symptoms, or services – resulting in targeted advertising based on those specific treatments, conditions, symptoms, or services.

---

[50] Jeff Horowitz, *Facebook-Parent Meta Limits Ad Targeting for Politics and Other Sensitive Issues: CEO Mark Zuckerberg Had Overruled Staffers Last Year When They Pushed for Similar Changes*, The Wall Street Journal (Nov. 9, 2021 4:34 pm), wsj.com/articles/facebook-parent-meta-bans-targeting-for-political-ads-11636488053.

[51] Meta, *Removing Certain Ad Targeting Options and Expanding Our Ad Controls* (Mar. 30, 2022), https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expanding-our-ad-controls.

[52] Meta Business Help Center, *About Lookalike Audiences* (2023), https://www.facebook.com/business/help/164749007013531?id=401668390442328.

298. Meta publishes guidance for brands in the health and pharmaceutical industry (which includes healthcare providers and covered entities).[53] As seen in the image below, Meta's 2022 guidance for health-related advertising instructs that targeting "Lookalikes of Meta Pixel" created the best results:



299. In August 2022, Meta published a white paper on its Health page addressing how "to uncover alternative targeting strategies" for health-related targeted advertising. The study advised that "Lookalike Audiences" of "Meta Pixel signals" were a cost-efficient replacement.[54]

300. In other words, while eliminating targeting based on health-interest categories, Meta simultaneously encouraged healthcare providers and other covered entities to increase their use of

---

[53] *Id.*

[54] Meta, *Enabling privacy and personalization in health advertising* (2022), https://www.facebook.com/business/industries/health (choose "Learn more" under "STUDY: Enabling privacy and personalization in health advertising").

1  the Meta Pixel, allowing Meta to continue to collect individually identifiable health information

2  about patients.

3      301. The Meta Health division publishes videos that it uses to encourage healthcare

4  providers and other covered entities to use Meta Collection Tools for health-based advertising.

5  The page for https://www.facebook.com/business/industries/consumer-goods/healthcare contains

6  hyperlinks to three videos designed to aid healthcare Partners to send patient information to Meta:








22     302. In its video on the topic of "compliance," Meta advises advertisers how they can

23  (1) block commenters on their Meta pages; (2) add additional product safety information into an

24  ad; and (3) comply with Meta's "restrictions" on health advertising and still target ads to Facebook

25  users based on their health status.[55] This video does not address HIPAA, the CMIA, or other health

---

[55] Meta, *Chapter 3: Working together on compliance* (June 13, 2022),
https://www.facebook.com/business/inspiration/video/healthcare-chapter-3.

privacy laws or regulations. However, it does provide Meta's healthcare Partners with instructions on how to work their way around Meta's health advertising policies.

303. Meta's Niall Yelverton begins the video by explaining that it is the third and "final part of our series on why Meta and its platforms are the right places for your healthcare brands and how we can help you make the most of them."

304. To help avoid Meta's restrictions, Meta offers to "pre-review your ad to help it get through the approval process. The earlier we can be a part of the creative conversations, the better." By doing so, Meta takes an active role in the content of ads shown on its platform.

305. Meta tells advertisers:

> It's okay to describe or show a product or service that you want to promote, but you need to make sure your ads don't contain any content that talks about or implies personal attributes. This includes direct or indirect comments about a person such as their name, race, age, or even medical conditions, both mental and physical. You can't use words like 'you' or pose a question and you can't reference other in relation to a personal characteristic. For example, 'meet others who suffer from cancer' because you can't imply that you know anything personal about the person that you're targeting.

306. Meta then illustrates the differences between compliant and non-compliant text for targeted ads based on health. Under Meta's rules, it would not be acceptable for an ad targeting people with diabetes or depression to ask, "Do you have diabetes?" or "Depression getting you down? Get help now." But it would be acceptable to target people with bulimia, depression, or diabetes with ads that state, "Bulimia counseling available;" "Depression counseling;" or "New diabetes treatment available."

| "Compliant" Personal Health Targeting | "Non-Compliant" Personal Health Targeting |
|---|---|
| Diabetes treatment available. | Do you have diabetes? |
| Depression counseling. | Depression getting you down? Get help now. |
| Bulimia counseling available. | |

307. Meta provides advertisers with a PowerPoint slide to emphasize the point:



308. Meta's distinctions do nothing to protect the health information of Facebook users.

309. The purpose of Meta's ads policies is not to prevent ad targeting based on health.

310. Meta's ad policies merely mask the fact that Meta is permitting advertisers to target Facebook users based on health information such as bulimia, depression, and diabetes.

311. The purpose of Meta's ad policies is to make it more difficult for Facebook users to understand that Meta is permitting advertisers to target them based on individually identifiable health information.

312. As discussed above, Meta actively encourages healthcare providers and covered entities to install the Meta Collection Tools on their websites and applications, even though the type of information collected by Meta Collection Tools on a healthcare provider or covered entity's website and application will foreseeably include HIPAA-protected information and information protected by the California Medical Information Act.

313. Meta actively encourages healthcare providers and covered entities to create custom audiences and lookalike audiences based on data they have collected from Meta Collection Tools,

1   even though that data will foreseeably include HIPAA-protected information and information

2   protected by the California Medical Information Act.

3   314. As demonstrated by Meta's course of conduct, knowledge and statements, Meta

4   intends to induce healthcare providers and covered entities to install Meta Collection Tools, collect

5   patient medical data, and share that data with Facebook without authorization.

6   315. Meta engages in this scheme in order to make money.

7   316. Meta earns additional revenue selling advertisements to healthcare providers and

8   covered entities who target custom audiences and lookalike audiences based on data containing

9   individually identifiable health information collected through Meta Collection Tools.

10  317. Meta also earns additional revenue because healthcare providers and covered entities

11  buy more Meta advertisements due to the healthcare providers and covered entities being able to

12  share protected health information with Meta without authorization.

13  318. Meta saves money, and thus earns unjust profits, by refusing to spend money on

14  systems and procedures that would stop healthcare providers and covered entities from sharing

15  protected health information with Meta without authorization.

16  **K.   Meta can identify healthcare provider webpages where the Meta Collection**

17  **Tools are redirecting patients' health information to Meta without patients'**

18  **consent.**

19  319. One of Meta's Business Tools, the Facebook Crawler, "crawls the HTML of an app

20  or website …. The crawler gathers, caches, and displays information about the app or website,

21  such as its title, description, and thumbnail image." Meta instructs developers to "[e]nsure that

22  your app or website allows the Facebook Crawler to crawl the privacy policy associated with your

23  app or website."[56]

24  320. Meta could use the Facebook Crawler to identify all or practically all significant

25  webpages where Meta Collection Tools are deployed by healthcare providers or covered entities.

26

27

28

---

[56] Meta, *Meta for Developers: The Facebook Crawler* (2023),
https://developers.facebook.com/docs/sharing/webmasters/crawler.

321. In addition to the Facebook Crawler, Meta has created and maintains the FacebookBot, which Meta publicly describes as a tool that "crawls public web pages to improve language models for [Meta's] speech recognition technology" and which "crawl[s] 1 page per second by default."[57]

322. Other public documents from Meta acknowledge that the FacebookBot has obtained "2 trillion tokens of data from publicly available sources." As used in this statement, a "token" is simply a word that is derived from a text document that the FacebookBot crawled. Meta also states that its FacebookBot language model includes "over one million human-annotated examples[.]" Such data was collected up to September 2022, and updated in July 2023.

323. Meta could use the FacebookBot, data collected from the FacebookBot, and other data in its possession, custody, or control to identify all HIPAA- or CMIA-covered entities from which it is collecting information.

324. Federal law requires every healthcare provider or covered entity to "prominently post its [HIPAA] notice on the website and make the notice electronically available through the website." 45 C.F.R. § 164.520I(3).

325. Meta could use the Facebook Crawler and/or the FacebookBot to identify websites with the required HIPAA notice because the notice must include the phrase, "THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THAT INFORMATION." 45 C.F.R. § 164.520(b)(i).

326. Similarly, Meta can identify CMIA-covered pharmaceutical companies by searching for labeling language required by the FDA in 21 C.F.R. § 208.20, which requires prescription drug companies to provide "Medication Guides" in certain circumstances that "shall contain" a heading, "What is the most important information I should know about [DRUG NAME]."

327. Meta could have used the Facebook Crawler and/or FacebookBot at any point in the past to have identified and prevented health information from being collected via Meta Collection Tools.

---

[57] https://developers.facebook.com/docs/sharing/bot/.

328. Meta can identify all web developers and marketers to whom it provides services through the Meta Health division.

329. Upon information and belief, Meta maintains content classifications or taxonomies (sometimes called "verticals"), including health classifications, for each "Partner" and webpage from which Meta acquires information through Meta Collection Tools.

330. Meta is capable of using its own internal content classifications to identify health content that it is acquiring through Meta Collection Tools without authorization.

331. The digital advertising industry maintains standards for content classifications or taxonomies (sometimes referred to as "verticals") that are typically used for ad targeting. Industry "Content Taxonomy" standards are published by the Interactive Advertising Bureau, a trade group consisting of more than 700 companies (including Meta) that develops technical standards and solutions for the ad tech industry. The full standards are available at: https://iabtechlab.com/standards/content-taxonomy/ and https://iabtechlab.com/wp-content/uploads/2022/06/Content-Taxonomy-v3.0-Final.xlsx. The IAB "Content Taxonomy" standards include, but are not limited to the following categories: medical health, blood disorders, bone and joint conditions, brain and nervous system disorders, cancer, dental health, diabetes, digestive disorders, ENT conditions, endocrine and metabolic diseases, hormonal disorders, menopause, thyroid disorders, eye and vision conditions, foot health, heart and cardiovascular diseases, infectious diseases, lung and respiratory health, mental health, reproductive health, birth control, infertility, pregnancy, sexual health, skin and dermatology, sleep disorders, substance abuse, medical tests, pharmaceutical drugs, surgery, and vaccines.

332. Meta categorizes its advertising partners into industry-specific categories called "verticals."

333. Meta has a vertical for its "████████████████████" partners, which includes sub-verticals for:



*See* PIXEL_HEALTH0000000355.

334. Under the general vertical of "████████," Meta has a sub-vertical for "████████ ████████."

335. Meta has disclosed that it had identified the following number of total entities in the above-mentioned verticals by quarter going back to at least Q1 2020:

1

336. In addition to the verticals described above, Meta maintains a subvertical of "███

"  under the general vertical of "███."

337. Meta maintains a list of more than ███ websites that have been flagged by the

Filter as properties from which Meta may be collecting sensitive health information.

338. Despite having affirmatively identified these healthcare entities as health-related,

Meta continues to collect health information from the web-properties that Plaintiffs were able to

determine are associated with those HIPAA-covered entities.

**L.      Meta has been required to thoroughly police itself since at least 2011 by consent decrees governing the company's conduct.**

339. On July 27, 2012, the Federal Trade Commission entered an order pursuant to a

Consent Agreement with Meta, wherein it was ordered and agreed that, until July 27, 2032 twenty

years from the most recent date that the United States or the FTC files a complaint alleging any

violation of the order, whichever comes later, Meta "shall not misrepresent in any manner,

expressly, or by implication, the extent to which it maintains the privacy or security of covered

information [defined as "information from or about an individual consumer, including name,

address, email address, phone number, IP address, User ID or other persistent identifier, physical

location, or any information combined with any of the above], including, but not limited to:"

        a.      Meta's "collection or disclosure of any covered information";

        b.      "The extent to which a consumer can control the privacy of any covered

                information"; and

        c.      "The steps Respondent takes or has taken to verify the privacy or security

                protections that any third party provides."

340. Meta also agreed to "establish and implement, and thereafter maintain, a

comprehensive privacy program that is reasonably designed to (1) address privacy risks related to

the development and management of new and existing products and services for consumers; and

(2) protect the privacy and confidentiality of covered information. Such program, the content and

implementation of which must be documented in writing, shall contain controls and procedures

1    appropriate to [Meta's] size and complexity, the nature and scope of [Meta's] activities, and the

2    sensitivity of the covered information, including:

3              a.     "Designation of an employee or employees to coordinate and be responsible

4                     for the privacy program;"

5              b.     "the identification of reasonably foreseeable, material risks, both internal

6                     and external, that could result in [Meta's] unauthorized collection, use, or

7                     disclosure of covered information and an assessment of the sufficiency of

8                     any safeguards in place to control these risks. At a minimum, this privacy

9                     risk assessment should include consideration of risks in each area of

10                    relevant operation, including, but not limited to: (1) employee training and

11                    management, including training on the requirements of this order; and (2)

12                    product design, development, and research."

13             c.     "the design and implementation of reasonable controls and procedures to

14                    address the risks identified through the privacy risk assessment, and regular

15                    testing or monitoring of the effectiveness of those controls or procedures;"

16             d.     "the development and use of reasonable steps to select and retain service

17                    providers capable of appropriately protecting the privacy of covered

18                    information they receive from Respondent and requiring service providers,

19                    by contract, to implement and maintain appropriate privacy protections for

20                    such covered information;" and

21             e.     "the evaluation and adjustment of [Meta's] privacy program in light of the

22                    results of the testing and monitoring required …. any material changes to

23                    [Meta's] operations or business arrangements, or any other circumstances

24                    that [Meta] knows or has reason to know may have a material impact on the

25                    effectiveness of the privacy program."

26         341. Upon implementation of the privacy program, Meta agreed to "obtain initial and

27    biennial assessments and reports ('Assessments') from a qualified, objective, independent third-

28    party professional, who uses procedures and standards generally accepted in the progression."

Each Assessment was required to "set for the specific privacy controls" implemented during the reporting period, "explain how such privacy controls are appropriate to [Meta's] size and complexity, the nature and scope of [Meta's] activities, and the sensitivity of the covered information;" "explain how the privacy controls meet or exceed the protections" required by the Order; and "certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the reporting period." Each Assessment is provided to the Associate Director of Enforcement in the Bureau of Consumer Protection at the Federal Trade Commission.

342. Meta is further required to maintain records of:

    a.   "All widely disseminated statements by [Meta] or its representatives that describe the extent to which [Meta] maintains and protects the privacy, security, and confidentiality of any covered information, including, but not to, any statement related to a change in any website or service controlled by [Meta] that relates to the privacy of such information, along with all materials relied upon in making such statements, and a copy of each materially different privacy setting made available to users;"

    b.   "All consumer complaints directed at [Meta] or forwarded by [Meta] to a third party, that relate to the conduct prohibited by this order and any responses to such complaints;"

    c.   "Any documents, prepared by or on behalf of [Meta] that contradict, qualify, or call into question [Meta's] compliance with this order;"

    d.   "Each materially different document relating to [Meta's] attempt to obtain the consent of users referred to [in the Order], along with documents and information sufficient to show each user's consent; and documents sufficient to demonstrate, on an aggregate basis, the number of users for whom each such privacy setting was in effect at any time [Meta] has attempted to obtain and/or been required to obtain such consent;" and

e.   "All materials relied upon to prepare the Assessment, whether prepared by or on behalf of [Meta], including but not limited to all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, for the compliance period covered by such Assessment."

343. On or about April 27, 2020, the FTC Modified its Prior Order and issued a new order to which Facebook consented and which was approved by Judge Timothy J. Kelly in the District Court of Columbia. The Decision and Order modifying the prior order added the following provisions:

a.   The update defined a "Covered Incident" to mean "any instance in which [Meta] has verified or otherwise confirmed that the Covered Information of 500 or more Users was or was likely to have been accessed, collected, used, or shared by a Covered Third Party in violation of [Meta's] Platform Terms."

b.   "Covered Information" had a substantially similar definition as the previous order except that it added Social Security numbers, driver's licenses, financial account information, credit or debit information, dates of birth, and biometric information.

c.   "Covered Third Party" was defined to include "any individual or entity that uses or receives Covered Information obtained by or an behalf of [Meta] outside of a User-initiated transfer of Covered Information as part of a data portability protocol or standard."

d.   Meta is legally required to "[a]ssess and document, at least once every twelve months, internal risks in each area of its operation [including] partnerships with Covered Third Parties … to the privacy, confidentiality, or Integrity of Covered Information that could result in the unauthorized access, collection, use, destruction, or disclosure of such information. [Meta] shall further assess and document internal and external risks as described above as they related to a Covered Incident, promptly following

1      verification or confirmation of such an incident, not to exceed thirty (30)

2      days after the incident is verified or otherwise confirmed."

3    e.    Meta is legally required to "design, implement, maintain, and document

4      safeguards that control for the material internal and external risks identified

5      by [Meta] [with] [e]ach safeguard … based on the volume and sensitivity

6      of the Covered Information that is at risk, and the likelihood that the risk

7      could be realized and result in the unauthorized access, collection, use,

8      destruction, or disclosure of the Covered Information."

9    f.    "Specifically with respect to [Meta's] collection, use, or sharing of Covered

10      Information in any new or modified product, service, or practice, such

11      safeguards shall include: … a privacy review that assesses the risks to

12      privacy, confidentiality, and Integrity of the Covered Information, the

13      safeguards in place to control such risks, and the sufficiency of the User

14      notice, and, if necessary, consent; and documenting a description of each

15      reviewed product, service, or practice that was ultimately implemented, any

16      safeguards being implemented to control for the identified risks; and the

17      decision or recommendation made as a result of the review."

18    g.    "For each new or modified product, service or practice that presents a

19      material risk to privacy, confidentiality, or Integrity of the Covered

20      Information … producing a written report that describes: the types of

21      Covered Information that will be collected, and how that Covered

22      Information will be used, retained, and shared; the notice provided to users,

23      and the mechanisms, if any, by which Users will consent to, the collection

24      of their Covered Information, and the purposes for which such information

25      will be used, retained, or shared by Respondent; any risks to the privacy,

26      confidentiality, or Integrity of the Covered Information; existing safeguards

27      that would control for the identified risks … and whether any new

28      safeguards would be needed; and any other known safeguards or other

procedures that would mitigate the identified risks to the privacy, confidentiality, and Integrity of the Covered Information that were not implemented, such as minimizing the amount or type(s) of Covered Information that is collected, used, and shared, and each reason that those alternatives were not implemented."

h.   Meta "must submit a report within thirty (30) days following [Meta's] verification or confirmation of a Covered Incident" to its Assessor and the Federal Trade Commission.

i.   Meta must "create" an "Independent Privacy Committee" consisting of Independent Directors that "shall meet with the Assessor at least quarterly."

344. Meta received notice of suits relating to hospitals' unauthorized use of the Meta Pixel *at least as early as* August of 2020.

345. When Meta received notice of the litigation against hospitals based on those hospitals unauthorized use of the Meta Pixel on their websites, it was required by the FTC Consent Decree to produce a "Covered Incident" report.

346. Despite having outside notice of a Covered Incident, Meta took no action to actually require healthcare providers or covered entities to obtain the right to share patient information with Meta before doing so. Instead, Meta continued to encourage healthcare providers and covered entities to use Meta Collection Tools to share individually identifiable health information with Meta for the purpose of "inspiring" healthcare marketers and providers to "think about how we can really disrupt health and how we market to patients."

**M.   Meta uses health information it acquires without authorization for commercial gain.**

347. Plaintiffs action arises out of Meta's unauthorized acquisition of the health information, regardless of how Meta subsequently used or did not use the information.

348. Meta served Plaintiff John Doe I with ads based on his health information after he visited MedStar's website and reviewed information regarding his orthopedic surgery.



349. Upon information and belief, Meta maintains a history of every ad that it has shown to Plaintiffs and Class members on and off of Meta's social media sites, including on Meta properties and the Facebook Audience Network through which Meta serves ads to Facebook users on non-Meta websites.

350. Meta "generate[s] substantially all of [its] revenue from advertising."[58]

351. Upon information and belief, Meta annually receives billions of dollars of unearned advertising sales revenue from Meta heathcare Partners who are targeting Facebook users based on their health information.

_____
[58] Meta 2022 Annual Report at 17.

352. Meta does not publicly report revenues by advertiser categories or sectors. However, in 2019, the Washington Post reported that "[s]pending on Facebook mobile ads alone by pharmaceutical and health-care brands reached nearly a billion dollars in 2019, nearly tripling over two years, according to Pathmatics, an advertising analytics company."[59]

## V.    CLASS ACTION ALLEGATIONS

353. Plaintiffs bring this case as a class action on behalf of themselves and the following Class:

> All Facebook users whose health information was obtained by Meta from their healthcare provider or covered entity through Meta Collections Tools.

354. "Meta Collection Tools," are defined as, "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar collection tools."

355. A "covered entity" refers to a healthcare provider, health insurer, healthcare clearinghouse, patient portal provider, pharmacy, pharmaceutical company, and any other entity, business associate, or contractor for which health or medical information is protected by HIPAA or the CMIA.

356. Excluded from the Class are the Court and its personnel and Meta and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

357. Also excluded from the Class is health information that was obtained by Meta from Hey Favor, Inc.

358. Numerosity. The members of the Class are so numerous and geographically diverse that joinder is impracticable.

359. Commonality and Predominance. One or more common questions of law or fact are apt to drive resolution of the case and predominate over any questions affecting solely individual Class members. The common questions include but are not limited to:

---

[59] Nitasha Tiku, *Facebook has a prescription: More pharmaceutical ads*, Washington Post (Mar. 4, 2020 at 1:15 am), washingtonpost.com/technology/2020/03/03/facebook-pharma-ads/.

a.   Whether the Meta Terms of Service, Data Policy, and Cookies Policy constitute a valid contract between Meta and users;

b.   Whether Meta failed to "require" healthcare providers and covered entities to have the right to share patient data with Meta before deploying Meta Collection Tools on their websites;

c.   Whether Meta "employs dedicated teams around the world" to "detect potential misuse" of Meta Collection Tools as alleged in this action;

d.   Whether Meta "works with external service providers, partners, and other relevant entities" to "detect potential misuse" of Meta Collection Tools as alleged in this action;

e.   Whether Meta "develop[s] advanced technical systems" to "detect potential misuse" of Meta Collection Tools as alleged in this action;

f.   Whether Meta acquired the content of Class members' health communications;

g.   Whether Meta breached its contract with Class members;

h.   Whether Class members validly authorized Meta to acquire their individually identifiable health information;

i.   Whether Meta's acquisition of Class members' communications with their healthcare providers and covered entities occurred contemporaneous to their making;

j.   Whether Meta's collection of individually identifiable health information through placement of Meta Collection Tools on healthcare provider and covered entity websites is highly offensive;

k.   Whether Meta's placement of the _fbp cookie as a disguised first-party cookie through healthcare provider and covered entity websites is highly offensive;

l.   Whether Meta's placement of the _fbp cookie on Plaintiffs and Class members computing devices as a disguised first-party cookie through healthcare provider and covered entity websites was a trespass to chattels;

m.   Whether Meta failed to implement reasonable security procedures and practices in collecting Class members' individually identifiable health information;

n.   Whether the information at issue has economic value; and

o.   Whether Meta unjustly profited from its collection of patient portal, appointment, and phone call information.

360. Typicality. Plaintiffs' claims are typical of the claims of other Class members because they arise out of the same common course of conduct by Meta and are based on the same legal theories.

361. Adequacy. Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained competent and capable attorneys who are experienced trial lawyers with significant experience in complex and class action litigation, including privacy law. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with the interests of the Class.

362. Superiority. Plaintiffs and Class members have suffered and will continue to suffer harm and damages due to Meta's unlawful conduct. Absent a class action, however, most Class members are unlikely to be aware of Meta's conduct and would find the cost of litigating their claims prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

## VI.   TOLLING

363. Any applicable statute of limitations has been tolled by Meta's knowledge and concealment of the misrepresentations and omissions alleged herein. Through no fault or lack of

diligence, Plaintiffs and Class members were deceived and could not reasonably discover Meta's deception and unlawful conduct.

364. Plaintiffs and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Meta was acting unlawfully. Meta's alleged representations were material to Plaintiffs and Class members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and Class members could not have discovered Meta's alleged wrongful conduct through the exercise of reasonable diligence.

365. At all relevant times, Meta was, and still is, under a continuous duty to disclose to Plaintiffs and Class members the true nature of the disclosures being made and the lack of an actual "requirement" before Plaintiffs' and Class members' data was shared with Meta.

366. Meta knowingly, actively, affirmatively or negligently concealed the facts alleged herein. Plaintiffs and Class members reasonably relied on Meta's concealment.

367. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Meta's concealment, and Meta is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Breach of Contract)

#### By Plaintiffs on behalf of themselves and the Class

368. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

369. Meta requires Facebook users like Plaintiffs and Class members to click a box indicating that, "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy."

370. "Click-wrap agreements" like Meta's agreement with users are valid and binding contracts.

371. The Meta Terms of Service are binding on Meta and Plaintiffs and Class members.

372. The Meta Data Policy is binding on Meta and Plaintiffs and Class members.

373. The Meta Cookies Policy is binding on Meta and Plaintiffs and Class members.

374. The Meta Terms of Service state that "the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions."

375. Meta's services to Plaintiffs and Class members are not free.

376. In exchange for access to Meta and its services, Plaintiffs and Class members agree to provide Meta with a limited set of personal information and the ability to show the Plaintiffs advertisements based on the contractually bargained-for limited set of personal information that the parties agree can be acquired and used by Meta.

377. The "personal information" that Plaintiffs' and Class members' must pay for access to Meta's services is not unlimited but instead is bound by the promises made by Meta in the documents that make up the Meta contract with its users.

378. For example, by signing up for Meta, it is undisputed that Plaintiffs have not agreed to pay for the service by permitting Meta to collect their Social Security number. Nor have Plaintiffs or class members agreed to pay for Meta's services with their health information.

379. The "data license" that Meta promised Plaintiffs' and Class members it would charge for use of Meta products did not include any health information about the Plaintiffs or Class members that Meta would collect from their health entities (i.e. healthcare providers, health insurers, pharmacies, business associates, and prescription drug companies).

380. The "data license" that Meta promised it would charge for use of Meta's products expressly excluded any information that Meta's Partners did not have the right to share with Meta.

381. Meta makes the following contractual promises to Plaintiffs and Class members.

382. From approximately April 19, 2018 to July 2022, Meta promised: [60]

    a.    "[P]ublishers can send us information through Meta Business Tools they use, including … the Meta pixel. These partners provide information about your activities off of our products—including information about your device, websites you visit, purchases you make, the ads you see, and how

---

[60] The promise that Meta required Partners to have "lawful rights" to "share your data before providing any data to us" did not exist prior to April 19, 2018.

you use our services—whether or not you have an account or are logged into our Products. ….We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information. …Partners receive your data when you visit or use their services or through third parties they work with. *We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us*." (emphasis added).

b.   "Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described to you below … Combat harmful conduct and protect and support our community: … *We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products*, harmful conduct towards others, and situations where we may be able to help support or protect our community. *If we learn of content or conduct like this, we will take appropriate action – for example*, offering help, *removing content, blocking access to certain features, disabling an accoun*t, or contacting law enforcement." (emphasis added).

383. Meta changed the language of its policies on July 22, 2022. But these changes (1) reiterated the previous promises; and (2) included additional promises.

384. From July 22, 2022 to present, the Meta contract has promised:

a.   "How do we collect or receive this information from partners? Partners use our Business Tools … to share information with us. These partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. *We require Partners to have the right to collect, use, and share your information before giving it to us*." (emphasis added).

b.   "Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the

Products and services described to you below … Combat harmful conduct and protect and support our community: … *We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations, where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, we may take appropriate action based on our assessment that may include – notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement.*" (emphasis added).

385. A Facebook user who read Meta's contracts would be shocked to learn that Meta was collecting their individually identifiable health information from their health entities, including their healthcare providers, pharmacies, health insurers, business associates, and prescription drug companies.

386. Meta breached its promises by not requiring health provider and covered entity Partners to have the right to share Plaintiffs' and Class members' health information associated with their health entities before sharing their patient status and other identifiable health information, including their creation of patient portal accounts, access to patient portals, appointments, phone calls, and communications with health entities about their doctors, diagnoses, conditions, treatments, prescription drugs, health insurance, symptoms, patient status, and other information alleged herein.

387. Meta materially breached its contract with its users by failing to require that healthcare providers or covered entities gain the necessary patient authorizations before sharing any patient protected health information with Facebook.

388. Meta materially breached its contract with its users by failing to require that healthcare providers or covered entities submit records of the necessary patient authorization to Facebook before sharing any patient protected health information with Facebook.

389. Meta took no action to require its health Partners to not send Plaintiffs' and Class members' health information without consent.

390. Meta did not implement any technological blocks to prevent Meta's acquisition of health information without authorization.

391. Meta did not implement any monitoring system to prevent Meta's acquisition of health information without authorization.

392. Despite promising in its Terms of Service that it employs or contracts with external providers to "detect potential misuse" and has developed advanced technical systems for that purpose, Meta does not actively review which websites its Meta Collection Tools is installed on to determine whether its Pixel is transmitting Plaintiffs' and Class members' health information to Meta.

393. Instead of requiring Partners to have the right to share health information before doing so, Meta actively encouraged and solicited health entity Partners to share health information without regard or concern to whether the Partner had the right to share such information.

394. The following chart outlines the promises and Meta's breach:

| Promise | Breach |
|---|---|
| "We require Partners to have the right to … share your information before giving it to us." | Meta does not require Partners to have the right to share health information with Meta before giving it to Meta. |
| "We employ dedicated teams around the world … to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. | Meta does not employ dedicated teams to prevent its unauthorized acquisition of health information. To the contrary, Meta employs dedicated teams to encourage health entities to share health information with Meta that the health entities lack rights to share. |
| "We … develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action – for example … removing content, blocking access to certain features, disabling an account, or contacting law enforcement." | Meta has developed advanced technical systems to detect potential misuse of certain products and is fully capable of using those systems to detect Meta Collection Tools Partners from which it is acquiring health information without authorization. However, Meta has not used those systems to stop acquiring such information and has not taken appropriate action to prevent health entities from sharing health |

| Promise | Breach |
|---------|--------|
|  | information with Meta in the absence of the right to do so. |
| "We work with external service providers, partners, and other relevant entities … to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content." | Meta does not work with external service providers, Partners, or other relevant entities to detect potential misuse of sending health information to Meta through Meta Collection Tools without the right to do so. To the contrary, Meta works with Partners to help those Partners avoid the meaningless restrictions Meta places on ads that are targeted to health. As shown above, Meta teaches health entities how to avoid its "restrictions" on personalized health targeted ads by removing certain words that would give users the idea that the ad was specifically targeted to them, all the while continuing to target ads to specific users based on personal attributes, including health information that Meta obtained from Partners that did not have the right to share that information. |

395. An implied contract also exists between Meta and Plaintiffs and Class members that Meta will not conspire with others to violate Plaintiffs' and Class members' legal rights to privacy in their individually identifiable health information.

396. The patient health information that Meta obtains in breach of the contract includes:

    a.    Plaintiffs' and Class members' identifiers including, but not limited to, email addresses, IP addresses, persistent cookie identifiers, device identifiers, and browser fingerprint information;

    b.    the dates and times that Plaintiffs and Class members register for their healthcare provider or covered entity patient portals;

    c.    the dates and times that Plaintiffs and Class members log in and log out of their healthcare provider or covered entity patient portals;

    d.    the content of communications that Plaintiffs and Class members exchange inside their healthcare providers' patient portals immediately before logging out of the portals;

e.   the content of Plaintiffs' and Class members' communications relating to appointments with their healthcare providers;

f.   the content of Plaintiffs' and Class members' communications about their appointments, providers, treatments, conditions, symptoms, diagnoses, prognoses, payment information, prescription drugs, and insurance information with their providers and other covered entities; and

g.   Plaintiffs' and Class members' status as patients of their healthcare providers or covered entities.

397. In breaching these promises, Meta overcharged Plaintiffs and Class members by collecting data in excess of the "data license" that was agreed upon in the contract between Meta and its users. Specifically, Meta expressly promised that its "data license" would not include information that its Partners do not have the right to share with Meta, but Meta charged the additional data license anyway.

398. As a direct and proximate results of Meta's breach of contract, Plaintiffs and Class members did not receive the full benefit of the bargain, and instead received services from Meta that were less valuable than described in their contract with Meta. Plaintiffs and Class members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Facebook's partial, deficient, and/or defective performance.

399. Meta's breach caused Plaintiffs and Class members the following damages:

a.   Nominal damages;

b.   The interruption or preclusion of Plaintiffs' and Class members' ability to communicate with their healthcare providers or covered entities on their healthcare providers' or covered entity websites;

c.   The diminution in value of Plaintiffs' and Class members' protected health information;

d.   Plaintiffs' and Class members' inability to use their computing devices for the purpose of communicating with their healthcare providers or other covered entities;

e.     The loss of privacy due to Meta making sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private;

f.     Meta took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value;

g.     The deprivation of the benefit of the bargain in that Meta's contract stated that the data license for its services did not include health information from health Partners who did not have the right to share information with Meta, but Meta actually took more data than the contractually agreed-upon amount;

h.     The amount that Meta should have spent implementing controls to ensure that patient data was not provided to Meta without the patients' consent; and

i.     Plaintiffs and Class Members suffered an invasion of privacy. Plaintiffs and Class Members seek compensatory damages for the invasion of their privacy.

400. For Meta's breaches, Plaintiffs and Class members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

**SECOND CLAIM FOR RELIEF**

**(Breach of the Duty of Good Faith and Fair Dealing)**

**By Plaintiffs on behalf of themselves and the Class**

401. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

402. A valid contract exists between Meta and Plaintiffs and Class members.

403. The contract specifies that California law governs the parties' relationship.

404. Meta prevented Plaintiffs and Class members from receiving the full benefit of the contract by intercepting the content of their individually identifiable health information.

405. In doing so, Meta abused its power to define terms of the contract, including:

    a.    The meaning of the term "require" in Meta's promise that it would "require" Partners to have the right to share Plaintiffs' and Class members' data with Meta before doing so and then taking no action to prevent healthcare providers or covered entities from sharing protected health information without Plaintiffs' and Class members' valid consent.

    b.    The meaning of the term "appropriate action" in the promise "[i]f we learn of content or conduct like [potential misuse of our products, harmful conduct towards others, and situations where we may be able to help support or protect our community] we will take appropriate action – for example … removing content, blocking access to certain features, disabling an account, or contacting law enforcement." Based on Meta's other statements, "appropriate action" for health entities' unauthorized sharing of health information with Meta should have include removing Meta Collection Tools from the offending health websites; blocking the offending developers from deploying Meta Collection Tools on other health websites; disabling offending developers' accounts; and contacting health regulatory authorities if specific health entities persisted in the violations. Yet, Meta took none of these actions.

406. Meta did not act fairly and in good faith.

407. Rather than "requiring" Partners to obtain the right to share health information, Meta actively solicited them, through the Meta Health division, to share health information regardless of whether they had the right to do so.

408. Rather than taking "appropriate action" upon discovering that health information was being shared with Meta by health entities without the right to do so, Meta actively solicited their further disclosures and advertising revenue, through the Meta Health division.

409. In doing so, Meta frustrated and undercut Plaintiffs' and Class Members' contractual rights, and unfairly interfered with Plaintiffs' and Class Members' rights under the parties' contract.

410. As a direct and proximate results of Meta's breach of contract, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received services from Meta that were less valuable than described in their contract with Meta. Plaintiffs and Class Members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Facebook's partial, deficient, and/or defective performance.

411. Meta's breach caused Plaintiffs and Class members the following damages:

    a.    Nominal damages;

    b.    The interruption or preclusion of Plaintiffs' and Class members' ability to communicate with their healthcare providers or covered entities on their healthcare providers' or covered entity websites;

    c.    The diminution in value of Plaintiffs' and Class members' protected health information;

    d.    The inability to use their computing devices for the purpose of communicating with their healthcare providers or covered entities;

    e.    The loss of privacy due to Meta making sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private;

    f.    Meta took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without Meta sharing the benefit of such value;

    g.    The deprivation of the benefit of the bargain in that Meta's contract stated that the data license for its services did not include health information from health Partners who did not have the right to share information with Meta,

1      but Meta actually took more data than the contractually agreed-upon

2      amount; and

3      h.      Plaintiffs and Class Members suffered an invasion of privacy. Plaintiffs and

4              Class Members seek compensatory damages for the invasion of their

5              privacy.

6      412. For Meta's breaches, Plaintiffs and Class members seek nominal damages, general

7  damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any

8  other relief the Court deems just.

9      **THIRD CLAIM FOR RELIEF**

10     **(Violation of Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*)**

11     **By Plaintiffs on behalf of themselves and the Class**

12     413. Plaintiffs reallege and incorporate by reference each allegation in the preceding and

13  succeeding paragraphs.

14     414. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional

15  interception of the contents of any electronic communication. 18 U.S.C. § 2511.

16     415. The ECPA protects both the sending and receipt of communications.

17     416. The ECPA provides a private right of action to any person whose electronic

18  communications are intercepted. 18 U.S.C. § 2520(a).

19     417. Meta intentionally intercepted electronic communications that Plaintiffs and Class

20  members exchanged with their healthcare providers and covered entities through the Meta Pixel

21  installed on the healthcare providers' and covered entity websites.

22     418. The transmissions of data between Plaintiffs and Class members and their healthcare

23  providers or covered entities qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

24     419. Meta contemporaneously acquired Plaintiffs' and Class members' communications

25  with their healthcare providers or covered entities.

26     420. The intercepted communications include:

27     a.      the content of Plaintiffs' and Class members' registrations for patient

28             portals, including clicks on buttons to "Register" or "Signup" for portals;

b.   the content Plaintiffs' and Class members' log in and log out of patient portals, including clicks to "Sign-in," "Log-in," "Sign-out," or "Log-out";

c.   the contents of communications that Plaintiffs and Class members exchange inside patient portals immediately before logging out of the portals;

d.   the contents of Plaintiffs' and Class members' communications relating to appointments with medical providers;

e.   the contents of Plaintiffs' and Class members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

f.   Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

421. For example, interception of hartfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis involves "content."

422. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   The cookies Meta uses to track Plaintiffs' and Class members' communications;

b.   Plaintiffs' and Class members' browsers;

c.   Plaintiffs' and Class members' computing devices;

d.   Meta's web-servers;

e.   The web-servers of healthcare providers' or covered entity webpages where the Meta Pixel is present; and

f.   The Meta Pixel source code Meta deploys to acquire Plaintiffs' and Class members' communications.

423. Meta is not a party to Plaintiffs' and Class members' communications with their healthcare providers or covered entities.

424. Meta receives the content of Plaintiffs' and Class members' communications through the surreptitious redirection of those communications from the Plaintiffs' and Class members' computing devices.

425. Plaintiffs and Class members did not consent to Meta's acquisition of their patient portal, appointment, and phone call communications with their healthcare providers or covered entities.

426. Meta did not obtain legal authorization to obtain Plaintiffs' and Class members' communications with their healthcare providers or covered entities relating to communications with their health entities.

427. Meta did not require any health entity to obtain the lawful rights to share the content of Plaintiffs' and Class members' communications relating to patient portals, appointments, and phone calls.

428. Any purported consent that Meta received from healthcare providers or covered entities to obtain the content of Plaintiffs' and Class members' communications was not valid.

429. In acquiring the content of Plaintiffs' and Class members' communications relating to patient portals, appointments, and phone calls, Meta had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions including:

    a.    The unauthorized acquisition of individually identifiable health information is tortious in and of itself regardless of whether the means deployed to acquire the information violates the Wiretap act or any subsequent purpose or use for the acquisition. Meta intentionally committed a tortious act by acquiring individually identifiable health information without authorization to do so.

    b.    The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health information. Meta intentionally violated 42 U.S.C. 1320d-6 by

1               intentionally acquiring individually identifiable health information without

2               authorization.

3       c.     A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a

4               criminal offensive punishable by fine or imprisonment with *increased*

5               *penalties* where "the offense is committed with intent to sell, transfer, or

6               use individually identifiable health information for commercial advantage

7               [or] personal gain." Meta intentionally violated the enhanced penalty

8               provision of 42 U.S.C. § 1320d-6 by acquiring the individually identifiable

9               health information "with intent to sell transfer or use" it for "commercial

10              advantage [or] personal gain."

11      d.     A knowing intrusion upon Plaintiffs' and Class members' seclusion;

12      e.     Trespass upon Plaintiffs' and Class members' personal and private

13              property via the placement of an _fbp cookie associated with the domains

14              and patient portals for their healthcare providers and covered entities on

15              Plaintiffs' and Class members' personal computing devices;

16      f.     Violation of the California Consumer Legal Remedies Act;

17      g.     Violation of the California Constitution's right to privacy;

18      h.     Violation of various state health privacy statutes, including but not limited

19              to the California Confidentiality of Medical Information Act; the California

20              Consumer Privacy Protection Act; and the California Consumer Privacy

21              Act;

22      i.     Violation of various state computer privacy and property statutes,

23              including but not limited to the California Comprehensive Computer Data

24              Access and Fraud Act, Cal. Penal Code § 502;

25      j.     Violation of Cal. Penal Code § 484 for statutory larceny; and

26      k.     Violation of the federal wire fraud statutes at 18 U.S.C. §§ 1343 (fraud by

27              wire, radio, or television) and 1349 (attempt and conspiracy), which

28              prohibit a person from "devising or intending to devise any scheme or

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate … commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice."

430. The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the defendant did so with the intent to defraud; (3) that is was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used. The attempt version of the wire fraud statute provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349.

431. Meta's scheme or artifice to defraud in this action consists of:

    a.    the false and misleading statements and omissions in its contract documents set forth above, including the statements and omissions recited in the breach of contract and breach of good faith and fair dealing claims above;

    b.    the false and misleading statements and omissions that Meta made to the public regarding health advertising on Meta platforms, including Meta's announcement in November 2021 that it was "Removing Certain Ad Target Options and Expanding Our Ad Controls," an announcement which led directly to news articles from prominent news organizations headlined "Facebook plans to remove thousands and sensitive ad-targeting options;" and descriptions such as that Meta "plans to remove detailed ad-targeting options that refer to 'sensitive' topics, such as ads based on interactions with content around … health" and "ad buyers will no longer be able to use topics such as health … to target people;"

c.     The placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie of the patients' healthcare providers or covered entities rather than a third-party cookie from Meta.

432. The "property" involved consists of Plaintiffs' and Class members':

a.     Property rights to the confidentiality of their individually identifiable health information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes; and

b.     Property rights to determine who has access to their computing devices.

433. Meta acted with the intent to defraud in that it willfully invaded and took the Named Plaintiffs' and Class members' property:

a.     With knowledge that (1) the healthcare providers or covered entities did not have the right to share such data; (2) courts had determined that a healthcare providers' use of the Meta Pixel gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable Facebook user would not understand that Meta was collecting their individually identifiable health information based on their activities on their healthcare providers' or covered entity websites; (4) "a reasonable Facebook user would be shocked to realize" the extent of Meta's collection of individually identifiable health information; (5) a Covered Incident had occurred which required a report to be made to the FTC pursuant to Meta's consent decrees with the FTC; and (6) the subsequent use of health information for advertising was a further invasion of such property rights in making their own exclusive use of their individually identifiable health information for any purpose not related to the provision of their healthcare;

b.     Upon information and belief, Meta CEO Mark Zuckerberg was informed by Meta employees in 2020 that Meta should cease health-based advertising activities, but Zuckerberg overruled those employees;

c.    Meta was also aware of the misleading nature of the articles generated by its November 2021 press release regarding health information;

d.    Meta's CEO was also aware enough of the sensitive nature of publicity of the fact that Meta is tracking users off the Meta platform on any website that he either refused or was unable to answer direct, simple questions about Meta's general tracking when asked in a Congressional hearing; and

e.    With the intent to (1) acquire Plaintiffs and Class members' individually identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; (2) use the Named Plaintiffs' and Class members' individually identifiable health information without their authorization; and (3) gain access to the Named Plaintiffs' and Class members' personal computing devices through the 'fbp' cookie disguised as a first-party cookie.

434. It was reasonably foreseeable to Meta that its scheme and artifice to defraud would involve interstate wire communications and, in fact, interstate wire communications were used in the carrying out of Meta's scheme and artifice to defraud.

435. Meta knew its conduct would be highly offensive, as evidenced by its announcement on November 9, 2021, that it would no longer allow targeted advertising based on health, yet Meta continued to use the Meta Pixel to acquire health information from healthcare providers' or covered entity webpages for advertising purposes.

436. Any purported consent provided by Meta's healthcare provider or covered entity "Partners" using the Meta Pixel had a purpose that was tortious, criminal, and in violation of state constitutional and statutory provisions because it constitutes:

a.    A knowing intrusion into a private matter that would be highly offensive to a reasonable person;

b.    A violation of 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment and that includes increased penalties where "the offense is committed with intent to sell, transfer, or use individually

1   identifiable health information for commercial advantage [or] personal

2   gain."

3   c.   Trespass;

4   d.   Breach of fiduciary duty; and

5   e.   A violation of various state health privacy and computer privacy statutes,

6   including the CCPA.

7   437. A Maryland state court found that the facts alleged in this complaint stated a claim

8   against healthcare provider MedStar for intrusion upon seclusion, publication of private facts, and

9   violation of the Maryland Wiretap Act. *Doe v. Medstar*, Case No. 24-C-20-000591 (Baltimore

10  City, Maryland).

11  438. Courts around the country have uniformly held that a healthcare provider's use of the

12  Meta Pixel on its website without patient authorization is actionable in tort or contract or a statutory

13  violation. *See Doe v. Mercy Health*, Case No. A 2002633 (Hamilton County, Ohio); *Doe v.

14  Partners*, Case No. 1984-CV-01651 (Suffolk County, Massachusetts); *Doe v. Sutter Health*, Case

15  No. 34-2019-00258072-CU-BT-GDS (Sacramento County, California); *Doe v. University

16  Hospitals*, Case No. CV-20-9333357 (Cuyahoga County, Ohio); *Doe v. Sutter Health*, Case No.

17  34-2019-00258072-CU-BT-GDS (Sacramento County, California).

18  439. Meta has been aware since at least 2020 of these court decisions finding that a

19  healthcare provider's use of the Meta Pixel without valid patient consent is actionable, yet Meta

20  continued to acquire patient communications and information via the Pixel.

21  440. Meta's violations of the ECPA were willful and intentional and caused Plaintiffs and

22  Class members the following damages:

23  a.   The interruption or preclusion of Plaintiffs' and Class members' ability to

24  communicate with their healthcare providers or covered entities on their

25  healthcare providers' and covered entity websites;

26  b.   The diminution in value of Plaintiffs' and Class members' protected health

27  information;

28

c.   The inability to use their computing devices for the purpose of communicating with their healthcare providers;

d.   The loss of privacy due to Meta making sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private; and

e.   Meta took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without Meta sharing the benefit of such value.

441. For Meta's violations set forth above, Plaintiffs and Class members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Meta] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

442. Unless enjoined, Meta will continue to commit the violations of law alleged here. Plaintiffs want to continue to communicate with their healthcare providers and covered entities through online platforms but have no practical way of knowing if their communications are being intercepted by Meta, and thus continue to be at risk of harm from Meta's conduct.

443. For example, Meta told the Court that the way to avoid Meta's collection of health information was for a patient to call their healthcare provider. Yet, the Meta Pixel is designed so that Meta receives their data even when a patient calls their provider.

444. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by the plaintiff and any profits made by Meta as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**FOURTH CLAIM FOR RELIEF**

**(Violation of California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632)**

**By Plaintiffs on behalf of themselves and the Class**

445. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

446. The California Invasion of Privacy Act (CIPA) is codified at Cal. Penal Code §§ 630-638. The Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

447. Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars."

448. Cal. Penal Code § 632 provides, in pertinent part, that it is unlawful for any person to "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to … record the confidential communication." As used in the statute, a "confidential communication" is "any communication carried on in circumstances as may reasonably indicate that any part to the communication desired it to be confined to the parties thereto."

449. Meta is a "person" within the meaning of CIPA §§ 631 and 632.

450. Meta did not have the prior consent of all parties to learn the contents of or record the confidential communications at issue, as Plaintiffs and Class members did not provide express prior consent to Meta's wiretapping of their communications with healthcare providers and covered entities.

451. Meta is headquartered in California, designed and effectuated its scheme to track the patient communications at issue here from California, and has adopted California substantive law to govern its relationship with its users.

452. At all relevant times, Meta's conduct alleged herein was without the authorization and consent of the Plaintiffs and Class members.

453. Meta's actions were designed to learn or attempt to learn the meaning of the contents of Plaintiffs' and Class members' communications exchanged with their healthcare providers and covered entities.

454. Meta's learning of or attempt to learn the contents of patient communications occurred while they were in transit or in the process of being sent or received.

455. Unless enjoined, Meta will continue to commit the violations of law alleged here. Plaintiffs continue to want to communicate with their healthcare providers and covered entities through online platforms but have no practical way of knowing if their communications are being intercepted by Meta, and thus continue to be at risk of harm from Meta's conduct.

456. Plaintiffs and class members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**FIFTH CLAIM FOR RELIEF**

**(Intrusion Upon Seclusion—Common Law)**

**By Plaintiffs on behalf of themselves and the Class**

457. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

458. By collecting and disseminating the contents of Plaintiffs' and Class members' communications with their healthcare providers and covered entities without their knowledge,

1    Meta intentionally intruded into a realm in which Plaintiffs and Class members have a reasonable

2    expectation of privacy.

3        459. The communications at issue regarding the Named Plaintiffs include patient portal

4    logins and communications regarding doctors, conditions, treatments, symptoms, payments, and

5    other health-related communications content.

6        460. Plaintiffs and Class members enjoyed objectively reasonable expectations of privacy

7    in their communications with their medical providers and covered entities relating to the respective

8    patient portals, appointments, and health information and communications based on:

9            a.      The healthcare providers' or covered entities' status as their healthcare

10                   providers or a covered entity and the reasonable expectations of privacy that

11                   attach to patient-provider relationships;

12           b.      HIPAA;

13           c.      the ECPA;

14           d.      Meta's promise that it would "require" Partners to have the right to share

15                   their data before Meta would collect it; and

16           e.      California medical and computer privacy laws

17       461. Furthermore, Plaintiffs and Class Members maintained a reasonable expectation of

18   privacy when providing their patient medical data to their healthcare providers and covered entities

19   and when communicating with their healthcare providers and covered entities online.

20       462. Patient medical data is widely recognized by society as sensitive information that

21   cannot be shared with third parties without the patients' consent.

22       463. For example, public polling shows that, "[n]inety-seven percent of Americans believe

23   that doctors, hospitals, labs and health technology systems should not be allowed to share or sell

24   their sensitive health information without consent." [61]

25

26

---

27   [61] *Poll: Huge majorities wants control over health info,* Healthcare Finance (Nov. 10, 2020),
     https://www.healthcarefinancenews.com/news/poll-huge-majorities-want-control-over-health-

28   info.

464. Meta obtained unwanted access to Plaintiffs' and Class members' data, including but not limited to their patient status, the dates and times Plaintiffs and Class members logged in or out of patient portals, and the communications Plaintiffs and Class members exchanged while logged in to patient portals.

465. Meta's intrusion was also accomplished by placing the "fbp" cookie on the Plaintiffs' and Class members' computing devices through the web-servers of the Plaintiffs' and Class members' healthcare providers.

466. By disguising the third-party "fbp" cookie as a first-party cookie from the Plaintiffs' healthcare providers or covered entities, Meta ensure that it could hack its way around attempts that Plaintiffs and Class members might make to prevent Meta's tracking through the use of cookie blockers.

467. In designing the 'fbp' cookie as a disguised first-party cookie, Meta was aware that, like other websites that include sections where users' sign in to an account, any healthcare provider or covered entity website with a patient portal would require first-party cookies to be enabled for a patient to access the patient portal or other username / password protected "secure" part of the healthcare provider's website.

468. With first-party cookies being required for use of a patient portal and the Meta "fbp" cookie disguised as a first-party cookie, Meta was able to implant its tracking device on the computing devices of the Named Plaintiffs and Class members even where Plaintiffs or Class members made attempts to stop third-party tracking through the use of cookie blockers.

469. Meta's deployment of the "fbp" cookie as a third-party cookie disguised as a first-party cookie that is placed on Plaintiffs and Class members' computing devices is a highly offensive intrusion upon seclusion regardless of whether any information was further re-directed from the Plaintiffs or Class members computing devices to Meta.

470. Meta's intrusion into Plaintiffs' and Class members' privacy, including the placement of the _fbp tracking cookie on Plaintiffs' and Class members' devices, would be highly offensive to a reasonable person, namely because it occurred without Plaintiffs' and Class members' consent

or knowledge and violated HIPAA, the CMIA, the CCPA, the ECPA, the FTC Act, and Class members' property rights.

471. Placement of the _fbp cookie was highly offensive to a reasonable person because:

    a.    It involved placement of a tracking tool on Plaintiffs' and Class members' personal communications and computing devices while they were exchanging communications in what should have been a private conversation with their healthcare providers – and that tracking tool persisted on patient devices; and

    b.    Meta designed the _fbp tracking tool so that a patient could not securely login to their providers' patient portal without Meta being able to download its tracking tool onto the Plaintiffs' and Class members' communications devices.

472. Meta's intrusion caused Plaintiffs and Class members the following damages:

    a.    Nominal damages;

    b.    The interruption or preclusion of Plaintiffs' and Class members' ability to communicate with their healthcare providers or covered entities on their healthcare providers' or covered entity websites;

    c.    The diminution in value of Plaintiffs' and Class members' protected health information;

    d.    The inability to use their computing devices for the purpose of communicating with their healthcare providers or covered entities;

    e.    The loss of privacy due to Meta making sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private; and

    f.    Meta took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without Meta sharing the benefit of such value.

473. Meta's intrusion into Plaintiffs' and Class members' seclusion was with oppression, fraud, or malice.

474. For Meta's intrusion into their seclusion, Plaintiffs and Class members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

## SIXTH CLAIM FOR RELIEF

### (California Constitutional Invasion of Privacy)

### By Plaintiffs on behalf of themselves and the Class

475. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

476. Article I, section 1 of the California Constitution provides:

> *All people* are by nature free and independent and *have inalienable rights*. *Among these are* enjoying and defending life and liberty, acquiring, possessing, and protecting property, and *pursuing and obtaining* safety, happiness, and *privacy*.

Cal. Const. art. I, § 1 (emphasis added).

477. Plaintiffs and Class members have both an interest in precluding the dissemination and misuse of their health information by Meta, and in making intimate personal decisions and communicating with health providers and covered entities without observation, intrusion, or interference by Meta.

478. Plaintiffs and Class members had no knowledge and did not consent or authorize Meta to obtain the content of their communications with their healthcare providers and covered entities as described herein.

479. Plaintiffs and Class members enjoyed objectively reasonable expectations of privacy surrounding communications with their healthcare based on the healthcare providers' and covered entity's status as their healthcare providers or covered entities subject to federal and state health privacy laws, and the reasonable expectations of privacy that attach to such relationships, as evidenced by (among other things) federal laws such as HIPAA and California law protecting

health information, and Meta's promise that it would "require" its Partners to have the right to share their data before Meta would collect it.

480. Plaintiffs' and Class members' claims include but are not limited to Meta's unauthorized access to following private facts:

    a.    that Plaintiffs and Class members are patients of the various healthcare providers and covered entities;

    b.    the dates and times Plaintiffs and Class members clicked to sign up, log in, or log out of the various healthcare providers' and covered entity patient portals;

    c.    the dates and times that Plaintiffs and Class members scheduled appointments;

    d.    the fact that Plaintiffs and Class members were scheduling appointments with their provider or covered entity;

    e.    Plaintiffs' and Class members' communications with their healthcare providers or covered entity;

    f.    Other health information associated with Plaintiffs and Class members, including but not limited to doctors, conditions, treatments, prognoses, symptoms, health insurance, and prescription drug information; and

    g.    Plaintiffs' and Class members' communications exchanged while logged in to a patient portal.

481. The communications at issue regarding the Named Plaintiffs include patient portal logins and communications regarding doctors, conditions, treatments, symptoms, payments, and other health-related communications content.

482. In addition to acquiring Plaintiffs' and Class members' health information without authorization, Meta deposited the _fbp cookie on Plaintiffs' and Class members' computing devices by disguising it as a first-party cookie associated with their healthcare provider or covered entity rather than a Meta cookie.

483. Meta's intrusion upon seclusion with respect to the _fbp cookie occurred the moment that Meta caused the _fbp cookie to be placed on Plaintiffs' and Class members' devices.

484. Meta's conduct was intentional and intruded on Plaintiffs' and Class members' medical communications which constitute private conversations, matters, and data.

485. Meta's conduct in acquiring patient portal, appointment, and other communications— and its placement of the _fbp tracking cookie on Plaintiffs' and Class members' devices, would be an egregious breach of social norms because:

    a.   Meta conspired with Plaintiffs' and Class members' healthcare providers and covered entities to violate a cardinal rule of the provider-patient relationship;

    b.   Meta's conduct violated federal and state laws designed to protect patient privacy, including HIPAA and the CMIA;

    c.   Meta's conduct violated the ECPA;

    d.   Meta's conduct violated the express promises it made to Plaintiffs and Class members;

    e.   Meta placed a tracking tool on Plaintiffs' and Class members' personal communications and computing devices while they were exchanging communications in what should have been a private conversation with their healthcare providers – and that tracking tool persisted on patient devices;

    f.   Meta designed the _fbp tracking tool so that a patient could not securely login to their providers' patient portal without Meta being able to download its tracking tool onto the Plaintiffs' and Class members' communications devices.

486. Plaintiffs and Class members seek all relief available for invasion of privacy claims under the California Constitution, including:

    a.   Nominal damages;

    b.   General privacy damages;

c. The interruption or preclusion of Plaintiffs' and Class members' ability to communicate with their healthcare providers on their healthcare providers' or covered entity websites;

d. The diminution in value of Plaintiffs' and Class members' protected health information;

e. Plaintiffs and Class members' inability to use their computing devices for the purpose of communicating with their healthcare providers or covered entities;

f. The loss of privacy due to Meta making sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private; and

g. Meta took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without Meta sharing the benefit of such value.

## SEVENTH CLAIM FOR RELIEF

### (Trespass to Chattel)

### By Plaintiffs on behalf of themselves and the Class

487. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

488. Plaintiffs and Class members owned, leased, or controlled their computing devices from which they communicated with their medical providers or covered entities.

489. The Meta Pixel tracking source code is designed such that, when Plaintiffs and Class members visit their healthcare providers' or covered entity websites and patient portals, a cookie named '_fbp' is automatically set upon Plaintiffs' and Class members' computing devices.

490. The '_fbp' cookie is designed to avoid any attempts by Plaintiffs and Class members to block transmissions to Meta via cookies. To accomplish this task, the Meta Pixel tracking source code transmits and commands the '_fbp' cookie to be lodged in Plaintiffs' and Class members'

1   computing devices by asserting that it is a cookie from their healthcare providers or covered

2   entities.

3       491. The Meta Pixel lodges the _fbp cookie on Plaintiffs' and Class members' computing

4   devices regardless of whether they have attempted to block third-party cookies.

5       492. For security purposes, as a rule, Plaintiffs and Class members must enable first-party

6   cookies to use their healthcare providers' or covered entity patient portals. As a result, every

7   Plaintiff and Class member had the Facebook _fbp cookie lodged on their computing device.

8       493. Meta placed the _fbp cookie on Plaintiffs' and Class members' computing devices

9   intentionally and without Plaintiffs' and Class members' knowledge or authorization.

10      494. Meta's placement of the fbp cookie on Plaintiffs' and Class members' computing

11  devices is the modern equivalent of the placement of a bug in someone's telephone or on the desk

12  where their computer sits. Meta's source code, fbp cookie, and the Meta Pixel have taken the place

13  of the "bug," which is why these tools are often called "web bugs."

14      495. Meta's placement of the _fbp tracking tool on patient communications and computing

15  devices took up a measurable amount of available storage on the device that was no longer

16  available for storage of other information.

17      496. In the absence of the Meta source code and _fbp cookie, the Named Plaintiffs' and

18  absent Class members' communications devices would have more storage available.

19      497. Though the amount of storage wrongfully taken up by Meta through the _fbp cookies

20  at issue may be small for each individual device, it is measurable and consistent.

21      498. In the aggregate, the property deprivation caused by Meta is large – involving millions

22  (perhaps hundreds) of millions of devices and likely billions of communications.

23      499. Meta's source code that commanded Plaintiffs' and Class members' communications

24  devices to re-direct patient identifiers and communications to Meta used a measurable amount of

25  resources available for the exchange of communications that slowed the speed with which

26  Plaintiffs' and Class members' communications and computing devices were able to exchange

27  communications with their healthcare providers.

28

500. Researchers estimate that Facebook's Pixel code adds between 1.3 to 1.5 seconds to the load time for a webpage.[62] To put that in perspective, studies claim that the acceptable load time for an ecommerce site is two seconds or less – and Google "aim[s] for under a half-second."[63]

501. In the absence of the Meta source code and _fbp cookie, the Named Plaintiffs' and absent Class members' communications devices would operate more quickly in a measurable way.

502. Meta's source code, including the placement of the _fbp cookie, has caused class members to be deprived of significant lost time. *Schmitt v. SN Servicing Corp.*, No. 21-CV-03355-WHO, 2021 WL 3493754, at *6 (N.D. Cal. Aug. 9, 2021) (Orrick, J.).

503. Though the amount of such deprivation may be small for each individual communication, it is measurable and consistent. On information and belief, during a six-week period beginning in July 2022, for example, Meta received ██████ events via the Pixel in the United States alone. If only ██████ of Meta's Pixel events were from HIPAA or CMIA-covered entities, at 1.5 seconds per communication, Meta will have deprived absent Class members of ████ eight-hour working days or ██ working years of their time.[64] Assuming the average American annual salary of $71,456, Meta's trespass causes aggregate economic time-value of money loss of $██████ for every ██████ at-issue communications.[65] Even at the *minimum wage* in San Francisco ($18.07 per hour), in the Northern District of California venue chosen by Meta, Meta's trespass causes aggregate time-value of money loss of $██████ for every ████ at-issue communications.

504. Meta's trespass into Plaintiffs' and Class members' computing devices caused them the following damages:

    a.    Nominal damages for trespass;

    b.    Loss of available storage space on their communications and computing devices;

---

[62] https://josephpinder.com/blog/facebook-pixel-is-slowing-down-your-website-and-how-to-fix-it-securely.

[63] https://developers.google.com/search/blog/2010/05/you-and-site-performance-sitting-in

[64] This assumes an average workday of eight hours and a 250 day work year (50 weeks times 5 days per week).

[65] https://www.firstrepublic.com/insights-education/how-much-does-the-average-american-make

      c.     Loss of time caused by Meta's slowing of communications exchanged with their healthcare providers.

505. Meta's repeated actions to deposit unwanted _fbp cookies on Plaintiffs' and Class members' communications devices and to slow the speed with which Plaintiffs and Class members communicate with their healthcare providers, without Plaintiffs' consent, is evidence of its malicious disregard of Plaintiffs' and Class members' property rights.

506. For Meta's trespass, Plaintiffs and Class members seek nominal damages, actual damages, general damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

## EIGHTH CLAIM FOR RELIEF

### (Violation of California Consumer Legal Remedies Act, Cal. Civil Code§ 1780(a))

507. By stating that it required its Partners to have the right to collect, use and share Plaintiffs' and Class members' information but doing nothing to ensure their rights were protected, Meta violated section 1770(2) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(2).

508. By making the same representation, Meta violated section 1770(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

509. By making the same representation, Meta violated section 1770(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

510. Plaintiffs, like the Class, have been exposed to a wide-spread long-term advertising campaign from Meta that pervades nearly all aspects of online life. Meta's ubiquitous advertising included numerous and repeated representations that it placed "privacy at the forefront,"[66] and that it "embedd[ed] privacy into [its] products from the start."[67] In a prime-time television spot during the National Basketball Association playoffs, Meta proclaimed to viewers that "[f]rom now on,

---

[66] https://www.bbc.com/news/technology-64075067.
[67] https://about.fb.com/news/2023/05/upholding-our-commitment-to-protecting-your-privacy/.

1   Facebook will do more to keep you safe and protect your privacy."[68] The same promises ran across

2   movie theaters, during breaks in popular television programs, and on billboards and public transit

3   vehicles.[69] And Meta proudly proclaimed to its users that it would transparently communicate how

4   it collected, used, and shared their personal information so that users could enjoy Meta's services

5   "without compromising [their] privacy."[70] Plaintiffs' decision to use Facebook was influenced and

6   reinforced by their understanding that Meta took their privacy seriously, and would accurately and

7   honestly communicate to them about the personal information it collected about them. Plaintiffs

8   believed Meta's assurances that user privacy was an important touchstone to Meta's policies, and

9   those assurances were material to Plaintiffs' decision to use Facebook. Plaintiffs relied on Meta's

10  omissions and misrepresentations in making their decision to use Facebook under the belief that

11  Meta was not, and would not, collect or otherwise intercept their personal health information.

12  Plaintiffs would have attached importance to the knowledge that Meta did not require its healthcare

13  partners to have authorization before sharing information with Meta--or that "require" did not

14  mean anything beyond a line in a form business contract with Meta's partners. Had they known

15  that their communications would be instantaneously transmitted to Meta without their consent,

16  that knowledge would have impacted their decisions about how and when to interact with their

17  providers online.

18      511. Meta's partial representation that it requires healthcare partners to have the right to

19  share their patients' data before transmitting it to Meta is misleading, because Meta did not disclose

20  the material fact that Meta does not actually *require* healthcare partners from sharing their patients'

21  data with Meta even if those providers did not have consent from their patients before doing so.

22      512. Meta had exclusive knowledge of the material fact that Meta does not prevent

23  healthcare partners from sharing their patients' data with Meta even if those providers did not have

24  consent from their patients before doing so, a fact that was not known to plaintiffs or reasonably

25  accessible to the plaintiffs in light of Meta's omissions.

26  _____

27  [68] https://www.fastcompany.com/40563382/facebook-says-sorry-sort-of-in-its-biggest-ever-ad-campaign.

28  [69] https://www.wired.com/story/facebook-launches-a-new-ad-campaign-with-an-old-message/.
    [70] https://about.fb.com/news/2022/05/metas-updated-privacy-policy/.

513. Plaintiffs provided Meta notice of these violations, including via certified letter on August 29, 2023, but Meta did not cure within 30 days of that notice.

514. Plaintiffs seek declaratory and injunctive relief, actual or statutory damages (whichever is higher), restitution, punitive damages, or any other relief the Court deems appropriate as Meta received notice of these violations but did not cure within 30 days of that notice.

## NINTH CLAIM FOR RELIEF

**(Violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502)**

**By Plaintiffs on behalf of themselves and the Class**

515. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

516. The California Comprehensive Computer Data Access and Fraud Act ("CDAFA") was enacted to provide protection from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

517. The CDAFA does not require a quantitative threshold of damage to bring a claim, and there is no monetary threshold to qualify for CDAFA protection.

518. The CDAFA affords a private right of action to owners of computers, systems, networks, programs, and data who suffer as a result of a violation of the Act. Cal. Penal Code § 502(e)(1).

519. The CDAFA imposes civil liability on anyone who:

    a.    Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. Cal. Penal Code § 502(c)(1); and

    b.    Knowingly introduces any computer contaminant into any computer, computer system, or computer network. Cal. Penal Code § 502(c)(8).

520. "Computer services" under the CDAFA "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4).

521. "Computer network" is "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

522. "Computer system" is "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

523. "Data" is defined as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

524. "Computer contaminant" is defined as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

525. Meta's conduct, described herein, violates Cal. Penal Code §§ 502(c)(1) and (8).

526. Plaintiffs and Class members were the owners or lessees of the computers, computer systems, computer networks, and data described herein.

527. The Pixel constitutes a "contaminant" under the CDAFA because it is designed to, and does, self-propagate to contaminate users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted in the normal operation of the computers, computer systems, and computer networks.

528. The Meta _fbp cookie and source code usurp the normal operation of Plaintiffs' and Class members' computing devices because they supplant Plaintiffs' and Class members' choices in how those devices and their resources are used. Specifically, the Meta source code and the _fbp cookie command the Plaintiffs' and Class members' computing devices to act in ways that are contrary to that which is intended by Plaintiffs and Class members – and to store the _fbp cookie on the patient devices in way that is contrary to that which is intended by Plaintiffs and Class members – as the owners of the devices and data contained on them.

529. The Meta Source Code and _fbp cookie are not necessary for any Plaintiff's or Class member's device to communicate effectively with a healthcare provider. In fact, there are thousands of healthcare providers web-properties where Meta does not usurp the normal operation of a patient's computing devices.

530. Meta knowingly accessed, used, and caused to be used Plaintiffs' and class Members' data, computers, computer services, and computer networks in that Meta specifically designed the Pixel to surreptitiously place the _fbp cookie on users' computer browsers, which causes the devices' data processing functions and networks to redirect Plaintiffs' and Class members' data to Meta.

531. Meta knowingly introduced the Pixel into Plaintiffs' and Class members' computers, computer systems, and computer networks and provided itself the means of accessing Plaintiffs' and Class members' computers, computer systems, and computer networks in violation of the CDAFA by developing the Pixel and encouraging and providing instructions to healthcare providers and covered entities on its use and deployment.

532. Plaintiffs' and Class members' data that Meta redirects through the Pixel includes nonpublic information related to their communications with their healthcare providers and covered entities, including that Plaintiffs and Class Members registered for and logged into patient portals,

1   scheduled healthcare appointments, and searched for physicians and information about medical

2   conditions.

3       533. Meta makes use of Plaintiffs' and Class members' data to obtain money through

4   advertising.

5       534. Meta's use of Plaintiffs' and Class members' data is wrongful in that the use is

6   prohibited by state and federal laws and Meta's own policies, including but not limited to:

7           a.      the ECPA (18 U.S.C. §§ 2510-2523);

8           b.      the CIPA (Cal. Penal Code §§ 631 & 632);

9           c.      the HIPAA, including specifically 42 U.S.C. § 1320d-6;

10          d.      state consumer protection statutes, including but not limited to the CLRA

11                  (Cal. Civ. Code § 1750, *et seq.*);

12          e.      various state health and computer privacy statutes, including but not limited

13                  to:

14                      i.      the California Consumer Privacy Act (Cal. Civ. Code §

15                              1798.100);

16                      ii.     the California Comprehensive Computer Data Access and Fraud

17                              Act (Cal. Penal Code § 502); and

18          f.      Meta's Terms of Service, Data Policy, and Cookie Policy.

19      535. Meta lacks permission to use and access of Plaintiffs' and Class members' data,

20  computers, computer services, and computer networks, or to introduce the Pixel into Plaintiffs'

21  and Class members' computers, computer services, and computer networks, as evidenced by the

22  following:

23          a.      Plaintiffs and Class members never authorized Meta to place the _fbp

24                  cookie on their browser or otherwise access or use their data, computers,

25                  computer services, and computer networks;

26          b.      The Pixel was invisible to Plaintiffs and Class members;

27

28

c.   Plaintiffs and Class members were unaware that Meta was using the Pixel to surreptitiously access and use their data, computers, computer services, and computer networks;

d.   It was impossible for Plaintiffs and Class members to opt out of or prevent the functionality of the Pixel;

e.   Meta's own policies prohibit Meta from accessing and using Plaintiffs' and Class members' health information;

f.   Meta circumvented technical and code-based barriers to access and use Plaintiffs' and Class members' data, computers, computer services, and computer networks because the _fbp cookie that the Pixel places on Plaintiffs' and Class Members' computing devices is designed to disguise itself as a first-party cookie (from Plaintiffs and their healthcare providers and covered entities) so that Meta can circumvent password-protected patient portals, cookie blockers, and other technical barriers; and

g.   Plaintiffs' and Class members' data that Meta accesses and uses is not publicly viewable and only became accessible to Meta through Meta's surreptitious and unauthorized placement of the _fbp cookie on Plaintiffs' and Class members' computing devices.

536. As a result of Meta's violations of CDAFA, Plaintiffs and Class members suffered damage to their devices, including but not limited to:

a.   Meta occupied storage space on their computing devices without authorization and without compensating Plaintiffs' or Class members for such access;

b.   Meta caused the computing devices to work slower than they would in the absence of Meta's actions and without compensating Plaintiffs or Class members for such slowdowns;

c.      Meta used the computing resources of Plaintiffs' computing devices without authorization and without compensating Plaintiffs or Class members for use of those resources; and

d.      Meta unjustly profited from the data taken from Plaintiffs' computers without authorization.

537. Meta's violations of the CDAFA were willful, fraudulent, and/or oppressive, as evidenced by the following:

a.      Meta knew that Plaintiffs and the Class would not be aware of the presence of a Pixel on any given website;

b.      Meta knew and intended that the _fbp cookie would appear as a disguised first-party cookie, preventing normal cookie-blocking software from blocking the _fbp cookie;

c.      Meta knew or should have known that the Pixel and _fbp cookie would share some protected information and consciously disregarded the violation of the rights of Plaintiffs and the Class;

d.      Meta encouraged its health partners to install the Pixel on their websites knowing that some information transmitted to Meta would be sensitive and protected;

e.      Meta encourages partners to install the Pixel in order to profit from the use of Plaintiffs' and the Class's information, despite knowing that not all information transmitted was lawfully shared;

f.      Meta does in fact use information transmitted from the Pixel in order to profit from the use of Plaintiffs' and the Class's information, despite knowing that not all information transmitted was lawfully shared;

g.      Meta continued to receive information through the Pixel from its health partners despite knowing that some transmitted information was sent without proper authorization;

h.   Meta did not take appropriate action to stop the transmission of unauthorized data;

i.   Meta did not inform Plaintiffs or the Class that their sensitive information was transmitted to Meta;

j.   Meta's Terms of Service, Privacy Policy, and Cookie Policy represented that Meta required its partners to have authorization to share information with Meta *before* information was sent to Meta;

k.   Meta continued to represent through its official and public representations that it requires its partners to have authorization to share information with Meta *before* information is sent to Meta, even after constructing its Filter; and

538. Plaintiffs believed that their communications with their healthcare providers were private and that Meta would require any partner to have authorization before sharing that information.

539. For Meta's violations of CDAFA, Plaintiffs and Class members seek actual damages, general damages, unjust enrichment, punitive damages, appropriate injunctive or other equitable relief pursuant to Cal. Penal Code § 502(e)(1) and any other relief the Court deems just. Pursuant to Cal. Penal Code § 502(e)(2), Plaintiffs and Class Members also ask the Court to award them their reasonable attorney's fees.

540. Pursuant to Cal. Penal Code § 502(e)(4), Plaintiffs and Class Members are also entitled to punitive or exemplary damages because Facebook's violations are willful, and upon information and belief, Facebook is guilty of oppression, fraud, or malice as defined in Cal. Civil Code. § 3294.

### **TENTH CLAIM FOR RELIEF**

**(Unjust Enrichment – California Law)**

**By Plaintiffs on behalf of themselves and the Class**

541. Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

542. Meta has wrongfully and unlawfully transmitted, received, used, and sold Plaintiffs' and Class members' individually identifiable health information without their consent for substantial profits.

543. Plaintiffs' and Class members' individually identifiable health information conferred an economic benefit on Meta.

544. Meta has been unjustly enriched at the expense of the Plaintiffs and Class members.

545. Meta has unjustly retained the benefits of its unlawful and wrongful conduct.

546. It would be inequitable and unjust for Meta to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

547. Plaintiffs and Class members accordingly are entitled to relief, including restitution and disgorgement of all revenues, earnings, and profits that Meta obtained as a result of its unlawful and wrongful conduct.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Certify the proposed Class, designating Plaintiffs as class representatives and their counsel as class counsel;

B.      Award compensatory damages, including statutory damages where available, to Plaintiffs and Class members for all damages sustained as a result of Meta's wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Award actual, direct, general, and benefit-of-the-bargain damages;

D.      Award punitive damages on the causes of action that allow for them and in an amount that will deter Meta and others from like conduct;

E.      Award injunctive relief;

F.      Award restitution and disgorgement of Meta's profits from its unjust conduct;

G.      Award attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure section 1021.5;

H.      Award pre-judgment and post-judgment interest, as provided by law; and

I.      Award any other, further, and different relief as the Court deems just.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and Class members, demand a trial by jury of any and all issues in this action so triable of right.

RESPECTFULLY SUBMITTED AND DATED this 10th day of October, 2023.

By: */s/ Jason "Jay" Barnes*
Jason "Jay" Barnes, *Admitted Pro Hac Vice*
Email: jaybarnes@simmonsfirm.com
Eric S. Johnson, *Admitted Pro Hac Vice*
Email: ejohnson@simmonsfirm.com
An V. Truong, *Admitted Pro Hac Vice*
Email: atruong@simmonsfirm.com
Jennifer Paulson, *Admitted Pro Hac Vice*
Email:jpaulson@simmonsfirm.com
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue, 7th Floor
New York, New York 10016
Telephone: (212) 784-6400

Geoffrey Graber, CSB #211547
Email: ggraber@cohenmilstein.com
Eric Kafka, *Admitted Pro Hac Vice*
Email: ekafka@cohenmilstein.com
Claire Torchiana, CSB #330232
Email: ctorchiana@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Paul R. Kiesel, CSB #119854
Email: kiesel@kiesel.law
Jeffrey A. Koncius, CSB #189803
Email: koncius@kiesel.law
Nicole Ramirez, CSB #279017
Email: ramirez@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

Beth E. Terrell, CSB #178181
Email: bterrell@terrellmarshall.com
Amanda M. Steiner, CSB #190047
Email: asteiner@terrellmarshall.com
Benjamin M. Drachler, *Pro Hac Vice Pending*
Email: bdrachler@terrellmarshall.com
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Andre M. Mura, CSB #298541
Email: amm@classlawgroup.com
Hanne Jensen, CSB #336045
Email: hj@classlawgroup.com
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*Attorneys for Plaintiffs and Proposed Class*

**SIGNATURE ATTESTATION**

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

Dated: October 10, 2023

*/s/ Andre M. Mura*
Andre M. Mura

# Exhibit 11

Docusign Envelope ID: 393AAEBA-0A48-42EE-A6A7-274A28590C90

1

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)

2

lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)

3

dharris@gibsondunn.com
200 Park Avenue

4

New York, NY 10166
Telephone:    (212) 351-4000

5

ELIZABETH K. MCCLOSKEY, SBN 268184

6

emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746

7

abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600

8

San Francisco, CA 94111
Telephone:    (415) 393-8200

9

*Attorneys for Defendant Meta Platforms, Inc.*

10

11

## UNITED STATES DISTRICT COURT

12

## NORTHERN DISTRICT OF CALIFORNIA

13

## SAN FRANCISCO DIVISION

14

15

16

IN RE META PIXEL HEALTHCARE
LITIGATION

17

18

This Document Relates To:

19

All Actions

20

21

Case No. 3:22-cv-03580-WHO (VKD)

**DECLARATION OF ROBERT SHERMAN IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S MOTION FOR RECONSIDERATION OF THE COURT'S APRIL 10, 2025 DISCOVERY ORDER**

Hon. Virginia K. DeMarchi

22

23

24

25

26

27

28

## DOCUMENT FILED UNDER SEAL

Gibson, Dunn &
Crutcher LLP

I, Robert (Rob) Sherman, declare as follows:

1.     I am Vice President of Policy and Deputy Chief Privacy Officer at Meta Platforms, Inc. ("Meta"). I have been continuously employed by Meta since April 2012, and I have always held privacy-focused roles during my time at Meta. In particular, I have held my role as Deputy Chief Privacy Officer since February 2014. Over the course of my employment at Meta, I have acquired substantial personal knowledge of Meta's privacy policies, practices, and decisions.

2.     I make this declaration in support of Meta's Motion for Reconsideration of the Court's April 10, 2025 Discovery Order, filed on April 30, 2025. Unless otherwise stated, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently to them.

3.     I have been deeply involved in, and have substantial firsthand knowledge regarding, Meta's privacy decisions relevant to this litigation, including Meta's efforts to prevent receipt of potentially sensitive data via the Business Tools (such as filters and notifications) and changes in Meta policies concerning advertisement targeting. When I participate in making privacy-related decisions, I generally do so with the assistance of numerous other Meta employees.

4.     I have personal knowledge of proposals to change our behavioral advertising control from an opt-out to an opt-in. I can testify as to considerations taken into account when evaluating those proposals.

5.     I frequently advise Mr. Zuckerberg and work with him to address privacy-related issues. In general, Mr. Zuckerberg relies on other Meta personnel to advise him on Meta's privacy-related decisions.

I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on April 30, 2025, in Palo Alto, CA.

Signed by:

Robert M.

A377E98661BF422...

Robert Sherman

-1-